## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLOIRDA
## TALLAHASSEE DIVISION

**CONGRESSWOMAN CORRINE BROWN,**

      **Plaintiff,**

**vs.**                                                **Case No.:**

**KEN DETZNER, in his official capacity as**
**Secretary of State of the State of Florida,**
**THE FLORIDA SENATE and THE**
**FLORIDA HOUSE OF REPRESENTATIVES,**

      **Defendants.**

---

## VERIFIED COMPLAINT

## INTRODUCTION

This is a redistricting lawsuit.  This action is brought pursuant to §2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq. and the Fourteenth and Fifteenth Amendments to the United States Constitution pursuant to 42 U.S.C. §1983.   Plaintiff seeks declaratory and injunctive relief against continued use of any congressional redistricting plan that dilutes the voting strength of African Americans.  The drawing and redrawing of Congresswoman Brown's district, as required by the Florida Supreme Court's opinion, carries with it the very real and imminent possibility of Congresswoman Brown's constituents being deprived of the ability to elect a representative of their choice.  Her district – often criticized for its shape – is a minority access district – a district where minorities have the greatest chance of electing representatives of their choice.  The 5th Congressional District's contours trace the historic settlement of Black citizens along the St. Johns River.  Like the St. Johns River, Congresswoman Brown's district

extends from Jacksonville, Florida to just north of Orlando, Florida. Black citizens settled along the St. Johns River because redlining and restrictive covenants prevented Black citizens in North-Central Florida from living elsewhere. Thus, despite its shape, which roughly traces the shape of the St. Johns River, Florida's 5th Congressional District contains within it a distinct Black population with a shared history. The Florida Supreme Court has ordered the district redrawn (and has effectively redrawn) in a manner that would undo its historic configuration and disperse the community contained within it. *League of Women Voters of Florida v. Detzner*, 40 Fla. L. Weekly S432 (Fla. July 9, 2015) (requiring the Florida Legislature to redraw the district with an east-west configuration). To do so is improper and contrary to law.

## JURISDICTION

1.     Plaintiff's complaint arises under the United States Constitution and federal statutes. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4) and 42 U.S.C. §§ 1983 and 1988.

2.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

3.     Plaintiff requests a three-judge court under 28 U.S.C. §2284(a), as Plaintiff's action "challenge[s] the constitutionality of the apportionment of congressional districts" in Florida.

4.     Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

5.     Plaintiff, Congresswoman Corrine Brown, is an African American voter from Duval County. She is a United States Congresswoman who has been a strong advocate for the African American community.

2

6.     Defendant, Ken Detzner, is the Florida Secretary of State.  Plaintiffs sue Secretary Detzner in his official capacity only.   In his official capacity, Secretary Detzner serves as Florida's Chief Elections Officer, and custodian of the Florida Constitution.  *See, e.g.,* Fla. Stat. §§ 15.01, 97.012, 100.371.

7.     Defendant, the Florida Senate ("Senate"), is one house of the Legislature of the State of Florida.  Defendant Florida Senate is responsible for drawing reapportionment plans for the Senate that comply with the Florida Constitution.

8.     Defendant, the Florida House of Representatives ("House"), is the other house of the Legislature of the State of Florida.   Defendant Florida House of Representatives is responsible for drawing reapportionment plans for the Senate that comply with the Florida Constitution.

## FACTUAL BACKGROUND

### A.     Florida History

9.     Florida has a long, sad history of racial discrimination in voting.  *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992)

10.     Florida quite successfully evaded the intent of the Fifteenth Amendment for decades by enacting facially neutral laws, such as white primary laws, poll taxes, literacy tests, and other tactics to bleach the voter rolls, ensuring that black voters could not participate in the political process.

11.     Florida took other actions to exclude black voters, such as giving the governor the authority to appoint members of county commissions so that white voters would retain control even in majority-minority "Black Belt" counties.

12.     Likewise, the legislature provided for the appointment of school board members by the State Board of Public Instruction so as to avoid the possibility of electing African Americans.

13.     The state employed other methods to ensure that black children received substandard educations, and the ramifications of this are still felt today.

14.     In North-Central Florida, this history was especially vicious.  When the white primary was found to be unconstitutional in the 1940s, the city of Jacksonville switched to at-large elections to prevent the election of black candidates from predominantly black wards.

15.     African-Americans were faced with physical violence when trying to register or to vote, from Reconstruction up through the 1900s.

16.     The Ku Klux Klan was particularly strong in the region encompassed by Congressional District 5.

17.     After the passage of the Voting Rights Act in 1965, the effective enfranchisement of black voters was slow in coming.  Florida did not send its first African American member to Congress until court intervention in 1992.

18.     During that redistricting cycle, Democrats were in control of the House and Senate, but could not agree on a congressional plan.  In the hands of a federal court, two majority-black districts (Congressional District 3 in North-Central Florida and Congressional District 17 in South Florida) and one near-majority black district (Congressional District 23 in South Florida) were drawn, and Florida sent three African-American Congresspersons to Washington, D.C. for the first time in over 120 years.

19.     The state continues to erect electoral impediments for black voters even today.  In Duval County, a post-2000 election study found that as many as one out of five ballots cast by black voters did not count in that election, compared to one out of fourteen white ballots.

20.     Prior to the 2000 election, the state contracted with a private company to purge felons from the voter rolls, and black voters felt the disproportionate impact from these poorly-conducted purges.

21.     In 2011, the state of Florida moved to dramatically cut the early voting period, despite the fact that black voters were twice as likely to vote early when compared with white voters.

22.     Finally, the state of Florida implements the country's most stringent and racially discriminatory felony disenfranchisement laws.  In 2010, nearly one in four African Americans was disqualified from voting due to a felony conviction – more people are disenfranchised in Florida on these grounds than in any other state.

23.     African-American voters sill encounter numerous obstacles in the region encompassed by Congressional District 5 that detrimentally affect their ability to participate in the political process.   African Americans disproportionately face challenges in education, housing, and access to public services.  Economic disparities, including trouble finding jobs, disproportionately plague black voters in Congressional District 5.

**1.     History of Sanford**

24.     Sanford was established in the 1870s by Henry Shelton Sanford.  Sanford was a diplomat who bought the land to establish it as a transportation hub, only twenty years after African Americans established a neighboring town named Goldsboro.

25.     The town had post offices, business, and basic infrastructure that a town needs to function.  As Sanford developed, it eventually swallowed up Goldsboro as well as the other surrounding predominantly African American neighborhoods.  As the surrounding towns, including Goldsboro, merged with Sanford, minority groups did not enjoy the same commodities as their white counterpart.

26.     Sanford's motto "The Friendly City" is not an accurate representation of the city's inequitable treatment of its minority groups.  In 1947, baseball hall of famer Jackie Robinson and another black player, Johnny Wright, were shuttled from Sanford to Daytona Beach due to numerous death threats that they faced.  In 1997, the city of Sanford issued a public apology regarding the events that occurred with Robinson and proclaimed April 15, 1997 as Jackie Robinson Day.

27.     Over 65 years later, 17 year old Trayvon Martin was gunned down for wearing a hoodie in a gated community by the neighborhood's community watch coordinator.

28.     Beside these two infamous situations, Sanford also dealt with deep-seated issues regarding a sub-par education system, income inequalities, and inadequate housing for minorities.

**2.     History of Eatonville**

29.     Eatonville is one of the first self-governing all-black municipalities in the United States.

30.     The town is named after Josiah C. Eaton, one of a small group of white landowners who were willing to sell sufficient land to African Americans to incorporate as a black town.

31.     Noted African-American author Zora Neale Hurston grew up in Eatonville and featured it in many of her stories.  Hurston's novel *Their Eyes Were Watching God* presents an overview of the founding of the town through the eyes of Janie Crawford, the protagonist.

**B.     History of District 5**

32.     The creation of District 5 was the direct result of years of litigation to remedy decades of vote dilution experienced by African Americans that denied them the opportunity to elect representatives of their choice.

33.     After the 1990 decennial census, Florida was apportioned four additional Congressional seats, for a total of 23 members of Congress.  *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1078 (N.D. Fla. 1992).

34.     Prior to the 1992 election, Florida had not had a federal African American Congressperson since Josiah Thomas Walls in 1871.

35.     Nationally, prior to the passage of the Voting Rights Act in 1965, between the years of 1832-1965, there were only 28 elected African Americans.  From 1965-present, there were/are 103 elected African Americans.

36.     When the state legislature reached an impasse on drawing a new congressional plan, the Florida NAACP filed a Voting Rights Act lawsuit, asking a federal court to draw a majority-black district in North-Central Florida to remedy the vote dilution present in the state for decades.  The congressional district at stake in this litigation was the result of that lawsuit.

37.     In response to *Johnson v. Mortham*, 926 F. Supp. 1460 (N.D. Fla. 1996), the Jacksonville-to-Orlando configuration was created with almost unanimous support in 1996, when Democrats controlled the House of Representatives and the Governor's Office, and it has received bipartisan support ever since.

38.     After the 2000 census, Florida was again apportioned additional congressional seats, and the Florida NAACP again pushed the legislature to keep an African-American district in North-Central Florida.

39.     In a racial gerrymandering challenge to that 2002 drawing of what was, in this redistricting round, the benchmark for Congressional District 5, a federal court found that the district was a reasonably compact district that ensured black voting strength in the region was not diluted. *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1307-1309 (S.D. Fla. 2002).

40.     In 2010, Florida voters approved two new constitutional provisions governing redistricting in the state. Amendment 5, now codified as Article III, Section 20, of the Florida Constitution, established criteria for drawing congressional districts and Amendment 6, now codified as Article III, Section 21, established criteria for state legislative redistricting.

41.     After the decennial census data was received, the Florida NAACP worked to develop redistricting maps that would fully comply with the new amendments. With regard to Congressional District 5 (then numbered Congressional District 3), the Florida NAACP, informed by its members who live and struggle every day with conditions on the ground in North-Central Florida, drew the district in a way it believed necessary to avoid vote dilution and retrogression. That map was submitted to the legislature on November 1, 2011.

42.     The legislature conducted numerous hearings across the state. In late January, the legislature introduced plan H000C9047, the final proposed plan for Florida's congressional districts. Congressional District 5 in the legislatively-proposed plan followed the advice for the district presented through the NAACP's submission.

43.     Communities within the district that were accustomed to the benefits of having representation of their choice were not stranded in districts where they would not be able to elect

candidates of choice.  The ability of black voters in the region to elect their candidates of choice was not lessened.

44.     Following the enactment of the congressional redistricting plan in early 2012, the League of Women Voters of Florida, Common Cause, and several individual voters filed lawsuits challenging that congressional plan as violating the new state constitutional redistricting criteria. *See Romo v. Detzner*, 2014 WL 3797315 (Fla.Cir.Ct. July 10, 2014).

45.     Specifically, the state Plaintiffs alleged that Congressional District 5 unnecessarily packed black voters into the district and, as such, compliance with minority voting protections in the constitution did not justify the district's non-compact shape.

46.     On July 10, 2014, the trial court ruled that Congressional District 5 violated Art. III, Section 20 of the state constitution, and that it would need to be redrawn.  The Court declined to give the legislature any specific directions on how compliance should be achieved.

47.     After the trial court's instructions to the legislature to swiftly draw a remedial map, the legislature called a special session on August 7, 2014.

48.     Tallahassee NAACP president Dale Landry testified that taking the district out west instead of south was simply not an option.  He detailed how Congressional District 5 still served as a much needed voting rights remedy in North-Central Florida.

49.     He also offered the unique perspective of an African American resident of Tallahassee – one who personally understood that an East-West configuration of the district could not adequately replace a North-South configuration.

50.     NAACP leaders also testified to the shared history of their communities and the increased responsiveness of elected officials when their communities were included in a district in which black voters have the opportunity to elect their candidate of choice.

51.     After the special session, state Plaintiffs challenged the remedial map, arguing that the changes made to Congressional District 5 did not correct the constitutional problems identified by the trial court. The trial court disagreed, finding that "the remedial plan adequately addresses the constitutional deficiencies [] found in the Final Judgment."

52.     Recognizing that what the Plaintiffs were asking the court to do was to find that a North-South configuration of the district was unconstitutional, the trial court declined to do so. Instead that court found that there were "legitimate, non-partisan policy reasons for preferring a North-South configuration for this district over an East-West configuration, and the Plaintiffs have not offered convincing evidence that an East-West configuration is necessary in order to comply with tier-one and tier-two requirements of Article III, Section 20."

53.     On October 23, 2014, the Florida Supreme Court accepted jurisdiction and on July 9, 2015, the court ordered that District 5 be redrawn in an East-West configuration. *See League of Women Voters of Florida v. Detzner*, 40 Fla. L. Weekly S432 (Fla. July 9, 2015).

## COUNT I
## VOTING RIGHTS ACT OF 1965

54.     The allegations contained in paragraphs 1 through 53 above are re-alleged as if fully set forth herein.

55.     The election practices and procedure used to apportion Congressional District 5, violate the rights of African American voters in violation of Section 2 of the Voting Rights Act of 1965.

56.     Section 2 of the Voting Rights Act of 1965, 42 U.S.C. §1973, prohibits any electoral practice or procedure that "results in a denial or abridgment of the right of any citizen…to vote on account of race or color." 42 U.S.C. §1973(a).

57.     In the redistricting context, this is a prohibition against what is known as "minority vote dilution," and Section 2 is violated where, "Based on the totality of circumstances, it is shown that the political processes leading to nomination or election…are not equally open to participation by members of a [racial or language minority group] in that its members have less opportunity than other members of the electorate to participate in the political processes and to elect representatives of their choice." 42 U.S.C. §1973(b).

58.     The "totality of the circumstances" of redrawing the district will dilute African American voting strength, resulting in "less opportunity than other members of the electorate to participate in the political process and to elect the representatives of their choice." 42 U.S.C. §1973.

59.     Unless enjoined by this Court, Defendants will continue to violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, by enforcing standards, practices, or procedures that deny African American voters opportunity to participate effectively in the political process on an equal basis with other members of the electorate.

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment granting:

A.     A declaratory judgment that Defendants' actions violate the rights of Plaintiff as protected by Section 2 of the Voting Rights Act, 42 U.S.C. §1973 et seq.

B.     Preliminary and permanent injunctive relief requiring Defendants, their successors in office, agents, employees, attorneys and those persons acting in concert with them and/or at their discretion – to develop and implement redistricting plans that do not dilute African American voting strength for the United States House of Representatives, and also enjoining and forbidding the use of a redistricting plan that dilutes the voting strength of minorities;

C.      Reasonable attorney's fees and costs;

E.      An order of this Court retaining jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

E.      Such other and further relief as the Court may deem just and proper.

### COUNT II
### 42 U.S.C. §1983

60.      The allegations contained in paragraphs 1 through 53 above are re-alleged as if fully set forth herein.

61.      The East-West configuration of District 5 was adopted with an intent to, and it does, deny or abridge the right of African American citizens residing in District 5 to vote on account of their race and color.

62.      This intentional discrimination is in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment granting:

A.      A declaratory judgment that Defendants' actions violate the Fourteenth and Fifteenth Amendment to the United States Constitution and 42 U.S.C. §1983;

B.      Reasonable attorney's fees and costs;

C.      An order of this Court retaining jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

D.      Such other and further relief as the Court may deem just and proper.


Respectfully submitted,

_____
Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Amanda J. Woods, Esquire
Florida Bar No.: 112296
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:      (904) 356-9661
Facsimile:      (904) 356-9667
Email:          sheplaw@att.net
COUNSEL FOR PLAINTIFFS

swp[brown.corrine.complaint2]

## VERIFICATION

STATE OF FLORIDA     }
                             } ss.
COUNTY OF DUVAL    }

BEFORE ME, the undersigned authority, this day personally appeared **The Honorable Corrine Brown, Congresswoman**, who first being duly sworn, says she is the Plaintiff, in the above-sought cause; she has read the foregoing Complaint and Demand for Jury Trial; she has personal knowledge of the facts and matters set forth and alleged; and attests that each and all these facts are true and correct.

**Corrine Brown, Congresswoman**
**Fifth District of Florida**

The foregoing instrument was acknowledged before me this _11TH_ day of August, 2015 by **Corrine Brown, Congresswoman**, who is personally known to me and who did take an oath.

Signature of person taking oath
Notary Public, State of Florida

AMANDA WOODS
Commission # FF 211298
Expires March 17, 2019
Bonded Thru Troy Fain Insurance 800-385-7019

Name typed, printed or stamped

ldh[brown.corrine.verification]