## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLOIRDA
## TALLAHASSEE DIVISION

**CONGRESSWOMAN CORRINE BROWN,**

        **Plaintiff,**

**vs.**                                                   **Case No.: 4:15-cv-00398-WS-CAS**

**KEN DETZNER, in his official capacity as**
**Secretary of State of the State of Florida,**
**THE FLORIDA SENATE and THE**
**FLORIDA HOUSE OF REPRESENTATIVES,**

        **Defendants.**

_____

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
## AND MEMORANDUM OF LAW

      Plaintiff, by and through undersigned counsel, and pursuant to Fed.R.Civ.P. 65, hereby moves this Honorable Court to enter its order preliminarily enjoining Defendants, their agents, servants, employees, attorneys and all persons in active concert and participation with Defendants to develop and implement redistricting plans that do not violate Section 2 and 5 of the Voting Rights Act of 1965 and also enjoining and forbidding the use of redistricting plans that violate Section 2 and 5 of the Voting Rights Act of 1965. Pursuant to N.D. Fla. Loc. R. 7.1(D), Plaintiff respectfully submits that oral argument of one hour will assist the Court's resolution of these issues. Plaintiff hereby incorporates the Verified Complaint filed in this cause into this Motion and in further support thereof, Plaintiff states:

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

The court should issue a preliminary injunction because (1) Plaintiff is likely to succeed on the merits; (2) Plaintiff will suffer imminent and irreparable injury absent an injunction; (3) Plaintiff would suffer greater harm without injunctive relief than Defendant would suffer if the injunction is granted; and (4) the public interest would be served by enjoining Defendant's unconstitutional acts. *See International Cosmetics Exchange, Inc. v. Gapardis Health and Beauty, Inc.*, 303 F. 3d 1242, 1246 (11th Cir. 2002).

## I.   Likelihood of Success on the Merits

The election practices and procedure used to apportion Congressional District 5, violate the rights of African American voters in violation of Section 2 of the Voting Rights Act. Section 2 of the Voting Rights Act of 1965, 42 U.S.C. §1973, prohibits any electoral practice or procedure that "results in a denial or abridgment of the right of any citizen...to vote on account of race or color." 42 U.S.C. §1973(a). In the redistricting context, this is a prohibition against what is known as "minority vote dilution," and Section 2 is violated where, "Based on the totality of circumstances, it is shown that the political processes leading to nomination or election...are not equally open to participation by members of a [racial or language minority group] in that its members have less opportunity than other members of the electorate to participate in the political processes and to elect representatives of their choice." 42 U.S.C. §1973(b). Here the "totality of the circumstances" of redrawing District 5 will dilute African American voting strength, resulting in "less opportunity than other members of the electorate to participate in the political process and to elect the representatives of their choice." 42 U.S.C. §1973.

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the United States Supreme Court articulated the elements of a minority vote dilution claim, starting with the three threshold

2

conditions that begin the inquiry. *Id.* at 50.  The conditions are: (1) that the minority group be "sufficiently large and geographically compact to constitute a majority" in a single-member district; (2) that the minority group be "politically cohesive"; and (3) that the white majority vote "sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Id.* at 50-51.  After establishing the three *Gingles* pre-conditions, plaintiffs alleging vote dilution under Section 2 must then demonstrate that, under the totality of the circumstances, that minority voters have had less opportunity to elect candidates of their choice. *Id.* at 46. When determining whether vote dilution has occurred under the totality of the circumstances, courts generally are guided by the so-called "Senate Factors" or "Senate Report Factors" identified in a United States Senate report accompanying the reauthorization of the Voting Rights Act in 1982.

These factors include: (1) the extent of any history of official discrimination that touched the minority group members' rights to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting is racially polarized; (3) the extent to which potentially discriminatory practices or procedures have been used; (4) if there is a candidate slating process, whether minority candidates have been denied access to it; (5) the extent of any discrimination against minorities in education, employment and health, which might hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which minority group members have been elected to public office (proportionality); (8) whether there is a lack of responsiveness on the part of elected officials to the minority group's particularized needs; and (9) whether the policy supporting the use of the voting policy or practice is tenuous. *Id.* at 36-37

(citing S. Rep. No. 97-417, at 28-29 (1982), reprinted in 1982 U.S. Code Cong. & Admin. News 177).[1]

The first *Gingles* pre-condition examines both the potential for creating an additional majority-minority district and the reasonable compactness of the minority community involved. *Gingles*, 478 U.S. at 50. The Supreme Court has been unequivocal: "[t]o be sure, § 2 does not forbid the creation of a noncompact majority-minority district." *LULAC v. Perry*, 548 U.S. 399, 430 (2006) (quoting *Bush v. Vera*, 517 U.S. 952, 999 (1996) (Kennedy, J., concurring)). Under the *Gingles* geographical compactness analysis, "[t]he degree of geographical symmetry or attractiveness is…a desirable consideration for districting, but only to the extent it aids or facilitates the political process." *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1466 (M.D. Ala. 1988). Rather than just the shape of the district or untethered mathematical measures, the characteristics of the minority community itself – the shared interests and needs— are more determinative in establishing whether the minority group is geographically compact. *DeGrandy v. Wetherell*, 794 F. Supp. at 1085. Indeed, the benchmark version of Congressional District 5 was substantially less compact than it is now, and a federal court found that district to be "reasonably compact" and complying "to a reasonable extent with traditional redistricting criteria." *Martinez*, 234 F. Supp. 2d at 1301.

The second and third prongs of the *Gingles* analysis examine racially polarized voting— whether minority voters are cohesive as a bloc and whether white majority voters, as a bloc, usually oppose the candidate of choice of minority voters. No party in the Florida Supreme Court contested the proposition that the second prong of *Gingles* is satisfied and all the experts

---

[1] These factors are addressed in Plaintiff's Verified Complaint which is incorporated into this Motion.

who examined racially polarized voting concluded that black voters are politically cohesive. *See*

*League of Women Voters of Florida v. Detzner*, 40 Fla. L. Weekly S432 (Fla. July 9, 2015).

As far as the third prong, Florida NAACP expert Dr. Richard Engstrom demonstrated in his

report that voting in the prior Congressional District 3 and current Congressional District 5 is

racially polarized. *See* Dr. Engstrom's racial polarization analysis attached hereto as Exhibit A.

Based on Dr. Engstrom's examination, another unavoidable conclusion is that white voters in

North-Central Florida do generally tend to vote as a block to defeat the minority candidate of

choice. *Id.* The success of incumbent Congresswoman Corrine Brown does not negate the

potential for vote dilution. She is the only African American candidate to have ever won a

Congressional seat in the area. Her success, though laudable, is due to the "special effects" of

incumbency rather than an end to racial voting patterns in the region and Dr. Engstrom's study

confirms this. *Id.* Thus, Defendant's actions violate Section 2 of the Voting Rights Act of 1965.

**II.    Irreparable Injury**

    Where, as here, success on the merits is extremely likely, a lesser showing of irreparable

harm is required. *Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1203 (S.D.

Fla. 2007) ("The determination of whether there is a substantial likelihood of success on the

merits 'does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be

employed, balancing the hardships associated with the issuance or denial of a preliminary

injunction with the degree of likelihood of success on the merits.'") (citing *Fla. Med. Ass'n, Inc.

v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979)).

    Plaintiff faces actual and impending irreparable harm, as the Florida Supreme Court has

ordered the Florida Legislature to redraw the congressional map in question. Unless enjoined by

this Court, Defendants will continue to violate the Voting Rights Act of 1965, 42 U.S.C. § 1973,

by enforcing standards, practices, or procedures that deny African American voters opportunity to participate effectively in the political process on an equal basis with other members of the electorate.  Further, the right to vote is entitled to special constitutional protection as the right to the exercise of the franchise "in a free and unimpaired manner is preservation of other basic civil rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  The Supreme Court has long recognized that the right to vote is "fundamental," *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009), because it is "preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (noting that "the right of qualified voters…to cast their votes effectively…rank[s] among our most precious freedoms").  The Supreme Court also has made clear that "the right of suffrage can be denied by [means of] dilution…just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555.  Adhering to these precepts, courts have widely recognized that an infringement upon the right to vote (including by its dilution) constitutes an irreparable injury. *See, e.g., Chatman v. Spillers*, 44 F.3d 923, 924 (11th Cir. 1995); *United States v. Dallas County Com'n*, 791 F.2d 831, 831-33 (11th Cir. 1986); *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986).  Moreover, no amount of monetary compensation can undo these harms. *See, e.g., Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("An injury is irreparable if it cannot be undone through monetary remedies.").

### III.    Balance of Harms

Plaintiffs suffer irreparable harm from the clear violation of their rights under the Voting Rights Act of 1965.  The balance of the equities undoubtedly weighs in favor of a preliminary injunction. Plaintiffs are seeking to protect their right to suffrage—"one of [their] most fundamental rights." *Bartlett*, 556 U.S. at 10. As the Supreme Court has explained, "[n]o right is

more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Reynolds*, 377 U.S. at 555 ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."). Defendants are not at risk of an injunction causing it harm in excess of the irreparable harm suffered by Plaintiffs. *See Ga. Latino Alliance for Human Rights v. Deal*, 793 F. Supp. 2d 1317, 1340 (N.D. Ga. 2011) ("[B]y merely preserving the status quo, [the] injunction will impose no new and onerous burdens on the Defendants."), *aff'd in part and rev'd in part on other grounds*, 691 F.3d 1250 (11th Cir. 2012). Accordingly, the balance of harms favors the Plaintiff being granted an injunction.

## IV.   **Public Interest**

The public interest is clearly served by an injunction protecting rights secured under the Voting Rights Act of 1965. "[T]he right of suffrage is a fundamental matter in a free and democratic society," *Reynolds*, 377 U.S. at 561-62, and "Section 2, as amended, represents 'a strong national mandate for the immediate removal of all impediments, intended or not, to equal participation in the election process.'" *Dillard*, 640 F. Supp. at 1363 (quoting *Harris*, 593 F. Supp. at 315). Further, there is no public interest in allowing an illegal practice to continue. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d, 1261, 1273 (11th Cir. 2006); *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981). Thus, entry of the relief sought by Plaintiff will serve the public interest.

## V.   **Bond**

No bond should be required.  Defendants would not suffer any harm from the requested injunction that could be assuaged by recovery from a monetary bond.

## CONCLUSION

Plaintiff is likely to succeed on the merits, and Defendants' actions threaten Plaintiffs with imminent irreparable harm.  The balance of harms overwhelmingly favors the issuance of the requested injunction, as does the public interest.  Accordingly, based on Plaintiff's Verified Complaint as well as the above memorandum of law, Plaintiff's motion for preliminary injunction should be granted.

Respectfully submitted,

Wm. J. Sheppard, Esquire
Florida Bar No.:  109154
Elizabeth L. White, Esquire
Florida Bar No.:  314560
Matthew R. Kachergus, Esquire
Florida Bar No.:  503282
Bryan E. DeMaggio, Esquire
Florida Bar No.:  055712
Amanda J. Woods, Esquire
Florida Bar No.:  112296
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:     (904) 356-9661
Facsimile:     (904) 356-9667
Email:         sheplaw@att.net
COUNSEL FOR PLAINTIFFS

Swp[brown.corrine.preliminary.inj.mot]