UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CONGRESSWOMAN CORRINE BROWN,

      Plaintiff,

v.

KEN DETZNER, in his official capacity as
Secretary of State of the State of Florida,
THE FLORIDA SENATE, and THE FLORIDA
HOUSE OF REPRESENTATIVES,

      Defendants.

CASE NO. 4:15-cv-00398-MW-CAS

**LEAGUE OF WOMEN VOTERS OF FLORIDA, COMMON CAUSE, DEIRDRE MACNAB, LAVONNE GRAYSON, GEORGE OLIVER III, AND ANGELA DEMONBREUN'S MOTION TO INTERVENE AS DEFENDANTS AND INCORPORATED MEMORANDUM OF LAW**

The League of Women Voters of Florida ("LWVF"), Common Cause, Deirdre Macnab ("Macnab"), LaVonne Grayson ("Grayson"), George Oliver III ("Oliver"), and Angela DeMonbreun ("DeMonbreun") (collectively, "Proposed Intervenors") request leave to intervene as defendants as of right pursuant to Rule 24(a)(2), Federal Rules of Civil Procedure, or alternatively to intervene permissively pursuant to Rule 24(b)(1), Federal Rules of Civil Procedure. Proposed Intervenors attach as **Exhibit 1** their proposed answer setting forth the claims and defenses for which intervention is sought. As grounds for their request, Proposed Intervenors state:

## I.    INTRODUCTION AND BACKGROUND

In 2010, the citizens of Florida overwhelmingly approved Amendments 5 and 6 to the Florida Constitution, known together as the "FairDistricts Amendments." The

FairDistricts Amendments require the Florida House of Representatives and Florida Senate (collectively, the "Legislature") to draw congressional and state legislative redistricting plans and individual districts (1) without "the intent to favor or disfavor a political party or an incumbent," (2) without "the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice," and (3) in compliance with the tier-two requirements of equal population, compactness, and respect for political and geographical boundaries. *See* FLA. CONST. art. III §§ 20, 21. By imposing these constitutional restrictions on redistricting, the voters of Florida "sought to eliminate the age-old practice of partisan political gerrymandering" and "restore the core principle of republican government, namely, that the voters should choose their representatives, not the other way around." *League of Women Voters of Fla. v. Detzner*, ___ So. 3d ____, 2015 WL 4130852, at *1 (Fla. July 9, 2015) ("*Apportionment VII*") (internal quotation marks and citation omitted).

In 2012, the Legislature enacted a North-South version of District 5 that was "visually not compact" and "bizarrely shaped" and did "not follow traditional political boundaries as it [wound] from Jacksonville to Orlando." *Id.* at *65. District 5 contained a series of hooks and tentacles, including a "finger-like appendage jutting into District 7 and Seminole County," *id.* at *67, and at one point "narrow[ed] to the width of Highway 17," *id.* at *65. On July 10, 2014, a Florida trial court found that this initial version of District 5 violated the requirements of Article III, Section 20 of the Florida Constitution. *Id.* at *74. In so holding, the trial court specifically ruled that Section 2 of the Voting

2

Rights Act ("VRA") did not justify the configuration of District 5.  *See id.* at \*65-\*66 (holding that the version of District 5 in the 2012 plan did not meet preconditions for a vote dilution claim under *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)).[1]

On August 11, 2014, the Legislature enacted a revised version of District 5 that maintained its overall North-South configuration, but eliminated the appendage into Seminole County.  *See id.* at \*34.  After an appeal from the trial court ruling approving the revised plan, the Florida Supreme Court ruled that the revised plan did not correct the constitutional defects in District 5.   Because the Legislature did not carry its burden of "prov[ing] that the North-South configuration is necessary to avoid diminishing the ability of black voters to elect a candidate of their choice," the Florida Supreme Court ordered that "District 5 must be drawn in an East-West manner" that is more compact and divides fewer counties while preserving minority voting strength.  *Id.* at \*35.

In response to the Florida Supreme Court's ruling in *Apportionment VII*, the Legislature convened a special session.   During the special session, the Legislature considered remedial plans with East-West versions of District 5, but ultimately failed to enact a remedial plan.  Remedial proceedings are ongoing in the state court litigation, and the ultimate features of the congressional districts remain to be determined.

Plaintiff, the twelve-term incumbent in District 5, asks this Court to revisit the Florida courts' ruling on the inapplicability of Section 2 of the VRA.  Although Plaintiff does not clearly identify her requested relief, she refers to the path of the St. Johns River

---

[1] The quoted language in this paragraph comes from the trial court's final judgment, which is appended to the *Apportionment VII* opinion.  *See id.* at \*55-\*78.

3

and communities in Jacksonville, Orlando, and Sanford, (Doc. 1 at 1-2, 5-7), and submits a portion of an expert report filed in the state court case to defend the 2012 version of District 5, (Doc. 1-1, Doc. 2 at 5).  Accordingly, Plaintiff appears to seek a return to a North-South District 5 that includes an appendage into Seminole County.

## II.    PROPOSED INTERVENORS

LWVF is a nonpartisan organization founded in 1939 to promote active citizenship through informed and engaged participation in government.  LWVF has thousands of members and supporters statewide, many of whom are registered voters.  Common Cause is a nonpartisan organization dedicated to helping citizens make their voices heard in the political process and hold their elected leaders accountable to the public interest.  Common Cause has nearly 30,000 members in Florida, many of whom are registered voters.  LWVF and Common Cause have sought redistricting reform in Florida for decades and were among the primary proponents of the FairDistricts Amendments, and their members have been actively engaged in Florida's redistricting process.  LWVF and Common Cause filed and pursued the litigation that resulted in the invalidation of Florida's congressional plan.  In the state court case, LWVF and Common Cause advocated for the East-West configuration of District 5 that Plaintiff now challenges on VRA grounds.  *See Apportionment VII*, 2015 WL 4130852, at *34-*39. The membership of LWVF and Common Cause includes voters residing in the North-South version of District 5 in the 2012 and 2014 plans, the East-West versions of District 5 in proposals submitted by the plaintiffs in the state court litigation and drawn by the Legislature in the August 2015 special session, and surrounding districts.

4

Macnab is a registered voter residing in Winter Park in Orange County, Florida and is the immediate past president of LWVF.  Grayson is an African-American registered voter residing in Seminole County, Florida and is the president of the League of Women Voters of Seminole County.  Macnab and Grayson reside within District 7 in the 2012 and 2014 plans.  Because District 7 borders District 5, the relief requested by Plaintiff directly impacts voters within District 7, including Macnab and Grayson.

Oliver is an African-American registered voter residing in Ocoee in Orange County, Florida.  Oliver resides within District 10 in the 2012 plan and District 5 in the 2014 plan.  African Americans lacked the ability to elect candidates of their choice in District 10 in the 2012 plan because of the configuration of District 5 for which Plaintiff is advocating in this case.  East-West versions of District 5 in proposed plans submitted by the plaintiffs in the state court litigation and drawn by the Legislature in special session allow neighboring District 10 to be drawn as a coalition district in which African Americans and Hispanics can join together to elect candidates of their choice.

DeMonbreun is a registered voter residing in Jacksonville in Duval County, Florida and is the president of the League of Women Voters of Jacksonville. DeMonbreun resides within the North-South version of District 5 in the 2012 and 2014 plans and the East-West versions of District 5 in proposals submitted by the plaintiffs in the state court litigation and drawn by the Legislature in special session.

### III.    ARGUMENT

A party is entitled to intervene as of right if there is a "timely motion" and the movant "claims an interest relating to the property or transaction that is the subject of the

action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. P. 24(a)(2).  If the standard for intervention as of right is not satisfied, the Court may nevertheless allow a party to intervene permissively if there is a "timely motion" and the movant "has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1)(B).

In cases implicating voting rights, advocacy organizations such as LWVF and Common Cause and individual voters have routinely been allowed to intervene.  *See, e.g.*, *Clark v. Putnam Cnty.*, 168 F.3d 458, 462 (11th Cir. 1999) (finding that individual voters could intervene as of right in county redistricting challenge and listing voting rights cases allowing intervention); *Kobach v. U.S. Election Assistance Comm'n*, 2013 WL 6511874 (D. Kan. Dec. 12, 2013) (allowing Common Cause and chapters of League of Women Voters to intervene permissively in voting rights case); *Texas v. Holder*, 63 F. Supp. 3d 54, 59 & n.4 (D.D.C. 2014) (noting that League of Women Voters of Texas, other organizations, and voters had been granted leave to intervene in VRA case); *Florida v. United States*, 885 F. Supp. 2d 299, 360 (D.D.C. 2012) (noting that LWVF, other organizations, and voters had been granted leave to intervene permissively in VRA case); *Johnson v. Mortham*, 915 F. Supp. 1529, 1535-39 (N.D. Fla. 1995) (allowing individual voters to intervene as of right and Florida State Conference of NAACP Branches to intervene permissively in redistricting case).  Indeed, in a prior lawsuit filed by Plaintiff asserting a challenge to Amendment 6 under the Elections Clause of the U.S. Constitution, the court permitted several voting rights groups and individual voters to

intervene.  *See* Order on Motions to Intervene, *Diaz-Balart v. Scott*, Case No. 10-23968-CIV-UNGARO (S.D. Fla. March 18, 2011) (Doc. 54) (granting motions to intervene by American Civil Liberties Union of Florida, Florida State Conference of NAACP Branches, Democracia Ahora, and individual voters).  As in the foregoing decisions, Proposed Intervenors readily meet the test for intervention.

### A.  <u>The Request to Intervene Is "Timely"</u>

Although no time limit is specified in Rule 24, "[t]he requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice."  *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989) (quoting *McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1074 (5th Cir. 1970)).  Courts, then, have focused on prejudice in determining whether to permit intervention.  *Id.*  This case is in its infancy.  No party has yet responded to Plaintiff's complaint and motion for preliminary injunction, no hearings have yet occurred, and no rulings have been made to date.  Accordingly, no party can reasonably claim prejudice as a result of the requested intervention.

### B.  <u>This Court Should Permit Proposed Intervenors to Intervene as of Right</u>

#### (1) The Relief Requested in this Action will Impair or Impede Proposed Intervenors' Interest in their Effective Right to Vote

Proposed Intervenors' effective right to vote is directly at stake in Plaintiff's request for a return to a North-South District 5.  The right to vote is among the most important liberties in our democratic system.  *See Burson v. Freeman*, 504 U.S. 191, 214 (1992) (Kennedy, J., concurring) ("Voting is one of the most fundamental and cherished liberties in our democratic system of government."); *Reynolds v. Sims*, 377 U.S. 533, 555

(1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."); *In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So. 3d 597, 600 (Fla. 2012) ("*Apportionment I*") ("[T]he right to elect representatives—and the process by which we do so—is the very bedrock of our democracy.").

The North-South version of District 5 is a vestige of Florida's partisan past that is grossly non-compact, divides every county that it touches, destroys the tier-two compliance of surrounding districts, and marginalizes minority voters by concentrating them in a single district, rather than the two minority opportunity districts that the East-West version of District 5 allows to be created. The benefits of overpacking African-American voters into a single district inure directly to the Republican Party and Plaintiff, as the incumbent in District 5. The North-South configuration was, in short, "a key component of the Legislature's unconstitutional intent in the drawing of the congressional redistricting plan." *Apportionment VII*, 2015 WL 4130852, at *35.

The relief requested in this action would eviscerate the FairDistricts Amendments, overturn a prior ruling that Section 2 of the VRA does not apply, and deprive Proposed Intervenors of years of hard-fought redistricting reform. LWVF and Common Cause supported the FairDistricts Amendments at the ballot box, served as lead plaintiffs in the state court litigation that Plaintiff now seeks to revisit, and advocated for the proposed East-West configuration of District 5 at issue in this case. Members of LWVF and Common Cause, along with Macnab, Grayson, Oliver, and DeMonbreun, are residents of District 5 or its surrounding districts who stand to have their right to vote diminished by

the relief sought by Plaintiff.   Thus, Proposed Intervenors "claim[] an interest" that "relat[es] to the . . . transaction that is the subject of the action," and disposition of this action may "impair or impede" that interest.  FED. R. CIV. P. 24(a)(2).

### (2) The Existing Parties Will Not Adequately Represent the Interests of Proposed Intervenors

The Eleventh Circuit has emphasized that the movant's burden in showing inadequacy of representation is "minimal" and requires only that existing parties' representation of the movant's interests "may be inadequate."  *Clark*, 168 F.3d at 460 (quoting *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n.10 (1972)); *see also Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist*., 983 F.2d 211, 216 (11th Cir. 1993) (same).   "Any doubt concerning the propriety of allowing intervention should be resolved in favor of the proposed intervenors because it allows the court to resolve all related disputes in a single action."  *Fed. Sav.*, 983 F.2d at 216.

### (a) The Legislature

The Eleventh Circuit has explained that "[b]ecause elected officials in a majority-rule democracy may represent only part of the electorate (for instance, members of their party), 'it is normal practice in reapportionment controversies to allow intervention of voters . . . supporting a position that could theoretically be adequately represented by public officials.' "  *Clark*, 168 F.3d at 462 n.3 (quoting *Nash v. Blunt*, 140 F.R.D. 400, 402 (W.D. Mo. 1992), *summarily aff'd. sub nom. African Am. Voting Rights Legal Defense Fund, Inc. v. Blunt*, 507 U.S. 1015 (1993)); *see also Georgia v. U.S. Army Corps of Engineers,* 302 F.3d 1242, 1259 (11th Cir. 2002) (reversing denial of intervention as of right where government and private intervenors sought identical outcome of litigation,

but governmental entity could not be said to represent proposed intervenors' motivational interests and share all of its positions).  This principle holds particularly true here.

The Legislature has vigorously – and unsuccessfully – resisted the FairDistricts Amendments at every opportunity.   Its efforts to defeat the FairDistricts Amendments include, among other things: (1) challenges to the ballot initiative for the Amendments, (2) an attempt to offer a misleading financial impact statement to undermine public support for the Amendments, (3) an attempt to offer a "poison pill" counter-amendment to confuse voters into diluting the effect of the Amendments, and (4) federal litigation to invalidate Amendment 6 under the Elections Clause of the U.S. Constitution.  *See Advisory Op. to Att'y Gen. re Standards for Establishing Legislative Dist. Boundaries*, 2 So. 3d 161 (Fla. 2009) (rejecting financial impact statement); *Advisory Op. to Att'y Gen. re Standards for Establishing Legislative Dist. Boundaries*, 2 So. 3d 175 (Fla. 2009) (rejecting challenge to ballot initiative); *Roberts v. Brown*, 43 So. 3d 673 (Fla. 2010) (rejecting challenge to ballot initiative); *Fla. Dep't of State v. Fla. State Conf. of NAACP Branches*, 43 So. 3d 662 (Fla. 2010) (rejecting counter-amendment); *Brown v. Sec'y of State of Fla.*, 668 F.3d 1271 (11th Cir. 2012) (rejecting Elections Clause challenge).

Plaintiff and the Legislature have often been on the *same side* of these opposition efforts, raising joint challenges to the FairDistricts Amendments.  *See Roberts*, 43 So. 3d at 676; *Brown*, 668 F.3d at 1272.  It was, after all, common political interest that led a Republican Legislature and particular Democratic politicians to jointly support District 5's predecessor.  *See Johnson v. Mortham*, 926 F. Supp. 1460, 1490 (N.D. Fla. 1996) (rejecting claim that District 5's predecessor was required to be majority-minority,

holding that "the record belies th[e] view" that the Legislature sought to "further the state's redistricting interest of complying with the Voting Rights Act," and explaining that "the Republicans' desire to minimize Democratic voting strength shows just how politics made strange bedfellows . . ., as Republicans joined with African–American Democrats in an attempt by each group to enhance their own political power").

In state court litigation, the Legislature unsuccessfully raised the very same claim that Plaintiff asserts here – *i.e.*, that Section 2 of the VRA requires District 5 to be drawn in a North-South configuration that reaches into Seminole County.  *See Apportionment VII*, 2015 WL 4130852, at *65-*67.  The trial court rejected that argument, finding that it was legally unfounded and a pretext for partisan gerrymandering.  *Id.*  Accordingly, the Legislature can hardly be counted on to suddenly oppose its former comrade-in-arms, vigorously defend against the same challenge it previously raised, and serve as a reliable guardian the FairDistricts Amendments and Proposed Intervenors' interests.[2]

### (b) The Secretary

The Secretary of State (the "Secretary") is not responsible for drawing Florida's congressional or state legislative districts or for enforcing the FairDistricts Amendments. The Secretary merely conducts and administers elections based on the districts drawn by the Legislature.  *Compare* FLA. CONST. art. III §§ 16, 20, 21 (specifying constraints on

---

[2] The Chairman of the Senate Committee on Reapportionment publicly compared the Legislature's position as a defendant in this case to "being thrown in the briar patch" because the Legislature is "being sued . . . on the same basis that . . . [it] argued in favor of . . . in the state court process."  *See* The Florida Channel, 8/19/15 Press Availability with Senate Reapportionment Comm. Chair Bill Galvano, at 1:45-1:58, *available at* http://thefloridachannel.org/videos/81915-press-availability-with-senate-reapportionment -committee-chair-bill-galvano/ (last accessed Aug. 27, 2015).

Legislature in drawing districts) *with* FLA. STAT. § 97.012 (providing that Secretary "is the chief election officer of the state" and outlining his responsibilities). (*See also* **Ex. 2** ¶ 19 (state court answer denying that Secretary "implements or enforces legislative districts set by joint resolution")). Fundamentally, the Secretary must act in the interest of *all* of Florida's voters in carrying out his duties as chief election officer. This obligation "to represent everyone" – including Plaintiff and persons who support her – "in itself indicates that [the Secretary] represent[s] interests adverse to the proposed interveners," and the Secretary "cannot adequately represent the proposed defendants while simultaneously representing" the interests of others. *Clark*, 168 F.3d at 461.

The Secretary is also a political official appointed by Florida's Republican governor. In the state court litigation, the Secretary often opposed challenges to the congressional plan on the same grounds as the Legislature. (*See, e.g.*, **Exs. 3-4** (joinders in Legislature's motions to dismiss and response to motion for summary judgment); **Ex. 5** (answer denying entitlement to relief); **Ex. 6** (disclosure that Secretary would rely upon Legislature's trial witnesses and exhibits)). In doing so, the Secretary joined in and thus advocated precisely the same argument under Section 2 of the VRA that Plaintiff attempts to advance in this case. (*See* **Ex. 7** at 48-53 (Legislature's argument under Section 2 of the VRA on summary judgment); **Ex. 4** at 1 (joinder by Secretary)). As with the Legislature, the Secretary cannot be relied upon to protect Proposed Intervenors' interests when he asserted the same claim as Plaintiff in prior litigation.

In the state court proceedings, the Secretary also repeatedly emphasized the need to avoid disruption of election procedures and resisted deviating from pre-election

deadlines, even at the risk of conducting unconstitutional elections.  (*See, e.g.*, **Exs. 8-9** (objecting to continuances based on purported disruption of election process)).  Although courts have repeatedly held that pre-election deadlines must give way to constitutional and statutory mandates,[3] the Secretary refused to entertain any such adjustments.  (*See, e.g.*, **Ex. 8** at 6-7 (arguing that moving pre-election deadlines was not feasible); **Ex. 9** at 6 (same); **Ex. 10** at 3-4 (order noting that Secretary failed to offer "a proposed schedule with specific dates that would allow for a special election prior to the end of 2014" as instructed by court)).  The Secretary has, therefore, shown an unwavering willingness to err on the side of administrative convenience when additional cost or burden might permit elections in districts that comply with the FairDistricts Amendments.

As a result of his interest in maintaining existing election procedures, the Secretary may compromise a vigorous defense of an East-West version of District 5, for example, by acceding to a settlement to preserve pre-election deadlines or by declining to seek reconsideration, rehearing, appellate review, or other relief to avoid inconvenience in administering impending elections.  Consistent with the Secretary's obligations to the public, the Secretary might also seek to settle the case or limit its litigation activities to minimize the expenditure of taxpayer funds.  *See Clark*, 168 F.3d at 461-62 (noting that public officials have "an interest distinct from the proposed interveners'" because of their "duty to consider the expense of defending the [county redistricting] plan out of county

---

[3] *See, e.g.*, *Larios v. Cox*, 305 F. Supp. 2d 1335, 1342-43 (N.D. Ga. 2004) (recognizing that courts have "broad equitable power to delay certain aspects of the electoral process," such as the candidate qualifying period, "if [it] proves necessary to ensure constitutional elections"); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 777 (9th Cir. 1990) (directing trial court to impose new election schedule in light of delay during appeal).

coffers"). For Proposed Intervenors, by contrast, the effective right to vote – undiluted by a North-South District 5 – is paramount, even if state officials must alter pre-election deadlines, incur increased expense, or otherwise assume additional burdens to ensure elections in districts that comply with the FairDistricts Amendments.

Because of this divergence of incentives and objectives, the Secretary cannot be relied upon to defend against Plaintiff's challenges to the East-West version of District 5. *See id.* at 462 (finding that intervention as of right was proper where government officials had "[a] greater willingness to compromise," whereas "the proposed interveners intend to pursue their favored result with greater zeal"). Therefore, none of the defendants adequately represents the important interests at stake in this litigation, and Proposed Intervenors should be permitted to intervene as of right under Rule 24(a)(2).

### C. This Court Should Allow Proposed Intervenors to Intervene Permissively

The test for permissive intervention is whether the movant "has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1)(B). If allowed to intervene, Proposed Intervenors will vigorously defend their interests by arguing that this Court should not revisit the *Apportionment VII* decision or find a violation of Section 2 of the VRA – which precisely overlaps with the issue being litigated between Plaintiff, the Legislature, and the Secretary in the main action.

LWVF and Common Cause will also offer unique knowledge and perspective as voting rights groups long committed to ending the practice of partisan gerrymandering, advocates of the FairDistricts Amendments, and lead litigants in the very state court action that Plaintiff seeks to revisit. Macnab, Grayson, Oliver, and DeMonbreun will

14

likewise add perspective not represented by the existing parties as registered voters who stand to be injured by the requested return to a North-South District 5.  *See Kobach*, 2013 WL 6511874, at *4 (allowing Common Cause, chapters of League of Women Voters, and individuals to intervene permissively in voting rights case because of their "experience, views, and expertise" as "individuals or entities with a special interest in the administration of election laws") (internal quotation marks omitted).

In deciding whether to allow permissive intervention, this Court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  Because this action was filed little more than two weeks ago and no significant actions have been taken, the requested intervention will not unduly delay or prejudice any party.  Accordingly, if this Court does not find that intervention as a matter of right is warranted, it should nevertheless allow Proposed Intervenors to intervene permissively pursuant to Rule 24(b)(1)(B).

## IV.    CONCLUSION

For the foregoing reasons, Proposed Intervenors request that this Court (1) grant them leave to intervene as of right or, alternatively, to intervene permissively as defendants in this action; (2) deem the proposed answer attached as **Exhibit 1** to be filed; (3) allow Proposed Intervenors to file a response to Plaintiff's Motion for Preliminary Injunction (Doc. 2) within 14 days of the order allowing intervention; and (4) grant such other and further relief as is just and proper.

15

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

On August 19 and 20, 2015, undersigned counsel for Proposed Intervenors conferred with counsel for Plaintiff, counsel for the Secretary, counsel for the House, and counsel for the Senate regarding the relief sought in this motion. At that time, counsel for Plaintiff stated that Plaintiff opposes the request for intervention. Counsel for the Secretary, counsel for the House, and counsel for the Senate stated that their respective clients take no position on the request for intervention.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 28, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ David B. King
David B. King
Florida Bar No.: 0093426
Thomas A. Zehnder
Florida Bar No.: 0063274
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
dking@kbzwlaw.com
tzehnder@kbzwlaw.com

*Counsel for Proposed Intervenors,*
*The League of Women Voters of Florida,*
*Common Cause, Deirdre Macnab, LaVonne*
*Grayson, George Oliver III, and Angela*
*DeMonbreun*