# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CONGRESSWOMAN CORRINE BROWN,
JOHNNY BROWN, THEODORE BROWN,
MARY LAWSON BROWN, MARY L. GEORGE,
CRYSTAL R. BROWN, JUSTIN CAMPBELL,          Case No.: 4:15-cv-00398-MW-CAS
FERRILL HILL, MARGIE KELLY CODY,
JOSEPHINE HALL, SANDRA JACKSON,
MAMIE JACKSON, WILFRED W. REDDICK,
JR., SHANTEZ ROBINSON, CARRIE DAVIS,
JEAN REDDICK, ALVIN SHEPARD, CURTIS
WALKER, PHYLLIS JOHNSON, JEROME
BROWN, JOANN M. BROWN, HAZEL D. GILLIS,
ANTONIA G. BRYANT, EULIE B. JOHNSON,
LAVONNE P. MITCHELL, DARRYL MACK,
ANTHONY MACK, DORETHA MACK, CONSTANCE
S. HALL, SHAKUR ALI, MICHAEL ASHLEY,
LAWRENCE AVERBECK, ANITA BAILEY, LEON
BERRIER, DANIEL L. COLE, JASMINE CROMWELL,
TRICIA DUNLAP, LA' DAISHA EVANS, JAMES
FREEMAN, RUSSELL T. GASKIN, CLARETHA S.
HICKS, TEVIN HENDERSON, MITZI HUTCHINSON,
ANGELIQUE MATTHEWS, ANNA MCLAUGHLIN,
EDWIN MERRITT, LILLIE P. POWELL, TAURICE
RICKS, DEVIN ROBERTS, CARY P. ROBINSON,
ALEXANDRA SAFFICE, SHAKA SHABAZZ, FELICIA
SMITH, RICHARD ALAN SPAULDING, WILLIE
THOMAS, TEAONNDA THOMPSON, RODERIC
TURNER, MARY S. ADAMS, JOY GREGORY, WILBERT
GREGORY, CARLOTTA L. GUYTON, LUELLA
MCQUEEN, DOROTHY M. OLIVER, JACOBY
PITTMAN, BARON RIVERS, KIMBERLY RIVERS,
ANMENIA SHAHAB, NEEMA YA NATHIERI,
MELVIN A. PHILPOT, VELMA WILLIAMS,
BEVERLYE COLSON NEAL, TYRONE FIELDS,
GLORIA R. GREEN, MAXINE S. HIXON, REBECCA
JOHNSON, NEVA SPANN-KIRKLAND, SUSIE L.
JOHNSON HARRIS, EDDIE L. JAMES, BENTLEY
M. CAREY, DWYCE L. ROSS, KENNETH WALKER,
TIFFANY WARE, VANESSA WILLIAMS, CHARITA FINCH,
LAVENIA MAY, DR. ROLOUS A. FRAZIER, JR., DOROTHY
FLUITT, SHEILA B. SMITH, CLARISE REDDICK, DAISY
BALES, CONSTANCE BANGO, DELORIS R. SHEPHERD,

1

VERNON MCQUEEN, HERBERT WILLIAMS JR.,
ROD ZEIGLER, ROYCE FLAGLER, MABLE BUTLER,
JEAN CAMPBELL, WILLIE CAMPBELL, ELLA MAE
CAMPBELL, KALEIGH CAMPBELL, MIA CAMPBELL,
WALTER DULES WILLIAMS, LULA COOKS WILLIAMS,
ROBERTA WILLIAMS, DANIEL J. WILLIAMS, IDA M.
CARSON, JUANITA SANDERS, CHERYLL DANIELS, EDDIE
A. BENN, RICH SLEET, MARIA T. BARNES, ALLEN WIGGINS,
HENRIETTA J. TICE, JASMINE MCKAY, LATOYA DAVIS,
AND LULA DAVIS,

    **Plaintiffs,**

**vs.**

KEN DETZNER, in his official capacity as
Secretary of State of the State of Florida,
THE FLORIDA SENATE and THE
FLORIDA HOUSE OF REPRESENTATIVES,

    **Defendants.**

---

### FIRST AMENDED VERIFIED COMPLAINT

### INTRODUCTION

  This is a redistricting lawsuit. This action is brought pursuant to §2 of the Voting Rights

Act of 1965, 52 U.S.C. § 10301 *et seq.*, 42 U.S.C. § 1983 for violations of the Fourteenth and

Fifteenth Amendments to the Constitution of the United States, and a supplemental claim pursuant

to 28 U.S.C. §1367 is being brought for violations of Article III, Section 20, of the Florida

Constitution. Plaintiffs seek declaratory and injunctive relief against continued use of any

congressional redistricting plan that dilutes and diminishes the black vote. The drawing and

redrawing of the congressional district currently served by Plaintiff, Congresswoman Corrine

Brown, as required by the Florida Supreme Court's opinions, means that Congresswoman Brown's

constituents will be deprived of the ability to elect a representative of their choice. The North-

South contours of Congressional District 5 trace the historic settlement of black citizens along the St. Johns River. Like the St. Johns River, the North-South configuration of Congressional District 5 extends from Jacksonville, Florida to just north of Orlando, Florida. Black citizens settled along the St. Johns River because redlining and restrictive covenants prevented black citizens in North-Central Florida from living elsewhere. Thus, despite its shape, the North-South configured Congressional District 5 contains within it a distinct black population with a shared social and legal history. The Florida Supreme Court has ordered the district redrawn in a manner that undoes its historic configuration and disperses the community contained within it. *League of Women Voters of Florida v. Detzner*, 2015 WL 7753054 (Fla. December 2, 2015). To do so is improper and contrary to law. As a result, Plaintiffs bring this action and state:

### JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343(a)(3) and (4) and 42 U.S.C. §§1983 and 1988. The Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. §1367.

2.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b).

3.     Plaintiffs request a three-judge court pursuant to 28 U.S.C. §2284 and the court has been constituted (Doc. 14).

4.     Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

### PARTIES

5.     Plaintiff, Congresswoman Corrine Brown, is a black voter from Duval County. She is a United States Congresswoman serving Congressional District 5 who has been a strong advocate for the black community since 1993.

3

6.     Plaintiffs, Johnny Brown, Theodore Brown, Mary Lawson Brown, Mary L. George, Crystal R. Brown, Justin Campbell and Ferrill Hill, are black voters from Putnam County.

7.     Plaintiffs, Margie Kelly Cody, Josephine Hall, Sandra Jackson, Mamie Jackson, Wilfred W. Reddick, Jr., Shantez Robinson, Carrie Davis, Jean Reddick, Alvin Shepard, Curtis Walker, Phyllis Johnson, Jerome Brown, Joann M. Brown, Hazel D. Gillis, Antonia G. Bryant, Eulie B. Johnson, LaVonne P. Mitchell, Darryl Mack, Anthony Mack, Doretha Mack, Constance S. Hall, Shakur Ali, Michael Ashley, Lawrence Averbeck, Anita Bailey, Leon Berrier, Daniel L. Cole, Jasmine Cromwell, Tricia Dunlap, La' Daisha Evans, James Freeman, Russell T. Gaskin, Claretha C. Hicks, Tevin Henderson, Mitzi Hutchinson, Angelique Matthews, Anna McLaughlin, Edwin Merritt, Lillie P. Powell, Taurice Ricks, Devin Roberts, Cary P. Robinson, Alexandra Saffice, Shaka Shabazz, Felicia Smith, Richard Alan Spaulding, Willie Thomas, Teaonnda Thompson, Roderic Turner, Mary S. Adams, Joy Gregory, Wilbert Gregory, Carlotta L. Guyton, Luella McQueen, Dorothy M. Oliver, Jacoby Pittman, Baron Rivers, Kimberly Rivers, and Anmenia Shahab, are black voters from Duval County.

8.     Plaintiffs, Beverlye Colson Neal, Tyrone Fields, Gloria R. Green, Maxine S. Hixon, Rebecca Johnson, Neva Spann-Kirkland, Susie L. Johnson Harris, Eddie L. James, Bentley M. Carey, Dwyce L. Ross, Kenneth Walker, Tiffany Ware, Vanessa Williams, Charita Finch, Lavenia May, Dr. Rolous A. Frazier, Jr., Dorothy Fluitt, Sheila B. Smith, Clarise Reddick, Daisy Bales, Constance Bango, Deloris R. Shepherd, Herbert Williams Jr., Rod Zeigler, Royce Flagler, Mable Butler, Jean Campbell, Willie Campbell, Ella Mae Campbell, Kaleigh Campbell, Mia Campbell, Walter Dules Williams, Lula Cooks Williams, Roberta Williams, Daniel J. Williams, Ida M. Carson, Juanita Sanders, Cheryll Daniels, Eddie A. Benn, Rich Sleet, Maria T. Barnes, Allen

Wiggins, Henrietta J. Tice, Jasmine McKay, LaToya Davis, and Lula Davis are black voters from Orange County.

9.      Plaintiffs, Neema Ya Nathieri, Anthony Grant, and James Randolph are black voters from Eatonville, Florida.

10.     Plaintiffs, Melvin A. Philpot, Velma Williams, and Vernon McQueen are black voters from Sanford, Florida.

11.     Defendant, Ken Detzner, is the Florida Secretary of State. Plaintiffs sue Secretary Detzner in his official capacity only. In his official capacity, Secretary Detzner serves as Florida's Chief Elections Officer, and custodian of the Florida Constitution. *See, e.g.,* Fla. Stat. §§15.01, 97.012, 100.371. He is charged with administering Florida's election laws.

12.     Defendant, the Florida Senate ("Senate"), is one house of the Legislature of the State of Florida. Defendant Florida Senate is responsible for drawing redistricting plans in compliance with the Florida and United States Constitution.

13.     Defendant, the Florida House of Representatives ("House"), is the other house of the Legislature of the State of Florida. Defendant Florida House of Representatives is responsible for drawing redistricting plans in compliance with the Florida and United States Constitution.

## FACTUAL BACKGROUND

**I.      Florida History**

14.     The shape of North-South Congressional District 5[1] is in large part dictated by the history of the people in it. The district is populated with the descendants of slaves who worked

---

[1] The North-South Congressional Map referenced herein is attached as Exhibit 1. The East West Congressional Map referenced herein is attached as Exhibit 2.

the farms and plantations of North Florida and along the St. Johns River basin. (Transcript of trial in *Romo v. Detzner*, hereinafter referred to as "*Romo* Transcript," 5/30/14, 23).[2]

15.     Florida has a long, sad history of racial discrimination in all aspects of government and day to day life, including in voting. *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992); *see also* (*Romo* Transcript, 5/30/14, 23).

16.     Florida quite successfully evaded the intent of the Fifteenth Amendment for decades by enacting facially race-neutral laws, such as white primary laws, poll taxes, literacy tests, and other tactics to bleach the voter rolls, ensuring that black voters could not participate in the political process. (*Romo* Transcript, 5/30/14, 26-27).

17.     Florida took other actions to exclude black voters, such as giving the governor the authority to appoint members of county commissions so that white voters would retain control even in majority-minority "Black Belt" counties. (*Romo* Transcript, 5/30/14, 29-30).

18.     Likewise, the legislature provided for the appointment of school board members by the State Board of Public Instruction so as to avoid the possibility of electing blacks. (*Romo* Transcript, 5/30/14, 29-30).

19.     The state also employed other methods to ensure that black children received substandard educations, and the ramifications of this are still felt today. (*Romo* Transcript, 5/30/14, 29).

20.     In fact, the federal courts were required to intervene in North and Central Florida (comprising the Middle District of the United States District Courts for Florida) to ensure equal treatment of black school children, and adults. *See Mims v. Duval County School Board*, 329 F. Supp. 123 (M.D. Fla. 1971); *Bd. of Pub. Instruction of Duval County, Fla. v. Braxton*, 326 F.2d

---

[2] The trial transcript is located at Docs. 225-243 of *Warinner v. Detzner*, No. 4:14-cv-00164 (N.D. Fla.), of which Plaintiffs have requested judicial notice. (Doc. 15).

616 (5th Cir. 1964); *Ellis v. Board of Pub. Instr. Of Orange, Fla.*, 423 F.2d 203 (5th Cir. 1970); *United States v. Marion County Sch. Dist.*, 625 F.2d 607 (5th Cir. 1980). *See also* James Denham, *Fifty Years of Justice: A History of the U.S. District Court for the Middle District of Florida* (2015).

21.     In North-Central Florida, this history was especially vicious.  When the white primary was found to be unconstitutional in the 1940s, the City of Jacksonville switched to at-large elections to prevent the election of black candidates from predominantly black wards. (*Romo* Transcript, 5/30/14, 30).

22.     Blacks were faced with physical violence when trying to register or to vote, from Reconstruction up through the 1900s.  (*Romo* Transcript, 5/30/14, 34-36).

23.     The Ku Klux Klan was particularly strong in the region encompassed by Congressional District 5. (*Romo* Transcript, 5/30/14, 35).

24.     After the passage of the Voting Rights Act in 1965, the effective enfranchisement of black voters was slow in coming.  (*Romo* Transcript, 5/30/14, 38).

25.     Florida did not send its first black member to Congress until court intervention in 1992. (*Romo* Transcript, 5/30/14, 24-25).

26.     During that redistricting cycle, Democrats were in control of the House and Senate, but could not agree on a congressional plan.  In the hands of a federal court, two majority-black districts (Congressional District 3 in North-Central Florida and Congressional District 17 in South Florida) and one near-majority black district (Congressional District 23 in South Florida) were drawn, and Florida sent three black Congresspersons to Washington, D.C. for the first time in over 120 years. (*Romo* Transcript, 5/30/14, 24-25); *DeGrandy v, Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992).

27.     Notwithstanding, the state continues to erect electoral impediments for black voters even today. (*Romo* Transcript, 5/30/14, 43). In Duval County, a post-2000 election study found that as many as one out of five ballots cast by black voters did not count in that election, compared to one out of fourteen white ballots. (*Romo* Transcript, 5/30/14, 44).

28.     Prior to the 2000 election, the state contracted with a private company to purge felons from the voter rolls, and black voters felt the disproportionate impact from these poorly-conducted purges. (*Romo* Transcript, 5/30/14, 43-44).

29.     In 2011, the State of Florida moved to dramatically cut the early voting period, despite the fact that black voters were twice as likely to vote early when compared with white voters. (*Romo* Transcript, 5/30/14, 45-46).

30.     Finally, the State of Florida implements the country's most stringent and racially discriminatory felony disenfranchisement laws. (*Romo* Transcript, 5/30/14, 46-47). In 2010, nearly one in four blacks was disqualified from voting due to a felony conviction; more people are disenfranchised in Florida on these grounds than in any other state. (*Romo* Transcript, 5/30/14, 46-47).

31.     Black voters sill encounter numerous obstacles in the region encompassed by North-South Congressional District 5 that detrimentally affect their ability to participate in the political process. (*Romo* Transcript, 5/30/14, 43).

32.     Black candidates struggle to be elected from non-majority black districts in many of the counties in North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 8-9, 9-23; 6/2/14, 42-43, 53-54, 55-56; 6/3/14, 82-83).

33.     In many of the counties in North-South Congressional District 5, black candidates did not receive support from the Democratic party and often struggle to make it out of the Democratic primaries. (*Romo* Transcript, 6/2/14, 17-18, 53-54).

34.     Inadequacies in public services disproportionately burden black voters in counties in North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 10-11; 6/2/14, 60).

35.     Housing issues burden black voters in counties in North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 12-13; 6/2/14, 37-38, 46, 59-60, 86).

36.     Education issues disproportionately burden black voters in counties in the North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 11-12; 6/2/14, 36-37, 44, 46).

37.     Criminal justice issues disproportionately burden black voters in counties in North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 13-14).

38.     Economic disparities, including trouble finding jobs, disproportionately burden black voters in North-South Congressional District 5. (*Romo* Transcript, 6/2/14, 35-36, 44-46; 6/3/14, 86).

39.     Election administration problems disproportionately burden black voters in counties in North-South Congressional District 5. (*Romo* Transcript, 6/2/14, 32-34, 43-44).

40.     Black voters still face racial appeals in voting in counties in North-South Congressional District 5. (*Romo* Transcript, 6/2/14, 45, 57-59).

41.     An example of racial appeals in voting consisted of flyers distributed during elections that said. "save our children, and on the flyer there was a pretty little white girl with blue eyes.  And they told us to get our country back and things of that nature." (*Romo* Transcript, 6/2/14, 45).

42.     Another example of racial appeals in voting is consisted of candidates making "the kinds of statement that indicate that we want preferred treatment and these kinds of things. (*Romo* Transcript, 6/2/14, 57).

43.     Poverty in this geographic region ties the North-South Congressional District 5 together. (*Romo* Transcript, 5/30/14, 42-43).

44.     These challenges mean that in this area of the state, a district is still necessary for black voters to participate in the political process.

45.     At trial, a number of the NAACP lay witnesses testified about what it was like for black voters before they were a part of a district in which they could elect their candidate of choice. Before being a part of a district where they were so empowered, black voters felt unrepresented and had no relationship with their elected officials. (*Romo* Transcript, 5/30/14, 15; 6/2/14, 8-9, 62).

46.     Black voters have reaped substantial benefits by being in a district in which they can elect a candidate of their choice, including having a representative who understands the needs of the community she represents, brings infrastructure money to the district, helps black residents obtain government contracts, brings job fairs to the district, and is very accessible to her constituents. (*Romo* Transcript, 5/30/14, 14-15; 6/2/14, 9-13, 38-39, 46-48, 61-62; 6/3/14, 94-97).

47.     Numerous black voters who live in North-South Congressional District 5 testified that black voters in the district "constituted a single community having similar interest." *DeGrandy*, 794 F. Supp. at 1085. (*Romo* Transcript, 6/2/14, 13-18, 63-64).

A.      **History of the City of Sanford**

48.     The City of Sanford was established in the 1870s by Henry Shelton Sanford. Sanford was a diplomat who bought the land to establish it as a transportation hub, only twenty

years after blacks established a neighboring town named Goldsboro. (*Romo* Transcript, 5/30/14, 78).

49.     The town had post offices, business, and the basic infrastructure that a town needs to function.  As Sanford developed, it eventually swallowed up Goldsboro as well as the other surrounding predominantly black neighborhoods.  As the surrounding towns, including Goldsboro, merged with Sanford, blacks did not enjoy the same amenities as their white counterpart.

50.     Sanford's motto "The Friendly City" is not an accurate representation of the city's inequitable treatment of its minority groups.  In 1947, baseball hall of famer Jackie Robinson and another black player, Johnny Wright, were shuttled from Sanford to Daytona Beach due to numerous death threats that they faced.  In 1997, the City of Sanford issued a public apology regarding the events that occurred with Robinson and proclaimed April 15, 1997 as Jackie Robinson Day.

51.     Over 65 years later, 17-year-old Trayvon Martin, an unarmed black teenager, was gunned down for wearing a hoodie in a gated community by the neighborhood's community watch coordinator.  (*Romo* Transcript, 5/30/14, 13).

52.     Beside these two infamous situations, Sanford also dealt with deep-seated issues regarding a sub-par education system, income inequalities, and inadequate housing, for minorities. *See United States v. Seminole County*, 553 F.2d 992 (5th Cir. 1977).

53.     Sanford has been included in predecessors to North-South Congressional District 5 since 1992. (*Romo* Transcript, 5/2/14, 63).

54.     Turner Clayton, president of the NAACP Seminole County Branch, testified at trial that blacks in Seminole County face unique socioeconomic burdens, including issues with transportation and poverty. (*Romo* Transcript, 5/30/14, 10).

55.     He testified that blacks in Sanford face unique burdens in the schools, including issues with higher discipline rates of black students and lower teacher retention. (*Romo* Transcript, 5/30/14, 11).

56.     He testified that blacks in Sanford face unique burdens in housing including issues with public housing and affordable housing. (*Romo* Transcript, 5/30/14, 12-13).

57.     He testified that blacks in Sanford face huge disparities as compared to whites in the criminal justice system.  (*Romo* Transcript, 5/30/14, 13).

58.     At the trial, Senator Gaetz testified that he favored keeping the City of Sanford in the district. (*Romo* Transcript, 5/21/14, 67-68, 150-151, 152, 174, 184).

59.     Including Sanford in North-South Congressional District 5 better guards against both diminishment and vote dilution than would a district that excludes the minority community of Sanford from a historically performing minority district. [3]

60.     Black voters in Sanford, accustomed to effective and responsive representation, would be harmed if they were not included in a district in which black voters could elect the candidate of their choice. (*Romo* Transcript, 5/30/14, 14, 16; 6/3/14, 97-99).

**B.      History of the Town of Eatonville**

61.     The town of Eatonville is one of the first self-governing all-black municipalities in the United States.  (*Romo* Transcript, 5/28/14, 89).

62.     The town is named after Josiah C. Eaton, one of a small group of white landowners who were willing to sell sufficient land to blacks to incorporate as a black town. (*Romo* Transcript, 5/30/14, 81).

---

[3] The term "performing minority district" refers to "a district that is likely to perform for – this is, usually to result in the election of – minority candidates of choice.  *Martinez v. Bush*, 234 F.Supp. 2d 1275, 1322 (S.D. Fla. 2002).

63.     Noted black author Zora Neale Hurston grew up in Eatonville and featured it in many of her stories.  Hurston's novel *Their Eyes Were Watching God* presents an overview of the founding of the town through the eyes of Janie Crawford, the protagonist. (*Romo* Transcript, 5/30/14, 82-83).

64.     Black voters in Eatonville, accustomed to effective and responsive representation, would be harmed if they were not included in a district in which black voters could elect the candidate of their choice.

## II.     History of District 5

65.     The creation of North-South Congressional District 5 was the direct result of years of litigation to remedy decades of vote dilution experienced by blacks that denied them the opportunity to elect representatives of their choice.

66.     After the 1990 decennial census, Florida was apportioned four additional Congressional seats, for a total of 23 members of Congress. *DeGrandy*, 794 F. Supp. at 1078.

67.     Prior to the 1992 election, Florida had not had a federal black Congressperson since Josiah Thomas Walls in 1871. *DeGrandy*, 794 F. Supp. at 1079; (*Romo* Transcript, 5/30/14, 25-26).

68.     Nationally, prior to the passage of the Voting Rights Act in 1965, between the years of 1832-1965, there were only 28 elected blacks in the Congressional caucus.  From 1965-present, there were/are 103 elected blacks.

69.     When the state legislature reached an impasse on drawing a new congressional plan, the Florida NAACP, along with other plaintiffs, filed a Voting Rights Act lawsuit, asking a federal court to draw a majority-black district in North-Central Florida to remedy the vote dilution present in the state for decades. *DeGrandy*, 794 F. Supp. at 1086; (*Romo* Transcript, 5/30/14, 14). The

congressional district at stake in this litigation was the result of that lawsuit. *DeGrandy,* 794 F. Supp. at 1088; *Johnson v. Mortham*, 926 F. Supp. 1460 (N.D. Fla. 1996); (Transcript, 5/30/14, 14).

70.     In response to *Johnson v. Mortham*, 926 F. Supp. 1460 (N.D. Fla. 1996), the Jacksonville-to-Orlando configuration was created with almost unanimous support in 1996, when Democrats controlled the House of Representatives and the Governor's Office, and it has received bipartisan support ever since.

71.     While the district would be later modified to an iteration close to its current form and made more compact, its preservation in that remedied form (similar to the present form) continued to allow black voters the much-needed opportunity to participate equally in the political process. *Johnson*, 926 F. Supp. at 1493-95. A federal court upheld that remedied form as constitutional. *Johnson v. Mortham*, TCA 94-40025-MMP, 1996 WL 297280 (N.D. Fla. 1996).

72.     After the 2000 census, Florida was again apportioned additional congressional seats, and the Florida NAACP again pushed the legislature for a black district in North-Central Florida.

73.     In a challenge to that 2002 drawing, a federal court found that the district was a reasonably compact district that ensured black voting strength in the region was not diluted. *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1307-1309 (S.D. Fla. 2002).

74.     In 2010, Florida voters approved two new constitutional provisions governing redistricting in the state. Amendment 5, now Article III, Section 20, of the Florida Constitution, established criteria for drawing congressional districts and Amendment 6, now Article III, Section 21, of the Florida Constitution established criteria for state legislative redistricting.

75.     After the decennial census data was received, the Florida NAACP worked to develop redistricting maps that would fully comply with the new amendments.  With regard to Congressional District 5 (then numbered Congressional District 3), the Florida NAACP, informed by its members who live and struggle every day with conditions on the ground in North-Central Florida, drew the district in a way it believed necessary to avoid vote dilution and retrogression. That map was submitted to the legislature on November 1, 2011.

76.     The legislature conducted numerous hearings across the state.  In late January 2011, the legislature introduced plan H000C9047, the final proposed plan for Florida's congressional districts.   Congressional District 5 in the legislatively-proposed plan largely followed the NAACP's submission.

77.     Communities within the district that were accustomed to the benefits of having representation of their choice were not stranded in districts where they would not be able to elect candidates of choice.  The ability of black voters in the region to elect their candidates of choice was not lessened.

78.     Following the enactment of the congressional redistricting plan in early 2012, the League of Women Voters of Florida, Common Cause, and several individual voters filed lawsuits challenging that congressional plan as violating the new state constitutional redistricting criteria. *See Romo v. Detzner*, Case No. 2012-CA-000412014 WL 3797315 (Fla.Cir.Ct. Leon County, July 10, 2014).

79.     Specifically, the plaintiffs in that case alleged that North-South Congressional District 5 unnecessarily packed black voters into the district and, as such, compliance with minority voting protections in the Florida Constitution did not justify the district's non-compact shape.

80.     On July 10, 2014, the circuit court ruled that North-South Congressional District 5 violated Art. III, Section 20 of the Florida Constitution and that it would need to be redrawn.  The court declined to give the legislature any specific directions on how compliance should be achieved.

81.     After the circuit court's instructions to the legislature to swiftly draw a remedial map, the legislature called a special session on August 7, 2014.

82.     Tallahassee NAACP president Dale Landry testified that taking the district out west instead of south was simply not an option.  He detailed how North-South Congressional District 5 still served as a much needed voting rights remedy in North-Central Florida.

83.     He also offered the unique perspective of an African American resident of Tallahassee – one who personally understood that an East-West configuration of the district could not adequately replace a North-South configuration due to its failure to include communities of interest among other things.

84.     NAACP leaders also testified to the shared history of their communities and the increased responsiveness of elected officials when their communities were included in a district in which black voters have the opportunity to elect their candidate of choice.

85.     After the special session, the circuit court Plaintiffs challenged the remedial map, arguing that the changes made to Congressional District 5 did not correct the constitutional problems identified by the circuit court. The circuit court disagreed, finding that "the remedial plan adequately addresses the constitutional deficiencies ... found in the Final Judgment." *See* Exhibit 3.

86.     Recognizing that what the State Plaintiffs were asking the court to do was to find that a North-South configuration of the district was unconstitutional, the court declined to do so.

Instead the court found that there were "legitimate, non-partisan policy reasons for preferring a North-South configuration for this district over an East-West configuration, and the Plaintiffs have not offered convincing evidence that an East-West configuration is necessary in order to comply with tier-one and tier-two requirements of Article III, Section 20." *See* Order Approving Remedial Districting Plan attached hereto as Exhibit 3.

87.     On October 23, 2014, the Florida Supreme Court accepted jurisdiction and on July 9, 2015, it ordered that District 5 be redrawn in an East-West configuration. *See League of Women Voters of Florida v. Detzner*, 172 So.3d 363, 402 (Fla. 2015).

88.     In its opinion, the Florida Supreme Court stated, that North-South Congressional District 5 "also had the effect of benefitting the long-time incumbent of the district, [Plaintiff] Congresswoman Corrine Brown, who previously joined with leading Republicans in actively opposing the Fair Districts Amendment and redistricting reform." *Id.* at 403.

89.     During a closed door meeting of the North Florida Republican Caucus in August 2015, Representative Janet Adkins stated that East-West Congressional District 5 was the "perfect storm" for being able to defeat Congresswoman Corrine Brown because of the large number of black prisoners in her district.

90.     The Legislature convened in special session from August 10 to August 21, 2015, but the House and Senate could not agree on a remedial plan. The Florida House then moved the Florida Supreme Court for further relinquishment of jurisdiction. In its September 4, 2015 order on the House's motion, the Florida Supreme Court directed the trial court to "hold a hearing in which it shall consider 'proposed remedial plans from the parties'…especially focusing on the map passed during the special session by the House [Plan 9071], and any amendments offered thereto;

the map passed during the special session by the Senate [Plan 9062], and any amendments offered thereto; and the areas of agreement between the legislative chambers."

91.     On October 9, 2015, the circuit court recommended the adoption of a remedial map in which District 5 was drawn in an East-West configuration, noting, however that District 5 "appears still to be one of the least compact of the districts."

92.     After oral argument was held on November 10, 2015 and on December 2, 2015, the Florida Supreme Court adopted the remedial map in which District 5 is drawn in an East-West configuration. *League of Women Voters of Florida v. Detzner*, 2015 WL 7753054 (Fla. Dec. 2, 2015).

## III.    East-West Congressional District 5

93.     East-West Congressional District 5 reduces the Black Voting Age Population of Congressional District 5 from 50.1% to 45.1%.

94.     East-West Congressional District 5 takes out communities of interest and removes historically black cities from the district.

95.     North-South Congressional District 5 has two port cities whereas East-West Congressional District 5 has no water except for the Suwannee River.

96.     North-South Congressional District 5 has many tourism communities whereas East-West Congressional District 5 has few.

97.     North-South Congressional District 5 contains portions of two urban centers whereas East-West Congressional District 5 has portions of one.

98.     East-West Congressional District 5 combines far-flung communities worlds apart culturally and geographically, uniting downtown Jacksonville with rural blacks in Gadsden County.

99.     East-West Congressional District 5 is non-compact.

100.    East-West Congressional District 5 stretches more than 200 miles in a thin line over sparsely populated areas of North Florida.

101.    At the east end, a narrow corridor less than two miles wide leads from Jacksonville through Duval County.  North of Tallahassee, the district narrows to a width of 2.5 miles.  It then continues west another 50 miles to Chattahoochee.

102.    East-West Congressional District 5 carves Tallahassee into pieces.  A ten-mile appendage runs east from the Capitol along Apalachee Parkway, and a thumb protrudes north from the appendage and follows Capitol Circle to Interstate 10.

103.    East-West Congressional District 5 contains 17,140 individuals who live in correctional facilities. As a result of such individuals' status as convicted felons, they are not entitled to vote.  The number of individuals in Florida Department of Corrections (FDOC) correctional facilities further dilutes the black vote.

104.    The number of African Americans in FDOC correctional facilities is disproportionately black.

105.    In Duval County:

    (a)     52% of the population in Transition House Dinsmore is black.

    (b)     54% of the population of Bridges of Jacksonville is black.

    (c)     40% of the population of Jacksonville Bridge is black.

    (d)     13% of the population of Shisa House East is black.

106.    In Baker County:

    (a)     65% of the population of Baker C.I. is black.

    (b)     52% of the population of Baker Re-Entry Center is black.

19

      (c)     61% of the population of Baker Work Release Camp is black.

107.   In Columbia County:

      (a)     35% of the population of Bridges of Lake City is black.

      (b)     53% of the population of Columbia Annex is black.

      (c)     52% of the population of Columbia C.I. is black.

108.   In Gadsden County:

      (a)     29% of the population of Gadsden C.F. is black.

      (b)     48% of the population of Gadsden Re-Entry Center is black.

      (c)     40% of the population of Quincy Annex is black.

109.   In Hamilton County

      (a)     55% of the population of Hamilton Annex is black.

      (b)     53% of the population of Hamilton C.I. is black.

110.   In Jefferson County:

      (a)     56% of the population of Jefferson C.I. is black.

111.   In Madison County:

      (a)     49% of the population of Madison C.I. is black.

      (b)     45% of the population of Madison Work Camp is black.

112.   In Leon County:

      (a)     14% of the population of Shisa House West is black.

      (b)     41% of the population of Tallahassee Community Release Center is black.

## COUNT I
## 42 U.S.C. §1983

113.   The allegations contained in paragraphs 1 through 113 above are re-alleged and incorporated by reference herein.

114.   The election practices and procedures used to draw the East-West Congressional District 5, violate the rights of black voters in violation of Section 2 of the Voting Rights Act of 1965.

115.   Section 2 of the Voting Rights Act of 1965, codified at 52 U.S.C. §10301(a), prohibits any electoral practice or procedure that "results in a denial or abridgment of the right of any citizen…to vote on account of race or color." 52 U.S.C. §10301(a).

116.   In the redistricting context, this is a prohibition against what is known as "minority vote dilution," and Section 2 is violated where, "[b]ased on the totality of circumstances, it is shown that the political processes leading to nomination or election…are not equally open to participation by members of a [racial or language minority group] in that its members have less opportunity than other members of the electorate to participate in the political processes and to elect representatives of their choice." 52 U.S.C. §10301(b).

117.   The "totality of the circumstances" in the redrawing of the district show the dilution of black voting strength, resulting in "less opportunity than other members of the electorate to participate in the political process and to elect the representatives of their choice." 52 U.S.C. §10301.

118.   Unless enjoined by this Court, Defendants will continue to violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, by enforcing standards, practices, and/or procedures that deny black voters the opportunity to participate effectively in the political process on an equal basis with other members of the electorate.

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment granting:

A.      A declaratory judgment that Defendants' actions violate the rights of Plaintiffs as protected by Section 2 of the Voting Rights Act, 52 U.S.C. §10301 *et seq.*

B.      Preliminary and permanent injunctive relief enjoining Defendants from enforcing or giving any effect to the East-West configuration of Congressional District 5, including an injunction prohibiting Defendant Secretary Detzner from conducting any elections for the United States House of Representatives based on the East-West configuration of Congressional District 5, and forbidding the use of the East-West version of District 5;

C.      Reasonable attorney's fees and costs;

D.      An order of this Court retaining jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

E.      Such other and further relief as the Court may deem just and proper.

## COUNT II
## 42 U.S.C. §1983

119.    The allegations contained in paragraphs 1 through 113 above are re-alleged and incorporated by reference herein.

120.    The East-West configuration of District 5 was adopted with an intent to, and it indeed does, deny or abridge the right of black citizens residing in District 5 to vote on account of their race and color.

121.    This intentional discrimination is in violation of the Fourteenth and Fifteenth Amendments to the Constitution of the United States and 42 U.S.C. §1983.

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment granting:

A.      A declaratory judgment that Defendants' actions violate the Fourteenth and

Fifteenth Amendment to the United States Constitution and 42 U.S.C. §1983;

      B.      Preliminary and permanent relief enjoining Defendants from enforcing or giving Any effort to the East-West configuration of Congressional District 5 including an injunction prohibiting Defendant Secretary Detzner from conducting any elections for the United States House of Representatives based on the East-West configuration of Congressional District 5, and forbidding the use of the East-West version of District 5.

      C.      Reasonable attorney's fees and costs;

      D.      An order of this Court retaining jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

      E.      Such other and further relief as the Court may deem just and proper.

## COUNT III
### Art. III, §20, Fla. Const.

      122.      The allegations contained in paragraphs 1 through 113 above are re-alleged and incorporated by reference herein.

      123.      Article III, §20(a) of the Florida Constitution states that, "districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process..." Art. III, §20, Fla. Const. (a).

      124.      Compliance with Tier One provisions are prioritized over compliance with other provisions. Art. III, §20, Fla. Const. (b).

      125.      The East-West configuration of District 5 was adopted with an intent to, and it indeed does, deny or abridge the right of black citizens residing in District 5 to vote on account of their race and color.

      WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment granting:

23

A.    A declaratory judgment that Defendants' actions violate the Art. III, §20 of the Florida Constitution;

B.    Preliminary and permanent injunctive relief enjoining Defendants from enforcing or giving any effect to the East-West configuration of Congressional District 5, including an injunction prohibiting Defendant Secretary Detzner from conducting any elections for the United States House of Representatives based on the East-West configuration of Congressional District, and forbidding the use of the East-West version of District 5;

C.    An order of this Court retaining jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

D.    Such other and further relief as the Court may deem just and proper.

## COUNT IV
## Art. III, §20, Fla. Const.

126.    The allegations contained in paragraphs 1 through 113 above are re-alleged and incorporated by reference herein.

127.    Article III, §20(a) of the Florida Constitution states that, "districts shall not be drawn…to diminish [the ability of racial or language minorities] to elect representatives of their choice." Art. III, §20, Fla. Const. (a).

128.    Compliance with Tier One[4] provisions are prioritized over compliance with other provisions. Art. III, §20, Fla. Const. (b).

129.    The Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates. *Apportionment I*, 83 So.3d at 597, 625 (Fla. 2012).

---

[4] Tier one provisions are set forth in Article III, §20(a) of the Florida Constitution.  Tier two provisions are set forth in Article III, §20(b) of the Florida Constitution.

130.    The East-West district, when substituted for the existing North-South district, would diminish the ability of black voters to elect their candidates of choice in violation of the Florida Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court enter Judgment granting:

A.      A declaratory judgment that Defendants' actions violate the Art. III, § 20 of the Florida Constitution;

B.      Preliminary and permanent injunctive relief enjoining Defendants from enforcing or giving any effect to the East-West configuration of Congressional District 5 including an injunction prohibiting Defendant Secretary Detzner from conducting any elections for the United States House of Representatives based on the East-West configuration of Congressional District 5, and forbidding the use of the East-West version of District 5;

C.      An order of this Court retaining jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

D..     Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jesse B. Wilkison, Esquire
Florida Bar No.: 118505
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:      (904) 356-9661
Facsimile:      (904) 356-9667
Email:          sheplaw@att.net
COUNSEL FOR PLAINTIFFS

swp[brown.corrine.amended.complaint]

## VERIFICATION

STATE OF FLORIDA      }

                             } vs.

COUNTY OF _Duval_    }

BEFORE ME, the undersigned authority, this day personally appeared Corrine Brown, who first being duly sworn, says he/she is the Plaintiff, in the above-sought cause; she has read the foregoing Amended Complaint ~~and Demand for Jury Trial~~; she has personal knowledge of the facts and matters set forth and alleged; and attests that each and all these facts are true and correct.

_Corrine Brown_
Corrine Brown

The foregoing instrument was acknowledged before me this __18th__ day of

__December__, 2015 by Corrine Brown, who is personally known to me and who did take an oath.

_Linda D. Hughes_
Signature of person taking oath
Notary Public – State of Florida

**Linda D. Hughes**
Name typed, printed, or stamped

[brown.corrine.verification1]