IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CONGRESSWOMAN CORRINE BROWN,
JOHNNY BROWN, THEODORE BROWN,
MARY LAWSON BROWN, MARY L. GEORGE,
CRYSTAL R. BROWN, JUSTIN CAMPBELL,          Case No.: 4:15-cv-00398-MW-CAS
FERRILL HILL, MARGIE KELLY CODY,
JOSEPHINE HALL, SANDRA JACKSON,
MAMIE JACKSON, WILFRED W. REDDICK,
JR., SHANTEZ ROBINSON, CARRIE DAVIS,
JEAN REDDICK, ALVIN SHEPARD, CURTIS
WALKER, PHYLLIS JOHNSON, JEROME
BROWN, JOANN M. BROWN, HAZEL D. GILLIS,
ANTONIA G. BRYANT, EULIE B. JOHNSON,
LAVONNE P. MITCHELL, DARRYL MACK,
ANTHONY MACK, DORETHA MACK, CONSTANCE
S. HALL, SHAKUR ALI, MICHAEL ASHLEY,
LAWRENCE AVERBECK, ANITA BAILEY, LEON
BERRIER, DANIEL L. COLE, JASMINE CROMWELL,
TRICIA DUNLAP, LA' DAISHA EVANS, JAMES
FREEMAN, RUSSELL T. GASKIN, CLARETHA S.
HICKS, TEVIN HENDERSON, MITZI HUTCHINSON,
ANGELIQUE MATTHEWS, ANNA MCLAUGHLIN,
EDWIN MERRITT, LILLIE P. POWELL, TAURICE
RICKS, DEVIN ROBERTS, CARY P. ROBINSON,
ALEXANDRA SAFFICE, SHAKA SHABAZZ, FELICIA
SMITH, RICHARD ALAN SPAULDING, WILLIE
THOMAS, TEAONNDA THOMPSON, RODERIC
TURNER, MARY S. ADAMS, JOY GREGORY, WILBERT
GREGORY, CARLOTTA L. GUYTON, LUELLA
MCQUEEN, DOROTHY M. OLIVER, JACOBY
PITTMAN, BARON RIVERS, KIMBERLY RIVERS,
ANMENIA SHAHAB, NEEMA YA NATHIERI,
MELVIN A. PHILPOT, VELMA WILLIAMS,
BEVERLYE COLSON NEAL, TYRONE FIELDS,
GLORIA R. GREEN, MAXINE S. HIXON, REBECCA
JOHNSON, NEVA SPANN-KIRKLAND, SUSIE L.
JOHNSON HARRIS, EDDIE L. JAMES, BENTLEY
M. CAREY, DWYCE L. ROSS, KENNETH WALKER,
TIFFANY WARE, VANESSA WILLIAMS, CHARITA FINCH,
LAVENIA MAY, DR. ROLOUS A. FRAZIER, JR., DOROTHY
FLUITT, SHEILA B. SMITH, CLARISE REDDICK, DAISY
BALES, CONSTANCE BANGO, DELORIS R. SHEPHERD,

VERNON MCQUEEN, HERBERT WILLIAMS JR.,
ROD ZEIGLER, ROYCE FLAGLER, MABLE BUTLER,
JEAN CAMPBELL, WILLIE CAMPBELL, ELLA MAE
CAMPBELL, KALEIGH CAMPBELL, MIA CAMPBELL,
WALTER DULES WILLIAMS, LULA COOKS WILLIAMS,
ROBERTA WILLIAMS, DANIEL J. WILLIAMS, IDA M.
CARSON, JUANITA SANDERS, CHERYLL DANIELS, EDDIE
A. BENN, RICH SLEET, MARIA T. BARNES, ALLEN WIGGINS,
HENRIETTA J. TICE, JASMINE MCKAY, LATOYA DAVIS,
AND LULA DAVIS,

        Plaintiffs,

vs.

KEN DETZNER, in his official capacity as
Secretary of State of the State of Florida,
THE FLORIDA SENATE and THE
FLORIDA HOUSE OF REPRESENTATIVES,

        Defendants.

---

## PLAINTIFFS' FIRST AMENDED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW

Plaintiffs, by and through undersigned counsel, and pursuant to Fed.R.Civ.P. 65, hereby move this Honorable Court to enter its order preliminarily enjoining Defendants, their agents, servants, employees, attorneys and all persons in active concert and participation with Defendants from enforcing or giving any affect to the East-West Congressional District 5 including an injunction prohibiting Defendant Detzner from conducting any elections for the United States House of Representatives based on East-West Congressional District 5, forbidding the use of East-West Congressional District 5 and ordering that North-South Congressional District 5 be restored.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

The court should issue a preliminary injunction because: (1) Plaintiffs are likely to succeed on the merits; (2) Plaintiffs will suffer imminent and irreparable injury absent an injunction; (3)

Plaintiffs would suffer greater harm without injunctive relief than Defendants would suffer if the injunction is granted; and (4) the public interest would be served by enjoining Defendants' unconstitutional acts. *See Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

## I.    <u>Likelihood of Success on the Merits</u>

### A. Background

Even now, before the Plaintiffs have had the opportunity to take the discovery needed to definitively prove all of their allegations, there is ample publicly available information for Plaintiffs to establish the necessary likelihood of success to obtain a preliminary injunction. Congressional District 5, which runs from Jacksonville to Orlando in a North-South configuration, was originally created by a three judge court in this district. *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1078 (N.D. Fla. 1992). Specifically, after the Florida Legislature was unable to draw new districts following the 1990 census, the *DeGrandy* court adopted a districting plan that would draw the new districts in such a way that they would conform with the Voting Rights Act and the Constitution. *Id.* at 1078.   This Court noted the longstanding general history of official discrimination in Florida's electoral process and lack of success that minorities had in being elected to the United States Congress and Florida Legislature. *Id.* at 1079. In particular, it remarked that an African-American had not represented Florida in the United States Congress in over a century. *Id.*

The court adopted a new districting plan, created to remedy the disenfranchisement that minority voters faced. *Id.* at 1088. A crucial component of this plan was the creation of two districts where African Americans constituted the majority of the voting-age population, one of which would eventually become the current North-South District 5. *Id.* The North-South district was drawn to ensure that it would retain a majority African-American voting-age population, and avoid

"fracture[ing] the African-American community into influence districts, which would merely continue the past dilution of minority voting strength." *Id.* at 1085. The defendants in *DeGrandy* raised objections to the newly formed North-South district, because they took issue with the unusual shape that the court had to use to reach geographically separated enclaves of a single African-American community of interest and ensure that the new district would retain a majority African-American voting-age population. *Id. at* 1089. However, this Court noted that the aesthetic requirement of a geographically compact district should not undercut the primary goal of creating a district where the majority of the voting age population were minorities. *Id.* at 1084-85 (quoting *Dillard v. Baldwin County Bd. of Educ.*, 686 F. Supp. 1495, 1466 (M.D. Ala. 1988). It ultimately found that the North-South district was necessary to ensure that African-American voters in the district could elect the candidate of their choice.

Following its creation, the North-South District was later challenged and modified into a more compact form that more closely resembles its current state. *See Johnson v. Mortham*, 926 F. Supp. 1460 (N.D. Fla. 1996). The modified version of the district was upheld by this Court following the challenge. *Johnson v. Mortham*, TCA 94-40025-MMP, 1996 WL 297280 (N.D. Fla. 1996). Subsequently in 2002, the district was redrawn to accommodate for population increases reflected in the 2000 census. The new districts were once again upheld following a challenge in federal court alleging vote dilution and political gerrymandering. *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1308-1309 (S.D. Fla. 2002).

To this day, the North-South district has accomplished the original goals underlying its creation, by affording the African-American community who reside there an opportunity to elect the candidate of their choice. The North-South configuration of District 5 retains a black voting age population of 50.1%. Furthermore, it unites a singular political community of black voters who

have a shared cultural history as descendants of slaves who worked on the farms and plantations along the St. Johns River basin, and also experience shared difficulties with poverty, lack of employment and housing, as well as ongoing racial discrimination.

In 2010, however, the Florida Constitution was amended to impose additional requirements on congressional and state legislative redistricting plans. These amendments required such plans to draw such districts (1) without "the intent to favor or disfavor a political party or an incumbent," (2) without the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or diminish their ability to elect representatives of their choice," and (3) to comply with the "tier-two" requirements of equal population, compactness, and respect for political and geographical boundaries. Fla Const. Art. III §§ 20, 21. In 2012, the Florida legislature implemented a new districting plan, which retained the North-South configuration of District 5. That plan was subsequently challenged under the new constitutional provisions.

The Florida Supreme Court found that the new plan violated the Florida Constitution, largely because it determined that the legislature had drawn the plan with an unconstitutional intent to favor the Republican Party. *See League of Women Voters of Florida v. Detzner*, 172 So.3d 363, 403 (Fla. 2015). It ordered the Florida Legislature to redraw District 5 to change the "North-South" configuration, first introduced by this Court in *DeGrandy*, and adopt a new "East-West" configuration, which would run from Jacksonville to Tallahassee. After the Florida legislature was unable to adopt a remedial plan, the Florida Supreme Court issued another order adopting the Florida House's plan for District 5, which used the East-West configuration. *League of Women Voters of Florida v. Detzner*, 2015 WL 7753054 (Fla. Dec. 2, 2015).

In contrast to the North-South configuration, the East-West configuration does not adequately remedy the concerns that necessitated the North-South district's creation. Unlike the North-South District, the East-West district only has a black voting-age population of 45.1%. Additionally, the black voters who are represented in the East-West district do not form a cohesive political community. Rather, the new district wrangles together disparate groups, ranging citizens of downtown Jacksonville with rural blacks in Gadsden county. Because the East-West configuration deprives the black community in current District 5 of the ability to elect the candidate of their choice, Plaintiffs bring this challenge to enjoin the use of the East-West District 5 in future elections and restore the North-South District 5.

**B.    Vote Dilution**

The election practices and procedure used to draw East-West Congressional District 5 violate Section 2 of the Voting Rights Act and Article III, Section 20 of the Florida Constitution. Section 2 of the Voting Rights Act of 1965, 52 U.S.C. §10301, prohibits any electoral practice or procedure that "results in a denial or abridgment of the right of any citizen…to vote on account of race or color." 52 U.S.C. §10301(a). The language in Article III, Section 20 of the Florida Constitution mirrors the language in Section 2 of the Voting Rights Act. Article III, § 20(a) states that "districts shall not be drawn with the intent or result of denying the equal opportunity of racial or language minorities to participate in the political process…" Art. III, § 20(a), Fla. Const. In the redistricting context, these provisions prohibit what is known as "minority vote dilution," and Section 2 is violated where,

> Based on the totality of circumstances, it is shown that the political processes leading to nomination or election…are not equally open to participation by members of a [racial or language minority group] in that its members have less opportunity than other members of the electorate to participate in the political processes and to elect representatives of their choice.

6

52 U.S.C. §10301(b).

The essential feature of the vote-dilution standard is that, in some cases, it requires the creation of a majority-minority district. *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1085 (N.D. Fla. 1992); *LULAC v. Perry*, 548 U.S. 399, 425-26 (2006); *Apportionment I*, 83 So.3d 617, 623 (Fla. 2012) ("A successful vote dilution claim under Section 2 requires a showing that a minority group was denied a majority-minority district that, but for the purported dilution, could have potentially existed."). A majority-minority district is a district in which minorities are a "numerical, working majority of the voting-age population." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). It is insufficient to show that the Legislature might have created an additional influence district – i.e., a district in which minorities are a minority and, though perhaps able to influence elections, are unable to elect their preferred candidates. *Apportionment I*, 83 So. 3d at 623. It is also insufficient to show that the Legislature might have drawn a crossover district – i.e., a district in which minorities, though not a majority of the voting-age population, might be large enough, with the aid of white voters who "cross over," to elect their preferred candidates. *Id.*

The vote-dilution standard does not require the creation of a majority-minority district wherever possible, but only where certain conditions – conditions first announced in *Thornburg v. Gingles*, 478 U.S. 30 (1986) – are satisfied. The conditions are: (1) that the minority group be "sufficiently large and geographically compact to constitute a majority" in a single-member district; (2) that the minority group be "politically cohesive"; and (3) that the white majority vote "sufficiently as a bloc to enable it—in the absence of special circumstances . . . —usually to defeat the minority's preferred candidate." *Id.* at 50-51. If all three preconditions exist, and if, in the "totality of the circumstances," the minority group has less electoral opportunity than other members of the electorate, then a majority-minority district must be created. *Id.*; *LULAC v. Perry*,

548 U.S. 399, 425-26 (2006).  After establishing the three *Gingles* pre-conditions, plaintiffs alleging vote dilution under Section 2 must then demonstrate that, under the totality of the circumstances, that minority voters have had less opportunity to elect candidates of their choice. *Id.* at 46.

In the instant case, the first Gingles pre-condition is satisfied.  North-South Congressional District 5 has a majority black voting age population.  The first *Gingles* pre-condition also examines the reasonable compactness of the minority community involved. *Gingles*, 478 U.S. at 50. The Supreme Court has been unequivocal: "[t]o be sure, § 2 does not forbid the creation of a non-compact majority-minority district." *LULAC v. Perry*, 548 U.S. 399, 430 (2006) (quoting *Bush v. Vera*, 517 U.S. 952, 999 (1996) (Kennedy, J., concurring)).  Under the *Gingles* geographical compactness analysis, "[t]he degree of geographical symmetry or attractiveness is . . . a desirable consideration for districting, but only to the extent it aids or facilitates the political process." *Dillard v. Baldwin Cnty. Bd. of Educ.*, 686 F. Supp. 1459, 1466 (M.D. Ala. 1988). The characteristics of the minority community itself—the shared interests and needs—rather than just the shape of the district are more determinative in establishing whether the minority group is geographically compact than are untethered mathematical measures. *DeGrandy*, 794 F. Supp. at 1085 ("[M]embers of a minority group who live in separate enclaves may still be included in a single district where it can be shown that they constitute a single community having similar interests."); *LULAC*, 548 U.S. at 435 ("[I]t is the enormous geographical distance separating the Austin and Mexican border communities, coupled with the disparate needs and interests of these populations – not either factor alone – that renders District 25 noncompact [.]").  In other words, if the minority population is geographically concentrated or united through common characteristics, needs, and interests, then it is compact for purposes of vote dilution.  Indeed, a

prior version of Congressional District 5 was substantially less compact than it is now, and two federal courts found that district to be "reasonably compact" and complying "to a reasonable extent with traditional redistricting criteria." *Martinez v. Bush*, 234 F.Supp.2d 1275, 1301 (S.D. Fla. 2002); *Johnson v. Mortham*, 1996 WL 297280 (N.D. Fla. 1996).   Moreover, the Florida Constitution only requires districts be "compact" not that districts be "as compact as practicable." *See* Art. III, § 20(b), Fla. Const.   Otherwise, litigation would be endless, as every district can be incrementally improved forever. *Gaffney v. Cummings*, 412 U.S. 735, 750-751 (1973).

The second and third prongs of the *Gingles* analysis examine racially polarized voting— whether minority voters are cohesive as a bloc and whether white majority voters, as a bloc, usually oppose the candidate of choice of minority voters.   No party in the Florida Supreme Court[1] contested the proposition that the second prong of *Gingles* is satisfied and all the experts who examined racially polarized voting concluded that black voters are politically cohesive. *See League of Women Voters of Florida v. Detzner*, 172 So.3d 563 (Fla. 2015).

Florida NAACP expert Dr. Richard Engstrom who testified in connection with *Romo v. Detzner*, Case No. 2012-CA-00412 (Fla.Cir.Ct. Leon County) also demonstrated in his report that voting in the prior Congressional District 3 and current Congressional District 5 is racially polarized.   *See* Dr. Engstrom's racial polarization analysis attached hereto as Exhibit 1.   In conducting this analysis, Dr. Engstrom also used the most highly regarded and statistically sound methodology – ecological inference – to detect voting patterns by race.   (Transcript of trial in *Romo v. Detzner*, hereinafter referred to as "*Romo* Transcript," 6/2/14, 78).[2]   Dr. Engstrom used

---

[1] Plaintiff's expert in *Romo v. Detzner*, Dr. Ansolabehere, also conceded that the racial polarization element of *Gingles* is satisfied in Northeast Florida. (*Romo* Transcript, 5/28/14, 93).
[2] The trial transcript is located at Docs. 225-243 of *Warinner v. Detzner*, No. 4:14-cv-00164 (N.D. Fla.), of which Plaintiffs have requested judicial notice. (Doc. 15).

voter turnout in his analysis, and turnout specific to the district in question – the best data available. (*Romo* Transcript, 6/2/2014, 78-79).   Studying racially contested elections, which are widely considered to be the most probative elections for analyzing racial polarization, Dr. Engstrom found as follows: in North-South Congressional District 5 in 2008, then Senator Obama received 99.3% of the black vote, but only 29.2% of the white vote. *See* Exhibit 1 at 24.  Likewise, in North-South Congressional District 5 in 2012, President Obama received 99.7% of the black vote, but only 25.5% of the white vote. *Id.* at 25.  Dr. Engstrom concluded that Obama's ability to "reach across racial lines" applied to Hispanic voters and other voters, but not to white voters. *Id.* at 9.  When examining the racially contested U.S. Senate race in 2010, Dr. Engstrom also concluded that one cannot generalize from President Obama's support. *Id.*  In the 2010 Senate race, the black candidate, Kendrick Meek, received 90.7% of the African American vote, but only 10.4% of the white vote. *Id.* at 10, 26.  Dr. Engstrom also examined patterns of racially polarized voting in local elections in counties that are in North-Central Florida. *Id.* at 11.  In eight of the nine elections in Duval, Bradford and Alachua Counties, the black support for the black candidate exceeds 80%, while the highest white support for the black candidate in any of these nine elections is 29.2%. *Id.* at 11, 27, 28.  Thus, this analysis provides additional support for Dr. Engstrom's conclusion that voting is racially polarized between blacks and whites.

Based on Dr. Engstrom's examination, another unavoidable conclusion is that white voters in North-Central Florida do generally tend to vote as a bloc to defeat the minority candidate of choice. *See* Exhibit 1. The success of incumbent Congresswoman Corrine Brown does not negate the potential for vote dilution. She is the only black candidate to have ever won a Congressional seat in the area. Her success, though laudable, is due to the "special effects" of incumbency rather than an end to racial voting patterns in the region and Dr. Engstrom's study confirms this. *Id.; see*

*also Gingles*, 478 U.S. at 57 (finding that in some instances, special circumstances, such as incumbency and lack of opposition, rather than a diminution in usually severe white bloc voting, can account for these candidates' success).

Next, the "Senate Report Factors" identified in a United States Senate report accompanying the reauthorization of the Voting Rights Act in 1982 also indicate that adopting the East-West Configuration of District Five would lead to vote dilution. When determining whether vote dilution has occurred under the totality of the circumstances, courts generally are guided by the so-called "Senate Factors" or "Senate Report Factors" identified in a United States Senate report accompanying the reauthorization of the Voting Rights Act in 1982. These factors include: the extent of any history of official discrimination that touched the minority group members' rights to register, to vote, or otherwise to participate in the democratic process; the extent to which voting is racially polarized; the extent to which potentially discriminatory practices or procedures have been used; if there is a candidate slating process, whether minority candidates have been denied access to it; the extent of any discrimination against minorities in education, employment and health, which might hinder their ability to participate effectively in the political process; whether political campaigns have been characterized by overt or subtle racial appeals; the extent to which minority group members have been elected to public office (proportionality); whether there is a lack of responsiveness on the part of elected officials to the minority group's particularized needs; and whether the policy supporting the use of the voting policy or practice is tenuous. *Id.* at 36-37 (citing S. Rep. No. 97-417, at 28-29 (1982), reprinted in 1982 U.S. Code Cong. & Admin. News 177).

**1.  the extent of any history of official discrimination that touched the minority group members' rights to register, to vote, or otherwise to participate in the democratic process;**

Florida has a long, sad history of racial discrimination in all aspects of government and day to day life, including in voting. *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992); *see also* (*Romo* Transcript, 5/30/14, 23).  Florida quite successfully evaded the intent of the Fifteenth Amendment for decades by enacting facially race-neutral laws, such as white primary laws, poll taxes, literacy tests, and other tactics to bleach the voter rolls, ensuring that black voters could not participate in the political process. (*Romo* Transcript, 5/30/14, 26-27).  Florida took other actions to exclude black voters, such as giving the governor the authority to appoint members of county commissions so that white voters would retain control even in majority-minority "Black Belt" counties. (*Romo* Transcript, 5/30/14, 29-30).  Likewise, the legislature provided for the appointment of school board members by the State Board of Public Instruction so as to avoid the possibility of electing blacks. (*Romo* Transcript, 5/30/14, 29-30).

The state also employed other methods to ensure that black children received substandard educations, and the ramifications of this are still felt today. (*Romo* Transcript, 5/30/14, 29).  In fact, the federal courts were required to intervene in North and Central Florida (comprising the Middle District of the United States District Courts for Florida) to ensure equal treatment of black school children, and adults.  *See Mims v. Duval County School Board*, 329 F. Supp. 123 (M.D. Fla. 1971); *Bd. of Pub. Instruction of Duval County, Fla. v. Braxton*, 326 F.2d 616 (5th Cir. 1964); *Ellis v. Board of Pub. Instr. Of Orange, Fla.*, 423 F.2d 203 (5th Cir. 1970); *United States v. Marion County Sch. Dist.*, 625 F.2d 607 (5th Cir. 1980). *See also* James Denham, *Fifty Years of Justice: A History of the U.S. District Court for the Middle District of Florida* (2015).

In North-Central Florida, this history was especially vicious. When the white primary was found to be unconstitutional in the 1940s, the City of Jacksonville switched to at-large elections to prevent the election of black candidates from predominantly black wards. (*Romo* Transcript, 5/30/14, 30). Blacks were faced with physical violence when trying to register or to vote, from Reconstruction up through the 1900s. (*Romo* Transcript, 5/30/14, 34-36). Also, the Ku Klux Klan was particularly strong in the region encompassed by Congressional District 5. (*Romo* Transcript, 5/30/14, 35).

After the passage of the Voting Rights Act in 1965, the effective enfranchisement of black voters was slow in coming. (*Romo* Transcript, 5/30/14, 38). Florida did not send its first black member to Congress until court intervention in 1992. (*Romo* Transcript, 5/30/14, 24-25); *DeGrandy v, Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992). Thus, this factor weighs in Plaintiffs' favor.

## 2. the extent to which potentially discriminatory practices or procedures have been used;

The state continues to erect electoral impediments for black voters even today. (*Romo* Transcript, 5/30/14, 43). In Duval County, a post-2000 election study found that as many as one out of five ballots cast by black voters did not count in that election, compared to one out of fourteen white ballots. (*Romo* Transcript, 5/30/14, 44). Prior to the 2000 election, the state contracted with a private company to purge felons from the voter rolls, and black voters felt the disproportionate impact from these poorly-conducted purges. (*Romo* Transcript, 5/30/14, 43-44).

In 2011, the State of Florida moved to dramatically cut the early voting period, despite the fact that black voters were twice as likely to vote early when compared with white voters. (*Romo* Transcript, 5/30/14, 45-46). Finally, the State of Florida implements the country's most stringent

and racially discriminatory felony disenfranchisement laws. (*Romo* Transcript, 5/30/14, 46-47). In 2010, nearly one in four blacks was disqualified from voting due to a felony conviction; more people are disenfranchised in Florida on these grounds than in any other state. (*Romo* Transcript, 5/30/14, 46-47). Election administration problems also disproportionately burden black voters in counties in North-South Congressional District 5. (*Romo* Transcript, 6/2/14, 32-34, 43-44). Thus, this factor weighs in Plaintiffs' favor.

**3.   the extent of any discrimination against minorities in education, employment and health, which might hinder their ability to participate effectively in the political process;**

Housing issues disproportionately burden black voters in counties in North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 12-13; 6/2/14, 37-38, 46, 59-60, 86). Education issues disproportionately burden black voters in counties in the North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 11-12; 6/2/14, 36-37, 44, 46). Criminal justice issues disproportionately burden black voters in counties in North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 13-14). Economic disparities, including trouble finding jobs, disproportionately burden black voters in North-South Congressional District 5. (*Romo* Transcript, 6/2/14, 35-36, 44-46; 6/3/14, 86). Poverty in this geographic region ties the North-South Congressional District 5 together. (*Romo* Transcript, 5/30/14, 42-43). Thus, this factor weighs in Plaintiffs' favor.

**4.   whether political campaigns have been characterized by overt or subtle racial appeals;**

Black voters still face racial appeals in voting in counties in North-South Congressional District 5. (*Romo* Transcript, 6/2/14, 45, 57-59). An example of racial appeals in voting consisted

14

of flyers distributed during elections that said. "save our children, and on the flyer there was a pretty little white girl with blue eyes.  And they told us to get our country back and things of that nature." (*Romo* Transcript, 6/2/14, 45).  Another example of racial appeals in voting is consisted of candidates making "the kinds of statement that indicate that we want preferred treatment and these kinds of things." (*Romo* Transcript, 6/2/14, 57). Thus, this factor weighs in Plaintiffs' favor.

**5.   the extent to which minority group members have been elected to public office (proportionality); and**

Black candidates struggle to be elected from non-majority black districts in many of the counties in North-South Congressional District 5.  (*Romo* Transcript, 5/30/14, 8-9, 9-23; 6/2/14, 42-43, 53-54, 55-56; 6/3/14, 82-83).   In many of the counties in North-South Congressional District 5, black candidates did not receive support from the Democratic party and often struggle to make it out of the Democratic primaries. (*Romo* Transcript, 6/2/14, 17-18, 53-54).  Inadequacies in public services disproportionately burden black voters in counties in North-South Congressional District 5. (*Romo* Transcript, 5/30/14, 10-11; 6/2/14, 60).  Thus, this factor weighs in Plaintiffs' favor.

**6.   whether there is a lack of responsiveness on the part of elected officials to the minority group's particularized needs.**

At trial, in *Romo v. Detzner*, a number of the NAACP lay witnesses testified about what it was like for black voters before they were a part of a district in which they could elect their candidate of choice. Before being a part of a district where they were so empowered, black voters felt unrepresented and had no relationship with their elected officials. (*Romo* Transcript, 5/30/14, 15; 6/2/14, 8-9, 62).  Black voters have reaped substantial benefits by being in a district in which they can elect a candidate of their choice, including having a representative who understands the

needs of the community she represents, brings infrastructure money to the district, helps black residents obtain government contracts, brings job fairs to the district, and is very accessible to her constituents. (*Romo* Transcript, 5/30/14, 14-15; 6/2/14, 9-13, 38-39, 46-48, 61-62; 6/3/14, 94-97). Thus, this factor weighs in Plaintiffs' favor.

Thus, under the totality of the circumstances, minority voters have had less opportunity to elect candidates of their choice. Therefore, a majority minority district must be created in this area. *Apportionment I*, 83 So.3d at 623; *LULAC*, 548 U.S. at 425-26.  A majority-minority district cannot remedy a violation of Section 2 of the Voting Rights Act elsewhere in the state. *See Shaw v. Hunt*, 517 U.S. 899, 916 (1996); *LULAC*, 548 U.S. at 425-26.  Therefore, the North-South Congressional District 5 must be preserved as a majority-minority district to protect against vote dilution in this area.

North-South Congressional District 5 had a majority Black Voting Age Population (BVAP) and also preserved communities of interest.  On the other hand, East-West Congressional District 5 reduces the BVAP from 50.1% to 45.1%, removing its majority-minority status.  East-West Congressional District 5 takes out communities of interest and removes historically black cities, such as Sanford and Eatonville, from the district.  North-South Congressional District 5 has two port cities whereas East-West Congressional District 5 has no water except for the Suwannee River.  North-South Congressional District 5 has many tourism communities whereas East-West has few.  North-South Congressional District 5 contains portions of two urban centers whereas East-West only has portions of one.  East-West Congressional District 5 combines far-flung communities worlds apart culturally and geographically, uniting downtown Jacksonville with rural blacks in Gadsden County.

East-West Congressional District 5 is also non-compact.  East-West Congressional District 5 stretches more than 200 miles in a thin line over sparsely populated areas of North Florida.  At the east end, a narrow corridor less than two miles wide leads from Jacksonville through Duval County.  North of Tallahassee, the district narrows to a width of 2.5 miles.  It then continues west another 50 miles to Chattahoochee.  East-West Congressional District 5 carves Tallahassee into pieces.  A ten-mile appendage runs east from the Capitol along Apalachee Parkway, and a thumb protrudes north from the appendage and follows Capitol Circle to Interstate 10.

Further, the BVAP in East-West Congressional District 5 is illusory because of the number of prisons in East-West Congressional District 5 – with a population cannot vote.  According to the 2010 Census, 17,140 individuals live in correctional facilities in East-West Congressional District 5.  This is a substantial number.  The number of individuals in correctional facilities further dilutes the black vote because he number of African Americans in correctional facilities is disproportionately black.  *See* Exhibit 4.  There are also convicted felons in this area not in correctional facilities who further decrease the BVAP in this area because they also cannot vote.

While North-South Congressional District 5 has been deemed by some as one of the most gerrymandered in the United States, there is a clear and legal reason for this to be the case.  Simply, it is to uphold the intent and spirit of the Voting Rights Act of 1965.  Since 1992, this Congressional District has proven itself to provide the protections described in the Voting Rights Act of 1965 – to afford a minority population that is not compact in geographic terms, but is still a community of interest, the opportunity and ability to elect representatives of its choice.  Thus, it must be upheld and maintained.

**B. Diminishment**

Article III, Section 20, of the Florida Constitution incorporates into the state constitution a prohibition on diminishing minority voting strength that mirrors that prohibition in the 2006 amendments to Section 5 of the Voting Rights Act of 1965. *Apportionment I*, 83 So.3d at 620. Section 5 requires that covered jurisdictions show that any new voting "qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, or color, or [membership in a language minority group]." 52 U.S.C. §1304(a). In 1976, the United States Supreme Court explained that the "effect" standard means that preclearance should be denied for voting changes "that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976).

After the United States Supreme Court decision in *Georgia v. Ashcroft*, 539 U.S. 461 (2003), Congress clarified its intent as to the meaning of the Section 5's prohibition against voting changes with a discriminatory "effect" by stating that "in making preclearance determinations under Section 5, the comparative ability to elect preferred candidates of choice is the relevant factor to be evaluated when determining whether a voting change has a retrogressive effect." H.R. Rep. No. 109-478, at 71 (2006). The 2006 Voting Rights Act amendment specifies that a voting change "that has the purpose of or will have the effect of *diminishing the ability of [minority] citizens ... [to] elect their preferred candidates of choice* denies or abridges the right to vote within the meaning of [Section 5]." Pub. L. No. 109-246, 120 Stat. 577, 580-811 (2006) (codified at 52 U.S.C. §1304) (emphasis added). Furthermore, Congress noted that Section 5 "protect[s] the ability of [minority] citizens to elect their preferred candidates of choice." *Id.* The first tier of Art. III, §20 of the Florida Constitution contains that same language prohibiting the drawing of districts

18

that would *"diminish [racial or language minority voters'] ability to elect representatives of their choice."* (emphasis added).   In *Apportionment I,* the Florida Supreme Court unequivocally concluded that "by including the 'diminish'" language of recently amended Section 5, Florida has now adopted the retrogression principle as intended by Congress in the 2006 amendment. Accordingly, the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates." *Apportionment I,* 83 So.3d at 625.

The retrogression or diminishment standard in Section 5 and in the Florida Constitution is quite different from the vote dilution standard.   Courts analyze retrogression by comparing the proposed plan to the benchmark plan, looking at the historical ability to elect under the benchmark plan and comparing that to the predicted ability to elect under the newly enacted plan. *Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 487 (1997) (reviewing prior Supreme Court retrogression analyses).  The proper standard for determining whether retrogression exists employs a functional analysis, as opposed to a simple brightline test based on one variable, like minority voting age population percentage or voter registration percentage.  A functional analysis looks to all the relevant electoral circumstances effecting elections in a particular district when determining whether there is an "ability to elect." Dep't of Justice Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7470, 7471 (Feb. 9, 2011) ("2011 Guidance"). The multitude of factors that may be considered under a functional analysis include a district's minority voting age population; the extent of racially polarized voting; whether minority groups form voting coalitions; the effect of incumbency in past elections; and other factors that may affect turnout rates by race. *Id.; see also Georgia v. Ashcroft,* 195 F. Supp. 2d 25, 76, 78-79 (D.D.C. 2002); *LULAC,* 548 U.S. at 439-40; *Georgia v Ashcroft,* 539 U.S. at 485.  A brightline test is not

a sufficient measure because there might be a district in which a minority group makes up a bare majority of voting age population, but which, because of registration and turnout rates, is not a district in which minority voters have the ability to elect a candidate of their choice.

Under a Section 5 retrogression analysis, the retrogression determination must be made on a plan-wide basis. The U.S. Supreme Court has noted that while the analysis begins by looking at individual districts and whether the minority voters' ability to elect in each individual district is reduced, increased, or unchanged, the final determination must be made by assessing the net effect on minority voters' ability to elect in the new plan. Thus, the loss of an ability-to-elect district in one part of the state could be compensated by gains in other areas of the plan. *Ashcroft*, 539 U.S. at 479. However, performing a functional analysis on a statewide plan does not mean that minority opportunity or majority-minority districts that allow minority voters to elect their candidates of choice may be traded for a larger number of "influence" districts. This scenario is precisely what the 2006 VRA Amendments were intended to address. The Amendments overruled the part of *Georgia v. Ashcroft* which held that majority-minority districts could be traded for influence districts without violating Section 5. The Congressional "*Ashcroft* fix" was intended to redirect the focus of the Section 5 analysis to whether "the electoral power of a community [was] *more, less, or just as able* to elect a preferred candidate of choice." H.R. Rep. No. 109-478, at 44 (2006) (emphasis added). Congress decided that if a change rendered that community *less able* to elect a candidate of choice, then that change was retrogressive and would not be precleared. *Id.* at 46. While the *Ashcroft* District Court decision was overruled, the subsequent Congressional enactment revives the relevance of the district court's analysis, which appropriately took into consideration the effects of racially polarized voting on a smaller minority electorate in a proposed district.

While Section 5 demanded a plan-wide consideration of retrogression, and thus allowed for off-setting a lost ability to elect district in another area of the state, 2011 Guidance at 7471, the Florida Supreme Court did not determine whether such off-setting would be allowed under the state constitutional prohibition of retrogression. However, the language of the constitutional provision explicitly states that "districts shall not be drawn ... to diminish" the ability of minority voters to elect their candidates of choice. Section 5 does not contain that district-specific language.

Additionally, in his partial dissent in *Apportionment II,* Justice Perry, who was in the majority in *Apportionment I,* notes that he would have invalidated one of the districts challenged by the Florida NAACP because it was, as redrawn, "detrimental to black voters in Daytona Beach and that that community accustomed to being represented by the candidate of its choice, would be stranded in a district in which it most certainly will not be able to elect its candidate of choice or one responsive to its interests and needs." *Apportionment II,* 89 So.3d at 99 (Perry, J., concurring in part and dissenting in part). This language implies that Justice Perry did not consider the diminishment analysis to be plan-wide, but rather focused on the district-specific effects.

In addition to his racially polarized voting studies, Dr. Engstrom also performed a retrogression analysis. Based on his analysis, he concluded that all of the plaintiffs' proposed iterations of Congressional District 5 diminished the ability of black voters to elect their candidates of choice. (*Romo* Transcript, 6/2/2014, 93-94, 98-99). *See also* Exhibit 1 at 29-31. The stranding of black voters in districts in which they would not be able to elect their candidate of choice is retrogressive for those voters. The East-West Congressional District 5, when substituted for the

existing North-South district, would diminish the ability of black voters to elect their candidates of choice in violation of the Florida Constitution.[3]

### C.     Fourteenth Amendment

To prevail on their claim under the Fourteenth Amendment, Plaintiffs must show: (1) intentional discrimination; and (2) a resultant discriminatory effect. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). However, discriminatory purpose need not be the only underlying motivation for the challenged redistricting plan as long as it is one of the motives. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). During a closed door meeting of the North Florida Republican Caucus in August 2015, Representative Janet Adkins stated that East-West Congressional District 5 was the "perfect storm" for being able to defeat Congresswoman Corrine Brown because of the large number of black prisoners in her district. *See* Exhibit 3. These comments indicate that the East-West configuration of District 5 was adopted with an intent to, and it indeed does, deny or abridge the right of black citizens residing in District 5 to vote on account of their race and color. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). Additionally, as discussed above, the East-West configuration because of, *inter alia*, the large numbers of incarcerated black individuals in the East-West district, dilutes the voting strength and political influence of black voters.

Thus, the East-West configuration was "conceived or operated as [a] purposeful devic[e] to further racial discrimination...," *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (Stewart, J., plurality opinion) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)), "by minimizing

---

[3] As discussed above, the BVAP in this district is also somewhat illusory because of the number of prisons in the east-west configuration – with population that cannot vote. *See* Exhibit 3, 4.

cancelling out or diluting the voting strength of racial elements of the voting population." *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (quoting Whitcomb, 403 U.S. at 149). This intentional discrimination is in violation of the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

## II.   **Irreparable Injury**

Where, as here, success on the merits is extremely likely, a lesser showing of irreparable harm is required. *Faculty Senate of Fla. Int'l Univ. v. Winn*, 477 F. Supp. 2d 1198, 1203 (S.D. Fla. 2007) ("The determination of whether there is a substantial likelihood of success on the merits 'does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits.'") (citing *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979)).

Plaintiffs face actual and impending irreparable harm, as Congressional District 5 has been redrawn in an East-West fashion. Black voters, accustomed to effective and responsive representation, will be harmed by not being included in a district in which black voters could elect the candidate of their choice. Also, by permitting circulation of ballots based on, or otherwise implementing, the East-West Congressional District 5, Defendants will be enforcing an unconstitutional redistricting plan that racially discriminates against black voters. Congresswoman Brown also faces the burden of campaigning in a congressional district that may or may not exist after this Court's ruling on the merits of Plaintiffs' Complaint. Congresswoman Brown will be forced to accept the unlawful East-West Congressional District 5 to avoid being left behind while other candidates campaign for votes. In addition, these efforts will be for naught if the Court later determines that East-West Congressional District 5 is illegal and North-South

Congressional District 5 must be restored.  Allowing candidates to campaign before the Court rules on the merits will cause great confusion to voters.  County and local election boards may incorrectly inform voters of their district and precinct locations, and have to re-contact voters once this case concludes.  Prospective candidates may end up running in different districts.  Unnecessary confusion is certain.

Further, the right to vote is entitled to special constitutional protection as the right to the exercise of the franchise "in a free and unimpaired manner is preservation of other basic civil rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  The Supreme Court has long recognized that the right to vote is "fundamental," *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009), because it is "preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (noting that "the right of qualified voters...to cast their votes effectively...rank[s] among our most precious freedoms").  The Supreme Court also has made clear that "the right of suffrage can be denied by [means of] dilution...just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555.  Adhering to these precepts, courts have widely recognized that an infringement upon the right to vote (including by its dilution) constitutes an irreparable injury. *See, e.g., Chatman v. Spillers*, 44 F.3d 923, 924 (11th Cir. 1995); *United States v. Dallas County Com'n*, 791 F.2d 831, 831-33 (11th Cir. 1986); *Dillard v. Crenshaw County*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986).  Moreover, no amount of monetary compensation can undo these harms. *See, e.g., Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("An injury is irreparable if it cannot be undone through monetary remedies.").

### III.     Balance of Harms

Plaintiffs suffer irreparable harm from the clear violation of their rights under the Voting Rights Act of 1965.  The balance of the equities undoubtedly weighs in favor of a preliminary injunction.  Plaintiffs are seeking to protect their right to suffrage—"one of [their] most fundamental rights." *Bartlett*, 556 U.S. at 10. As the Supreme Court has explained, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Reynolds*, 377 U.S. at 555 ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.").  Defendants are not at risk of an injunction causing it harm in excess of the irreparable harm suffered by Plaintiffs. *See Ga. Latino Alliance for Human Rights v. Deal*, 793 F. Supp. 2d 1317, 1340 (N.D. Ga. 2011) ("[B]y merely preserving the status quo, [the] injunction will impose no new and onerous burdens on the Defendants."), *aff'd in part and rev'd in part on other grounds*, 691 F.3d 1250 (11th Cir. 2012).  Accordingly, the balance of harms favors the Plaintiffs being granted an injunction.

### IV.     Public Interest

The public interest is clearly served by an injunction protecting rights secured under the Voting Rights Act of 1965.  "[T]he right of suffrage is a fundamental matter in a free and democratic society," *Reynolds*, 377 U.S. at 561-62, and "Section 2, as amended, represents 'a strong national mandate for the immediate removal of all impediments, intended or not, to equal participation in the election process.'" *Dillard*, 640 F. Supp. at 1363 (quoting *Harris*, 593 F. Supp. at 315).  Further, there is no public interest in allowing an illegal practice to continue. *See KH*

*Outdoor, LLC v. City of Trussville*, 458 F.3d, 1261, 1273 (11th Cir. 2006); *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. 1981).  Thus, entry of the relief sought by Plaintiffs will serve the public interest.

## V.     **Bond**

No bond should be required.  Defendants would not suffer any harm from the requested injunction that could be assuaged by recovery from a monetary bond.

## CONCLUSION

Plaintiffs are likely to succeed on the merits, and Defendants' actions threaten Plaintiffs with imminent irreparable harm.  The balance of harms overwhelmingly favors the issuance of the requested injunction, as does the public interest.  Accordingly, based on Plaintiffs' First Amended Verified Complaint as well as the above memorandum of law, Plaintiffs' motion for preliminary injunction should be granted.

Respectfully submitted,

Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jesse B. Wilkison, Esquire
Florida Bar No.: 118505
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:    (904) 356-9661
Facsimile:    (904) 356-9667
Email:        sheplaw@att.net
COUNSEL FOR PLAINTIFFS

[brown.corrine.preliminary.inj.mot1]

26

## INDEX TO EXHIBITS

|  | Exhibit |
|---|---|
| Report of NAACP Expert Richard L. Engstrom prepared in connection with *Romo v. Detzner*, Case No. 2012-CA-00412 (Fla.Cir.Ct. Leon County) | 1 |
| Senate Committee on Reapportionment and House Select Committee Excerpted Testimony filed in *Warriner v. Detzner*, Case No. 4:14-cv-00164-JA (N.D. Fla.) | 2 |
| Transcript of Republican Party Quarterly Meeting September 21, 2015 | 3 |
| East-West Congressional District 5 Prisons Chart | 4 |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 29 , 2015, I electronically filed the

foregoing with the Clerk of the Court by using CM/ECF System which will send a notice of

electronic filing to the following:

**Adam S. Tanenbaum, Esquire**
**General Counsel**
**Florida Department of State**
**500 South Bronough Street, Suite 100**
**Tallahassee, Florida 32399-0250**

**David A. Fugett, Esquire**
**Assistant General Counsel**
**Florida Department of State**
**500 South Bronough Street, Suite 100**
**Tallahassee, Florida 32399-0250**

**Jason N. Zakia, Esquire**
**Jesse L. Green, Esquire**
**Raoul G. Cantero, Esquire**
**Wachovia Financial Center**
**Suite 4900**
**200 South Biscayne Boulevard**
**Miami, Florida 33131**

**Andy V. Bardos, Esquire**
**Gray Robinson, P.A.**
**301 South Bronough Street, Suite 600**
**Tallahassee, Florida 32301**

**David B. King, Esquire**
**Thomas A. Zehnder, Esquire**
**Vincent Falcone III, Esquire**
**King Blackwell Zehnder, et al.**
**25 East Pine Street**
**Orlando, Florida 32801**

5

I HEREBY CERTIFY that on December 29 , 2015, a true and correct copy of the foregoing document and the notice of electronic filing was sent by United States Mail to the following non-CM/ECF participants:

N/A

_____
ATTORNEY

ldh[brown.corrine.amend.complaint.motion]

6