UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

| | |
|---|---|
| CONGRESSWOMAN CORRINE BROWN, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| KEN DETZNER, in his official capacity as Secretary of State of the State of Florida, *et al.*, | ) ) ) ) ) |
| Defendants. | ) |

Case No. 4:15-cv-00398-MW/CAS

**THE LEGISLATIVE PARTIES' RESPONSE TO
PLAINTIFFS' AMENDED MOTION FOR PRELIMINARY INJUNCTION**

Defendants, the Florida House of Representatives and the Florida Senate (collectively, the "Legislative Parties"), file this response to Plaintiffs' Amended Motion for Preliminary Injunction (D.E. 35) (the "Motion"). The Legislative Parties take no position regarding Plaintiffs' request for a preliminary injunction against the Secretary of State. As explained below, however, this Court should not enjoin the Legislative Parties, who are not proper defendants in this proceeding.

**STATEMENT OF FACTS**

In the Motion, Plaintiffs challenge what they characterize as "the Florida House's plan for District 5, which use[s] [an] East-West configuration" (mot. 5). As explained below, however, the Legislature has never enacted an east-west configuration of

Congressional District 5. Instead, in 2012 the Legislature approved a north-south configuration of the district in an effort to protect minority voting rights, and defended that configuration in both a subsequent court challenge and on appeal of that challenge. In July 2015, however, the Florida Supreme Court rejected the Legislative Parties' configuration and ordered the Legislature to adopt an east-west configuration, as proposed by the challengers in that case. The Legislature did not pass a remedial plan, however, and the Supreme Court subsequently adopted a remedial plan designed by the challengers that contains an east-west configuration of District 5. Thus, the Legislative Parties are not responsible for either the current design of District 5 or the Supreme Court's decision requiring its use in Florida's congressional elections.

### The History Behind Congressional District 5

Congressional District 5—the only district at issue—has a long history. From 1876 to 1992, no African American in Florida was ever elected to Congress, as black voters were fractured into white districts without any chance of success for their preferred candidates. At last, in 1992, when the Legislature was unable to enact new congressional districts, a federal court drew predecessor District 3. *De Grandy v. Wetherell*, 794 F. Supp. 1076 (N.D. Fla. 1992). For the first time since Reconstruction, African Americans could elect and be represented by the candidate of their choice.

The court-drawn district was short-lived. In 1996, a federal court invalidated the court-drawn District 3—which followed a horseshoe shape from Orlando to Jacksonville, west to Columbia County, and south to Gainesville and Ocala (Exhibit A)—as a racial gerrymander. *See Johnson v. Mortham*, 926 F. Supp. 1460 (N.D. Fla. 1996).

In response, Democrats and Republicans in the Legislature acted together to create a Jacksonville-to-Orlando configuration of the district (Exhibit B). At that time, Democrats controlled the House of Representatives, with 63 of 120 members, and Republicans controlled the Senate, with 22 of 40 members. *See* Fla. S. Jour., Members of the Florida Senate (Reg. Sess. 1996); Fla. H.R. Jour., Members of the Florida House of Representatives (Reg. Sess. 1996). Both chambers resoundingly supported the North-South configuration. It passed the Senate by a vote of 40 to zero, *see* Fla. S. Jour. 784 (Reg. Sess. May 2, 1996), and the House by a vote of 116 to three, *see* Fla. H.R. Jour. 1630 (Reg. Sess. May 2, 1996). Representative Willie Logan, a Democrat, sponsored the bill. *See* Fla. HB 2745 (1996). The final districts were amended onto the bill through a floor amendment offered by Sen. Fred Dudley (R), Sen. Betty Holzendorf (D), Sen. Toni Jennings (R), and the Democratic Leader, Sen. Ken Jenne (D). *See* Fla. S. Jour. 762 (Reg. Sess. 1996). Governor Lawton Chiles, a Democrat, signed the bill into law. *See* Ch. 96-192, Laws of Fla. Thus, the Jacksonville-to-Orlando configuration was established with nearly unanimous bipartisan support. Without foreclosing future constitutional challenges, a federal court approved the redrawn district. *Johnson v. Mortham*, No. TCA 94-40025-MMP, 1996 WL 297280 (N.D. Fla. May 31, 1996).

The 2002 congressional plan—the benchmark plan for the 2010 redistricting cycle—included a similar north-south configuration of then-District 3 (Exhibit C). In litigation that followed its adoption, the district court made clear that District 3 was drawn "to satisfy the requirements" of the Voting Rights Act (VRA) and was not implicated in the plaintiffs' partisan-gerrymandering challenge: "The plaintiffs and

intervenors do not allege, obviously, that [District 3 was] politically gerrymandered in violation of the Equal Protection Clause." *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1345 n.93 (S.D. Fla. 2002). The court and parties agreed that District 3 was not a partisan gerrymander.

### The Current Redistricting Cycle

On November 2, 2010, Florida voters approved Amendment 6, which established new standards applicable to congressional districts in Florida. Amendment 6 was codified as Article III, Section 20 of the Florida Constitution. The "tier-one" standards established in Article III, Section 20(a)—which governed in the event of a conflict with the requirements of Section 20(b)—provide that "[n]o apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent [or] the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory." The minority voting requirements in that section were designed to mirror the requirements of Sections 2 and 5 of the VRA. *In re Senate Joint Resolution of Legislative Apportionment 1176,* 83 So. 3d 597, 619-20 (Fla. 2012) ("*Apportionment I*").

Article III, Section 20(b) established "tier-two" standards: "unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries."

In February 2012, the Legislature adopted a congressional redistricting map designated as H000C9047 (Plan 9047). *See* Exhibit D; *League of Women Voters of Fla v. Detzner*, 172 So. 3d 363, 373 (Fla. 2015) ("*Apportionment VII*"). Immediately thereafter, two groups of plaintiffs (the "LOWV Plaintiffs" (some of whom have intervened in this case) and the "Romo Plaintiffs") filed actions in Florida circuit court challenging the constitutionality of Plan 9047 under Article III, Section 20. *Id*. Among other things, the plaintiffs claimed that District 5 in Plan 9047 departed from the tier-two standards set forth in Article III, Section 20(b) without justification. The Legislative Parties argued that a north-south configuration was necessary to comply with the VRA and the tier-one minority protection requirements in Article III, Section 20(a) of the Florida Constitution. *Id*. at 402-03.

Nonetheless, after a two-and-a-half-week non-jury trial, in July 2014 the circuit court issued a final judgment holding that the Legislature drew District 5 in Plan 9047 in violation of Article III, Section 20. 172 So. 3d at 443-44. The circuit court found that District 5 "unnecessarily subjugates tier-two principals [sic] of compactness," but did not require the Legislative Parties to abandon their north-south configuration. *Id*. Rather, the court noted that an "appendage" designed to encompass the city of Sanford in Seminole County was unnecessary to comply with minority voting requirements. *See* Final Judgment, Exhibit E, at 20. The court invalidated one other district based on a different appendage. Ex. E at 34.

In August 2014, the Legislature held a special session to enact a remedial redistricting plan in accordance with the circuit court's final judgment. The Legislature

enacted Plan 9057, which maintained the north-south configuration but removed the two appendages the trial court had invalidated. *See* Exhibit F; 172 So. 3d at 386. On August 22, the circuit court approved Plan 9057. See Exhibit G. The circuit court found that "[t]here are legitimate non-partisan policy reasons for preferring a North-South configuration for this district over an East-West configuration, and the Plaintiffs have not offered convincing evidence that an East-West configuration is necessary in order to comply with tier-one and tier-two requirements of Article III, Section 20." *Id*. at 3.

Plaintiffs appealed both the final judgment and the order approving the remedial plan to the Florida Supreme Court. In July 2015, the Supreme Court affirmed in part and reversed in part. *Apportionment VII*, 172 So. 3d at 416. The Supreme Court held that there were constitutional deficiencies in eight districts, including District 5. *Id*. at 372. The Court found that the Romo Plaintiffs' alternative version of District 5, see Exhibit H, which was drawn in an east-to-west configuration, adhered more closely to the tier-two standards set forth in Article III, Section 20(b), and rejected the Legislative Parties' justifications for a north-to-south configuration. *Id*. at 404. Because the Supreme Court concluded that the Legislature could not establish "that the North–South configuration is necessary to avoid diminishing the ability of black voters to elect a candidate of their choice," it determined that "District 5 must be redrawn in an East–West manner." *Id*. at 371. The Supreme Court relinquished jurisdiction to the circuit court for 100 days to allow the court to issue a recommendation on any remedial plan adopted by the Legislature. *Id*. at 372.

The Legislature convened in special session from August 10 to August 21, but the House and Senate could not agree on a remedial plan. *League of Women Voters of Fla. v. Detzner*, No. SC14-1905, 2015 WL 7753054, at *7 (Fla. Dec. 2, 2015) ("*Apportionment VIII*"). The House then moved the Supreme Court for further relinquishment of jurisdiction. *Id*. The Supreme Court granted the motion in part, and directed the circuit court to recommend "which map proposed by the parties—or which portions of each map—best fulfills the specific directions in [the] Court's July 9, 2015, opinion and all constitutional requirements." *Id*.

The House and the Senate then submitted separate proposed redistricting plans to the circuit court, see Exhibits I and J, and the LOWV and Romo Plaintiffs offered their own proposals. See Exhibit K; *Apportionment VIII*, 2015 WL 7753054, at *8. All of the plans incorporated the version of District 5 designed by the Romo Plaintiffs and endorsed by the Supreme Court in *Apportionment VII*. *Apportionment VIII*, 2015 WL 7753054, at *13.

On October 9, 2015, the circuit court issued an order recommending the adoption of Plan CP-1, a plan submitted by the LOWV Plaintiffs, which included the east-west configuration of District 5 as originally designed by the Romo Plaintiffs. See Exhibit L; 2015 WL 7753054, at *54. On December 2, the Florida Supreme Court affirmed the circuit court's order and approved the adoption of Plan CP-1, which "shall be used for the 2016 Florida congressional elections and for Florida congressional elections thereafter until the next decennial redistricting." *Id*. at *36.

## ARGUMENT

In this case, Plaintiffs challenge the horizontal configuration of the remedial District 5, which the Florida Supreme Court mandated. Plaintiffs contend that such a configuration violates Section 2 of the federal Voting Rights Act, and seek an order enjoining Defendants "from enforcing or giving any affect [sic] to the East-West Congressional District 5" (mot. at 2). But, as explained above, the Legislative Parties did not design or enact the current version of District 5. And the Legislative Parties do not enforce Florida's election laws, including Florida's congressional districts. The Legislative Parties cannot, therefore, give effect to the relief that Plaintiffs seek: an injunction prohibiting enforcement of Congressional District 5. Because the Legislative Parties cannot provide the relief Plaintiffs seek, Plaintiffs are without standing to sue the Legislative Parties. Therefore, the Court should deny the Motion to the extent that it seeks injunctive relief against the Legislative Parties, who are not proper defendants in this proceeding. The Legislative Parties take no position regarding Plaintiffs' request for injunctive relief against the Secretary of State.

To obtain a preliminary injunction, a movant must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005).

Here, Plaintiffs cannot demonstrate a likelihood of success on the merits on their claims against the Legislative Parties, who do not enforce Florida's election laws and

cannot afford the relief that Plaintiffs seek. Thus, no injunctive relief against the Legislative Parties is warranted. *See Hope v. Bureau of Prisons*, 476 F. App'x 702, 705 (11th Cir. 2012) (affirming denial of injunctive relief where plaintiff's "claim could not succeed on its merits" where he failed to "demonstrate that any of the individual defendants were personally responsible for or causally connected to the supposed constitutional violation."); *Tex. Commerce Bank Nat'l Ass'n v. Florida*, 138 F.3d 179, 182 (5th Cir. 1998) (finding that the State of Florida was not a proper party to a suit and affirming denial of a motion for preliminary injunction).

Article III of the United States Constitution "limits the jurisdiction of federal courts to 'cases' and 'controversies.'" *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1244 (11th Cir. 1998) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992)). Embodied in this limitation is the doctrine of standing. "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning" of Article III. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To allege standing, a plaintiff must allege an injury in fact, a causal connection between the injury and the challenged action, and a likelihood that a favorable decision will redress the injury. *Socialist Workers Party*, 145 F.3d at 1244.

In an action for an injunction prohibiting enforcement of a law, a plaintiff lacks standing to sue public entities or public officials who have no enforcement authority and therefore no authority to redress the injury. In *Socialist Workers Party*, two minor political parties challenged a state statute that required them to file a bond. The defendants—the Florida Secretary of State and county Supervisors of Elections—moved

to dismiss.  The court declined to dismiss the Secretary of State, who had threatened enforcement and presented a credible threat of future enforcement.  *Id*. at 1245-48.  It did, however, dismiss the Supervisors of Elections:  "In a suit such as this one, where the plaintiff seeks a declaration of the unconstitutionality of a state statute and an injunction against its enforcement, a state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with enforcement of the provision at issue."  *Id*. at 1248 (citing *Shell Oil Co. v. Noel*, 608 F.2d 208, 211 (1st Cir. 1979)).  The court reviewed Florida's election laws but found no reason to conclude that the Supervisors of Elections possessed any authority to enforce the challenged law.  *Id*.  The plaintiffs likewise failed to direct the court to any authority that purported to vest the Supervisors with enforcement authority.  *Id*.  The court therefore held the Supervisors of Elections were not proper defendants and that, as to the Supervisors, the plaintiffs had alleged no case or controversy.

Similarly, in *Scott v. Taylor*, 405 F.3d 1251 (11th Cir. 2005), in a challenge to a redistricting plan, the court instructed the trial court to dismiss individual legislators who had been sued in their official capacities.  While it applied the doctrine of legislative immunity and therefore declined to consider standing on an interlocutory appeal, the court found it "extremely doubtful that [plaintiff] could satisfy the third prong of the standing requirements—a substantial likelihood that her injury could be redressed by a favorable decision against these legislator defendants," *id*. at 1256 n.8, explaining that "the legislator defendants have no role in the enforcement or implementation" of the challenged district, *id*. at 1257-58.  Judge Jordan, then sitting by designation, explained in

a concurring opinion that, "in a suit against state officials for injunctive relief, a plaintiff does not have Article III standing with respect to those officials who are powerless to remedy the alleged injury." *Id*. at 1259 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 616-18 (1973), and *Okpalobi v. Foster*, 244 F.3d 405, 426-27 (5th Cir. 2001)). "The legislators in this case do not have enforcement authority and are not involved in conducting elections in DeKalb County. Their role is limited to making law." *Id*. Judge Jordan concluded that an "injunction running against them therefore would do nothing" to redress the plaintiffs' injury. *Id*.; *see also Abdullah v. Ala. Sentencing Comm'n*, 386 F. App'x 947, 950 (11th Cir. 2010) (concluding that, where a plaintiff sought abrogation of a sex-offender registry and notification system, together with a purge of records, the Alabama Sentencing Commission was not a proper defendant, as it had no authority to afford the requested relief).

Courts in other jurisdictions agree with *Socialist Workers Party* and *Scott*. For example, in *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc), the Court held that the Governor and Attorney General of Louisiana were not proper defendants in an action to enjoin the "operation and effect" of a state statute that provided a private cause of action against medical doctors who perform abortions. The Governor and Attorney General had no authority either to enforce the challenged law or to prevent a private plaintiff from initiating a civil action under the statute. *Id*. at 427. An injunction directed to the Governor and Attorney General would, therefore, have been "utterly meaningless." *Id*. at 426. Because the Governor and Attorney General had no power to redress the

alleged injuries, the plaintiffs failed to establish a case or controversy between themselves and those defendants. *Id.* at 427.

Other courts have dismissed, or have affirmed dismissals of, governmental defendants that could not provide the relief requested. *See also Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1074-75 (9th Cir. 2010) (affirming the dismissal of claims against the National Park Service, which was merely a cooperating agency in an exchange of public and private lands consummated by the federal Bureau of Land Management, and which therefore had no authority to prevent the exchange); *McDaniel v. Bd. of Educ. of City of Chicago*, 956 F. Supp. 2d 887, 893 (N.D. Ill. 2013) (dismissing claims against the City of Chicago because only the Board of Education had authority to effectuate the requested injunction prohibiting closure of certain schools); *Scott v. DiGuglielmo*, 615 F. Supp. 2d 368 (E.D. Pa. 2009) (dismissing three prison officials who, though allegedly the cause of the plaintiff's injuries, were no longer employed at the prison in which the plaintiff was confined, and therefore had no authority to give effect to the requested injunction for prospective relief); *Libertarian Party of Ind. v. Marion Cty. Bd. of Voter Registration*, 778 F. Supp. 1458, 1461 (S.D. Ind. 1991) (dismissing claims against public officials who comprised the Indiana State Election Board, where the plaintiff sought production of voter-registration lists in the possession of a county voter-registration board); *Haridopolos v. Alachua Cty.*, 65 So. 3d 577, 577-78 (Fla. 1st Dist. Ct. App. 2011) (holding that the Speaker of the Florida House of Representatives and the President of the Florida Senate are not proper defendants in an

action that challenges the constitutionality of a state statute); *Atwater v. City of Weston*, 64 So. 3d 701, 703-04 (Fla. 1st Dist. Ct. App. 2011) (same).

The principles articulated in *Socialist Workers Party* and *Scott* demonstrate that the Legislative Parties are not proper parties to this case and therefore Plaintiffs' claims against them cannot succeed on the merits. Plaintiffs seek an injunction prohibiting enforcement of a congressional district that the Florida Supreme Court established. The Legislative Parties do not enforce congressional districts. The Florida Election Code grants no authority to the Legislative Parties to conduct elections. *See* Chs. 97-106, Fla. Stat. (2015). Nor does the Florida Constitution. Elections are conducted, election laws are administered, and electoral districts are enforced by the appropriate election officials—not by the Legislature.

The Legislative Parties are not proper defendants merely because the Florida Constitution authorizes them to enact laws. If they were, they would be proper defendants in any challenge to any statute, and would be embroiled in continual litigation. *Cf. Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) ("If a governor's general executive power provided a sufficient connection to a state law to permit jurisdiction over him, any state statute could be challenged simply by naming the governor as a defendant.").

Plaintiffs do not ask the Court to order the Legislature to enact new districts. But even if Plaintiffs had made that request, there would be no case or controversy between them and the Legislative Parties, since courts have no authority to order a legislature to enact legislation. An injunction that directs a legislature to enact legislation would

violate the separation of powers no less than legislation that directs a court to enter a particular order.  Courts have consistently refused to order legislative bodies to enact laws.  *See Smith & Lee Assocs.*, *Inc. v. City of Taylor*, *Mich.*, 102 F.3d 781, 796-97 (6th Cir. 1996); *Michigan v. U.S. Army Corps of Eng'rs*, 911 F. Supp. 2d 739, 758 n.16 (N.D. Ill. 2012).

Redistricting cases are no different.  In redistricting cases, courts do not order the enactment of redistricting legislation, but afford legislatures time to act before a judicial remedy is imposed.  *See Reynolds v. Sims*, 377 U.S. 533, 586 (1964) (explaining that the district court "properly refrained from acting further until the Alabama Legislature had been given an opportunity to remedy the admitted discrepancies in the State's legislative apportionment scheme" and "correctly recognized . . . that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so"); *Apportionment VIII*, 2015 WL 7753054, at *1 (explaining that, after invalidating Congressional District 5, the court "provided the Legislature with the opportunity to pass a constitutionally compliant plan").  To allow the Legislature an opportunity to enact redistricting legislation does not require the issuance of an order to the Legislature or otherwise take the shape of an enforceable command.  While the interest of the Legislature in redistricting is such that its intervention would be appropriate, *Brown v. Butterworth*, 831 So. 2d 683, 689 (Fla. 4th Dist. Ct. App. 2002), the Legislature is not a defendant authorized to afford relief that a court is authorized to mandate.

Thus, because the Legislative Parties are not proper defendants in this action, no injunctive relief against them is warranted.  *See Hope*, 476 F. App'x at 705 (affirming denial of injunctive relief where plaintiff failed to "demonstrate that any of the individual defendants were personally responsible for or causally connected to the supposed constitutional violation."); *Tex. Commerce Bank*, 138 F.3d at 182 (finding that the State of Florida was not a proper party to suit and affirming denial of motion for preliminary injunction).  The Legislative Parties take no position, however, regarding Plaintiffs' request for injunctive relief against the Secretary of State.

## CONCLUSION

For the reasons stated above, the Court should deny the Motion to the extent that it seeks injunctive relief against the Legislative Parties, who are not proper defendants in this proceeding.  The Legislative Parties take no position regarding Plaintiffs' request for injunctive relief against the Secretary of State.

*Brown v. Detzner, et al.*                                          Case No. 4:15-cv-00398-MW/CAS

Respectfully submitted,

| | |
|---|---|
| */s/ Raoul G. Cantero* | */s/ George N. Meros, Jr.* |
| Raoul G. Cantero | George N. Meros, Jr. |
| Florida Bar No. 552356 | Florida Bar No. 263321 |
| Jason N. Zakia | Andy Bardos |
| Florida Bar No. 698121 | Florida Bar No. 822671 |
| Jesse L. Green | **GrayRobinson, P.A.** |
| Florida Bar No. 95591 | Post Office Box 11189 |
| **White & Case LLP** | Tallahassee, Florida 32302 |
| Southeast Financial Center | Telephone: (850) 577-9090 |
| 200 S. Biscayne Blvd., Suite 4900 | E-mail: George.Meros@gray-robinson.com |
| Miami, Florida 33131-2352 | E-mail: Andy.Bardos@gray-robinson.com |
| Telephone: (305) 371-2700 | |
| Facsimile: (305) 358-5744 | Matthew J. Carson |
| E-mail: rcantero@whitecase.com | Florida Bar No. 827711 |
| E-mail: jzakia@whitecase.com | **General Counsel, The Florida House of Representatives** |
| E-mail: jgreen@whitecase.com | 422 The Capitol |
| | 402 South Monroe Street |
| George T. Levesque | Tallahassee, Florida 32399-1300 |
| Florida Bar No. 555541 | Telephone: 850-717-5500 |
| **General Counsel, The Florida Senate** | E-mail: matthew.carson@myfloridahouse.gov |
| 305 Senate Office Building | |
| 404 South Monroe Street | *Attorneys for Defendant, the Florida House of Representatives* |
| Tallahassee, Florida 32399-1100 | |
| Telephone: (850) 487-5237 | |
| E-mail: levesque.george@flsenate.gov | |

*Attorneys for Defendant, the Florida Senate*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed in the Court's CM/ECF System this 20th day of January, 2016, and thereby served upon all counsel of record.

By: */s/ Raoul G. Cantero*
      Raoul G. Cantero