IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CONGRESSWOMAN CORRINE
BROWN, *et al.*,

    *Plaintiffs*,

v.                                             Case No. 4:15-cv-00398-MW-CAS

KEN DETZNER, in his official capacity
as Secretary of State, THE FLORIDA
SENATE and THE FLORIDA HOUSE
OF REPRESENTATIVES,

    *Defendants*.
_____/

**DEFENDANT SECRETARY'S MEMORANDUM IN OPPOSITION TO
AMENDED MOTION FOR PRELIMINARY INJUNCTION (DE 35)**

Just as he did regarding the original motion, *see* DE 25, the Florida Secretary of State hereby opposes the plaintiff's amended motion for preliminary injunction (DE 35). For the purpose of appellate preservation, in opposition to that motion, the Secretary respectfully reasserts his sovereign immunity argument, originally set out in his motion to dismiss (DE 24 at 4-13), and reiterated in his opposition to the plaintiff's motion to amend her complaint (DE 44).[1] In any event, the Court should

---

[1] The Court rejected the Secretary's Eleventh Amendment sovereign immunity argument in its order denying his motion to dismiss. *See* DE 47. That order is subject to immediate appeal under the collateral order doctrine. *See P.R. Aqueduct & Sewer Auth v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146-47 (1993) (holding that district court order denying claim of Eleventh Amendment immunity

deny the injunction that the plaintiff seeks against the Secretary because it would not redress the harm she alleges.

## INTRODUCTION

Plaintiff Congresswoman Corrine Brown currently represents Florida's Fifth Congressional District ("CD-5"). DE 34-1 at 4. The other plaintiffs hail from various counties within the current CD-5. DE 34-1 at 5-6. Together, the plaintiffs note that the Florida Supreme Court, in its decision in *League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363 (Fla. 2015) ("*Apportionment VII*"), "ordered [CD-5] redrawn in a manner that undoes its historic configuration and disperses the community contained within it." DE 34-1 at 4. The plaintiffs contend that the "drawing and redrawing of [CD-5] . . . as required by the Florida Supreme Court's opinions, means that Congresswoman Brown's constituents will be deprived of the ability to elect a representative of their choice." DE 34-1 at 3. This, the plaintiffs

---

is immediately appealable as final decision under section 1291, title 28, of the U.S. Code pursuant to collateral order doctrine); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999) (same). If the Secretary does take that appeal, this Court would be divested of jurisdiction to enter a preliminary injunction against him until the sovereign immunity question is resolved. *Cf. Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *see Showtime/The Movie Channel, Inc. v. Covered Bridge Condo. Ass'n, Inc.*, 895 F.2d 711, 713 (11th Cir. 1990) (quoting *Griggs* and noting that once notice of appeal filed, the "district court retains only the authority to act in aid of the appeal, to correct clerical mistakes or to aid in the execution of a judgment that has not been superseded").

claim, "is improper and contrary to law." DE 34-1 at 4. The plaintiffs make other references to how the Florida Supreme Court ordered that CD-5 "be redrawn in an East-West configuration," DE 34-1 at 18, ¶ 87; *see also* DE 34-1 at 4, 19; DE 35 at 5, and they allude in count one to "election practices and procedures used to draw" the new CD-5 in an east-west configuration, DE 34-1 at 22, ¶ 114. The plaintiffs ultimately contend that the CD-5 configuration ordered and approved by the Florida Supreme Court constitutes "minority vote dilution" and violates section 2(b) of the Voting Rights Act, now codified at section 10301(b), title 52, of the United States Code, DE 34-1 at 22, ¶¶ 116-117.

Despite attributing responsibility to the Florida Supreme Court for the change in CD-5's configuration, the plaintiffs ultimately allege that the Secretary, along with the legislative defendants, is continuing to violate section 10301(b) "by enforcing standards, practices, and/or procedures that deny black voters the opportunity to participate effectively in the political process on an equal basis with other members of the electorate." DE 34-1 at 22, ¶ 118; *see also id.* at 23 (prayer for relief in count one). Similarly, in count two, even though the plaintiffs repeatedly reference the Florida Supreme Court's ordered change of CD-5, the plaintiffs assert that the new CD-5 configuration "was adopted with an intent to, and it indeed does, deny or abridge the right of black citizens residing in District 5 to vote on account of their race and color," and that this "intentional discrimination

3

is in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution and 42 U.S.C. § 1983." DE 34-1 at 23-24, ¶¶ 120-121 and prayer for relief.

But the plaintiffs make no references in the amended complaint to any conduct by the Secretary in the redrawing of CD-5 or the implementation of Florida's new congressional district map. Instead, there is a general allegation that the Secretary "serves as Florida's Chief Elections Officer, and custodian of the Florida Constitution," and that "[h]e is charged with administering Florida's election laws." DE 34-1 at 6, ¶ 11. The plaintiffs do not allege any action that the Secretary has taken or threatens to take that would interfere with their rights or that would affect the ability of the plaintiffs to elect a representative of their choice. In fact, the plaintiffs do not allege in their amended complaint or amended motion what the Secretary did or might do regarding CD-5; how the Secretary "administers" elections in a way that is relevant to existing or changed congressional district lines; or whether the Secretary has done or threatened to take any actions that might harm any of the plaintiffs. Nonetheless, the plaintiffs ask this Court simply to prohibit the Secretary "from conducting any elections for the United States House of Representatives based on the East-West configuration of [CD-5]." DE 34-1 at 23, 24; DE 35 at 2. The plaintiffs are not entitled to a preliminary injunction against the Secretary because they have not and cannot

demonstrate that he caused their alleged injury or that an injunction against him would redress that injury.

### THE PLAINTIFF IS NOT ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF AGAINST THE SECRETARY

To obtain a preliminary injunction, the plaintiffs must show a likelihood of success on the merits, irreparable harm unless the injunction issues, a balance of equities in the plaintiffs' favor, and no detriment to the public interest if the injunction issues. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011). Again, for the purpose of appellate preservation, the Secretary asserts that because of the Eleventh Amendment jurisdictional bar discussed at length in the Secretary's motion to dismiss (DE 24 at 4-13), and reiterated in his opposition to the motion for leave to amend (DE 44), the plaintiff cannot show a likelihood of success.

Moreover, the plaintiffs do not allege any harm *caused by the Secretary*, so for this reason as well, they cannot show a likelihood of success on the merits *against the Secretary*. "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal citation omitted). In fact, nowhere

5

in the plaintiffs' amended complaint or amended motion do they identify conduct or threatened conduct by the Secretary that is causing or will cause harm. And as explained in greater detail in the next section, there is nothing that the Secretary is charged with doing under Florida law regarding redistricting that the plaintiffs specifically could allege.

"Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1302 (11th Cir. 2007) (internal bracket, quotation, and citation omitted). The plaintiffs fail here to "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). In fact, the plaintiffs fail to establish that they even have standing to seek an injunction against the Secretary; any harm the plaintiffs claim are not traceable to the Secretary. Rather, to the extent the plaintiffs allege any conduct causing harm, they reference the directional east-west reconfiguration of CD-5 ordered by the Florida Supreme Court.

In short, the plaintiffs do not identify any connection between the Secretary and the drawing or implementation of congressional district boundaries, and they do not identify any specific enforcement action the Secretary has taken or threatens to take causing the plaintiffs harm. The injunction the plaintiffs seek against the Secretary, in other words, would not be reasonably likely to redress any harm that the plaintiffs describe in their amended complaint. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (explaining that for standing, "there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant," and "redressability—a likelihood that the requested relief will redress the alleged injury") (internal citations omitted); *Fla. Ass'n of Rehab. Facilities, Inc. v. HRS*, 225 F.3d 1208, 1219 (11th Cir. 2000) (noting that *Ex parte Young* exception to Eleventh Amendment immunity "applies to cases in which the relief against the state official *directly ends* the violation of federal law") (emphasis supplied).

### IMPLEMENTATION OF FLORIDA CONGRESSIONAL REDISTRICTING THROUGH TRACTS, BLOCKS, REPRECINCTING, AND BALLOTING

As noted above and explained below, the Secretary does not play the role in the redrawing or implementation of districts that the plaintiffs suggest in their amended complaint and amended preliminary injunction motion. Absent that

7

connection between the Secretary and enforcement of the law the plaintiffs challenge, the plaintiffs are not entitled to injunctive relief against the Secretary.

Congressional redistricting is a uniquely legislative function under the U.S. Constitution. *See* U.S. Const. art. I, § 4 (delegating to the legislative power of each State the authority to set the times, places, and manner of holding congressional elections); §§ 8.0001, 8.0002, 8.081, 10.11, 10.12, 10.13, Fla. Stat. (providing definitions and delineating boundaries of each congressional, state house, and state senate district, respectively, by composition of tracts, blocks, and voting tabulation districts); *cf. Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015) ("redistricting is a legislative function"). Implementation of those districts and the preparation of candidate ballots occur at the county, not state, level. And federal and Florida law determine when primary and general elections must occur, and Florida law specifies how a candidate qualifies. The Secretary, as qualifying officer for congressional candidates, operates only in a ministerial capacity. As the chief elections officer, the Secretary simply promulgates rules to ensure uniformity in ballot format across voting systems throughout the State.

### A. Reapportionment and Redistricting

Pursuant to federal law, because Florida is entitled to more than one representative to Congress, there must be congressional districts established by law

8

equal to the number of representatives to which Florida is entitled. *See* 2 U.S.C. § 2c. Representatives may only be elected from those districts established by state law. *See id.*

Following the 2010 census, pursuant to section 2a, title 2, of the United States Code, the Clerk of the U.S. House of Representatives certified to Florida that the State was entitled to 27 representatives in Congress based the U.S. Census Bureau's report on the subject. *See* U.S. Census Bureau, 2010 Census Briefs, "Congressional Apportionment" (Nov. 2011), *available at* https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf (last visited on Jan. 20, 2016); *cf. League of Women Voters of Fla. v. Fla. House of Representatives*, 132 So. 3d 135, 139 (Fla. 2013) ("*Apportionment IV*"). That apportionment was an increase from the 25 representatives to which Florida previously had been entitled. *Cf.* 2010 Census Briefs, *supra*.

In 2012, the Florida Legislature enacted chapter 2012-2, Laws of Florida, which established 27 congressional districts to be used in the 2012 primary and general elections and thereafter. *See Apportionment IV*, 132 So. 3d at 139. Those districts were codified at section 8.0002, Florida Statutes. In 2014, the Florida Legislature enacted chapter 2014-255, Laws of Florida, which redrew Florida's 27 congressional districts as a remedial plan after a trial court held that the 2012 congressional districts failed to meet the requirements of article III, section 20, of

9

the Florida Constitution. *See Apportionment VII*, 172 So. 3d at 370-71, 376, 386-87. Those districts were codified at section 8.081, Florida Statutes, and were to be used for elections *after* the 2014 general election. *See id.* at 387; *see also* § 8.088, Fla. Stat. Consequently, the 2014 primary and general elections were held for representatives from the districts enacted by chapter 2012-2, Laws of Florida.

In 2015, the Florida Supreme Court affirmed the trial court's invalidation of the 2012 congressional districts, but it also reversed the trial court's approval of several of the 2014 congressional districts. *See Apportionment VII*, 172 So. 3d at 371-72, 413-14, 416-17. The Florida Supreme Court later adopted a judicially-drawn congressional district map, and it ordered that the map be used for the 2016 primary and general elections and thereafter until there is another reapportionment. *See League of Women Voters of Fla. v. Detzner*, No. SC14-1905, 2015 WL 7753054, at *4, *36 (Fla. Dec. 2, 2015) ("*Apportionment VIII*"). The Florida Supreme Court appended the new congressional district map to its opinion and made the data file to be used by supervisors of elections available on its website. *See Apportionment VIII*, 2015 WL 7753054, at *36 & n.16. The Florida Senate subsequently placed that data file and congressional district map, entitled "Plan: SC14-1905," on its redistricting website at http://www.flsenate.gov/Session/Redistricting/Plan/SC14-1905 (last visited Jan. 20, 2016).

To be sure, the Secretary is not the officer who uses that data file and map to alter or create precincts, which is how districts actually are implemented. *Cf.* § 101.001, Fla. Stat. A congressional district map merely serves as a visual aid to show approximately where district lines fall on a geographical representation of the State. A congressional district actually is described in terms of "blocks," "tracts," and "voting tabulation districts." *See, e.g.*, §§ 8.0001, 8.08, Fla. Stat.; *cf. Apportionment VIII*, 2015 WL 7753054, at *36 n.16 ("The approved plan's .doj file can be accessed online at http://www.floridasupremecourt.org/decisions/2015/sc14-1905_app_doj.zip. When read by a computer redistricting application, a .doj file defines the districts in a redistricting plan by delineating which census blocks comprise the districts.").

For example, under the 2012 congressional districts enacted by the Legislature, CD-5, which Congresswoman Brown currently represents, is defined in terms like the following:

> (a) That part of Alachua County consisting of:
>
> 1. All of voting tabulation districts 5, 32, 37, 49, 50, 55, 56, 60, and 64.
>
> 2. That part of voting tabulation district 4 consisting of:
>
> a. That part of tract 20 consisting of blocks 2044, 2046, 4000, 4001, 4002, 4003, 4004, 4005, 4006, 4007, 4008, 4009, 4010, 4011, 4012, 4013, 4014, 4015, 4016, 4017, 4018, 4019, 4020, 4021, 4022, 4023, 4026, 4027,

11

>     4032, 4035, 4036, 4037, 4038, 4039, 4040, 4041, 4042,
>     4043, 4044, 4045, 4046, 4047, 4048, 4049, 4050, 4051,
>     4052, 4053, 4054, 4055, 4056, 4057, 4058, 4059, 4060,
>     4061, 4062, 4063, 4064, 4065, 4068, 4069, 4082, 4083,
>     4084, 4085, 4088, 4089, 4090, 4091, 4092, 4093, 4094,
>     4106, 4109, 4111, 4112, 4114, 4115, 4116, and 4117.
>
>     . . .
>
>     (b)  That part of Clay County consisting of:
>
>     1.  All of voting tabulation districts 34, 68, 69, 71, 86, 90, and 91.
>
>     . . .

§ 8.0002(5), Fla. Stat.  In other words, the ".doj" file made available by the Florida Supreme Court contains the "block" and "tract" data like that set out in section 8.0002 and quoted above for CD-5.  Again, that file now is also available at the Florida Senate's redistricting website, http://www.flsenate.gov/Session/Redistricting/Plan/SC14-1905 (last visited Jan. 20, 2016).

To implement these new congressional districts, supervisors of elections now can go to either the Supreme Court website or the Florida Senate website to download the data file and district map and remap their respective counties to establish new district lines, create new precincts following the census blocks and tracts used to define the districts, pursuant to section 101.001, Florida Statutes, and establish new polling locations as necessary.  Once a supervisor of elections

completes the coding and remapping and the redrawing of precinct lines, the supervisor presents the new county map and precincts to the board of county commissioners for approval. *See* § 101.001(1), Fla. Stat. Ultimately, Florida law tasks the *boards of county commissioners in each county*, upon the recommendation and approval of the supervisor, with the alteration and creation of precincts for voting. *See id.* Section 101.001 also requires supervisors of elections to maintain maps that show current geographical boundaries of each precinct and district in the county subject to the elections process. *See* § 101.001(3)(a), Fla. Stat.; *see also* § 101.001(3)(e), (4), Fla. Stat. (setting out boundary requirements for precincts and setting out corresponding responsibilities for supervisors of elections). The Department of State only maintains a searchable database containing the precincts and corresponding census blocks within those precincts, as that information and changes thereto are provided by the supervisors of elections. *See* § 101.001(3)(c), (d), 4(b), Fla. Stat.

### B.     Elections, Qualifying, and Balloting

Federal law establishes the first Tuesday after the first Monday in November of every even numbered year as the day for the election of representatives to Congress from Florida and the other States. *See* 2 U.S.C. § 7. That designated date coincides with the date for Florida's general election, which is defined by state statute to be held on the same day for the purpose of filling federal, state,

13

county, and district offices. *See* § 100.031, Fla. Stat. In 2016, then, there will be a general election on November 8, at which time Florida voters will elect representatives from Florida to Congress. *See id.*

Under Florida law, a primary election is an election held prior to a general election in order to select a party nominee to be voted for in the general election to fill a federal, state, county, or district office. *See* §§ 97.021(28), 100.061, 100.031, Fla. Stat. There in turn will be a primary election held on August 30, 2016, to nominate candidates of political parties to stand in the general election for those representatives. *See* § 100.061, Fla. Stat. (setting primary election 10 weeks prior to the general election). The candidate receiving the highest number of votes in each party's primary election will be that party's nominee for the office. *Id.* By law, it is the county *supervisors of elections* who must print on ballots to be used in the county at the next general election the names of the candidates nominated by a political party in the primary election. §§ 100.051, 101.2512, Fla. Stat.

Meanwhile, the Florida Department of State is the qualifying office for persons seeking to qualify for nomination or election to federal office, including representatives to Congress. *See* § 99.061(1), Fla. Stat. To qualify for nomination or election, a person must submit his or her qualification papers and either the qualifying fee or certificate of qualification by petition pursuant to section 99.095, Florida Statutes. *Id.* In addition to a properly executed check, the qualification

14

papers that must be filed are the following: a candidate's oath (which must specify the candidate's name as it is to appear on the ballot; the office sought, including the district number; and signature and verification); a written statement of political party affiliation; the form for the appointment of campaign treasurer and depository designation; and a public disclosure of financial interests. *See* § 99.061(7)(a), Fla. Stat.

As the qualifying officer for the office of representative to Congress from Florida, the Department of State performs only a ministerial function. *See* § 99.061(7)(c), Fla. Stat. It reviews qualifying papers for completeness, and if all required qualifying papers are submitted for office, and if each item within those papers appears facially to be complete, the Department must accept those papers and qualify the candidate. *See id.* The Department lacks the discretion to even determine whether the contents of those qualifying papers are accurate. *See id.*

The Department of State certifies to the supervisors of elections, within seven days of the close of qualifying, the names of all duly qualified candidates for nomination or election who have qualified with the Department, including those qualifying for the office of representative to Congress. *See* § 99.061(6), Fla. Stat. In 2016, the qualifying period for representatives to Congress is from noon on June 20 to noon on June 24. *See* § 99.061(9), Fla. Stat. (setting the qualifying period for federal candidates in a year of apportionment as the time period of noon on the

71st day prior to the primary election until noon on the 67th day prior to the primary election).

The Department of State does not print candidate ballots or direct which candidate ballot should be used in any particular precinct. Rather, the supervisors of elections print the ballots to be used in their respective counties at the next general election, and those ballots must include the names of candidates who have been nominated by a political party and the candidates who have otherwise obtained a position on the general election ballot in compliance with the requirements of the Florida Election Code. *See* §§ 100.051, 101.2512, Fla. Stat. Instead, the Secretary is charged with promulgating minimum requirements for uniform ballot formats to be used throughout the State for different voting systems. *Cf.* § 101.151, Fla. Stat. (setting out minimum ballot requirements and directing the Secretary to "adopt rules prescribing a uniform primary and general election ballot for each certified voting system"); rule 1S-2.032, Fla. Admin. Code ("Uniform Primary and General Election Ballot").

## CONCLUSION

The plaintiffs' amended complaint and amended motion for preliminary injunction focus almost entirely on the action taken by the Florida Supreme Court—its order that CD-5 be redrawn in an east-west configuration. The plaintiffs make no effort to describe any specific conduct or threatened conduct on

the part of the Secretary that has caused them the injury that they allege. In fact, the requested injunction against the Secretary would have no effect on CD-5 or its implementation. Because the plaintiffs have not pleaded a proper section 1983 claim against the Secretary, they cannot show a likelihood of success that would warrant an injunction against him. For the purpose of appellate preservation, the Secretary also reiterates his sovereign immunity defense in opposition to the preliminary injunction motion: The plaintiffs have not *alleged* any basis—and no legal basis exists—to override the Secretary's Eleventh Amendment immunity and subject him to a private suit in this Court. The motion for preliminary injunction against the Secretary should be denied.

                                  Respectfully submitted,

                                  */s/ Adam S. Tanenbaum*
                                  ADAM S. TANENBAUM (FBN 117498)
                                   *General Counsel*
                                   adam.tanenbaum@dos.myflorida.com
                                  DAVID A. FUGETT (FBN 835935)
                                   *Assistant General Counsel*
                                   david.fugett@dos.myflorida.com

                                  FLORIDA DEPARTMENT OF STATE
                                  R.A. Gray Building, Suite 100
                                  500 South Bronough Street
                                  Tallahassee, Florida 32399-0250
                                  Phone: (850) 245-6536
                                  Fax: (850) 245-6127

                                  *Counsel for the Florida Secretary of State*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, pursuant to N.D. Fla. Loc. R. 5.1(F), each party on whom this memorandum is to be served is represented by an attorney who will be served through this Court's CM/ECF system upon filing on this 20th day of January, 2016.

/s/ Adam S. Tanenbaum
ADAM S. TANENBAUM
ATTORNEY

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that the foregoing memorandum complies with the type-volume requirements of N.D. Fla. Loc. R. 7.1(F) because it contains 4038 words and was prepared using Microsoft Word with Times New Roman 14-point font.

/s/ Adam S. Tanenbaum
ADAM S. TANENBAUM
ATTORNEY