UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| CONGRESSWOMAN CORRINE BROWN et al., | CASE NO. 4:15-cv-00398-MW-CAS |
| Plaintiffs, | |
| v. | INTERVENORS' MOTION TO DISMISS PLAINTIFFS' VERIFIED AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW |
| KEN DETZNER, in his official capacity as Secretary of State of the State of Florida, THE FLORIDA SENATE, and THE FLORIDA HOUSE OF REPRESENTATIVES, | |
| Defendants. | |

Intervenors, The League of Women Voters of Florida, Common Cause, Deirdre Macnab, LaVonne Grayson, George Oliver III, and Angela DeMonbreun, pursuant to Federal Rule of Civil Procedure 12(b)(6), request the Court dismiss Plaintiffs' Verified Amended Complaint (Doc. 34-1), and as grounds therefor state:

## I.  INTRODUCTION

Plaintiffs attempt a feat previously tried and rejected multiple times, most recently when the Florida Supreme Court invalidated Florida's 2012 Congressional Plan and ordered Congressional District 5 ("CD5") to be drawn in an East-West configuration.  Led by Congresswoman Brown, CD5's twelve-term incumbent, Plaintiffs claim that CD5 may be drawn as a majority-black district – that is, with a voting majority of African Americans – and that the current East-West CD5 results

in minority vote dilution.  Plaintiffs seek to mandate a North-South CD5 that was tailor-made for Congresswoman Brown and snakes hundreds of miles from Jacksonville, to Gainesville, then to Orlando, with tentacles snatching African-American voters in Sanford and Eatonville along the way, so as to get its Black Voting Age Population ("BVAP") just over 50 percent.

Several dispositive barriers stand in the way.  First, Full Faith and Credit requires giving preclusive effect to the recent state court judgment.  The Legislature and NAACP, on behalf of Florida's citizens, sought and failed to establish that vote dilution would result if CD5 were drawn East-West versus the 2012 Congressional Plan's North-South CD5 configuration.  Under applicable Florida law, the state court's judgment should be given res judicata effect, barring Plaintiffs' claims.

Second, Plaintiffs cannot state a vote-dilution claim under Section 2 of the Voting Rights Act ("VRA"), as they cannot show the first (*Gingles*) precondition: that the relevant minority group is sufficiently large and geographically compact to constitute a majority in a single-member district.  Plaintiffs' proposed CD5 – the very same CD5 previously rejected by the Florida Supreme Court – is neither comprised of a single compact minority population, nor is it a functioning majority-black district, as is necessary for Plaintiffs to show a plausible vote-dilution claim.

2

Finally, the Florida Supreme Court's recent decision reflects that it did not subordinate traditional redistricting principles to racial considerations in requiring an East-West CD5 configuration.  Given the deference owed to State redistricting decisions, and because Plaintiffs have failed to show a valid, race-neutral or VRA-compliant alternative, Plaintiffs have not plausibly alleged the intent or causation elements required to state a claim of intentional discrimination.

## II. BACKGROUND[1]

There has been a history of ill-fated efforts to create majority-black districts in north Florida.  In 1992, a three-judge panel in *DeGrandy v. Wetherall*, 794 F. Supp. 1076 (N.D. Fla. 1992), adopted a majority-black congressional district in north Florida ("CD3"), created by joining dispersed African-American populations in Jacksonville, Gainesville, Orlando, Sanford, and elsewhere.  *Johnson v. Mortham*, 926 F. Supp. 1460, 1468-69, 1471-72 (N.D. Fla. 1996).  Based on a plan proposed by a Florida Senator, the majority-black CD3 received support from "strange bedfellows . . . as Republicans joined with African-American Democrats

---

[1] The facts and procedural posture of this action are taken entirely from the allegations in Plaintiffs' Verified Amended Complaint (Doc. 34-1), from the records of the prior state court action, and from official public records, which are subject to judicial notice in accordance with FED. R. EVID. 201.  Pursuant to the Court's Order (Doc. 32) granting Plaintiffs' request for judicial notice, Intervenors have filed, as part of a Notice of Filing (Doc. 52), copies of record filings from the prior state court action on which Intervenors rely in this motion.  Intervenors do not recite all of Plaintiffs' allegations focusing on the history of racial discrimination in Florida, as a summary of those allegations is unnecessary to resolve the issues raised in this motion.

in an attempt by each group to enhance their own political power," by packing Democrats into a single northeast Florida district.  *Id.* at 1490 & n.60.

Within a few years, a second three-judge panel in *Johnson v. Mortham* invalidated the majority-black CD3 by finding, among other things, that *DeGrandy* relied on a theory – since rejected by the U.S. Supreme Court – that the VRA requires maximizing the number of majority-black districts.  *Id.* at 1469 (finding *DeGrandy* in conflict with *Johnson v. DeGrandy*, 512 U.S. 997 (1994)).   The *Mortham* court found that a reasonably compact majority-black district could not be drawn, and that a majority-black district was not needed for African Americans to elect candidates of their choice.   *Id.* at 1471, 1475-76.   The court thus invalidated the district, and the Legislature later drew a different version with a BVAP of only 42.7%.  *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1308 (S.D. Fla. 2002).  From 1996 through 2000, that version of CD3 consistently elected a black candidate of choice (Congresswoman Brown) by hefty, if not landslide, margins of 61.2% in 1996, 55.4% in 1998, and 57.6% in 2000. *See id.*[2]

Following the 2000 census, VRA claims once again arose, when the Legislature enacted a new version of CD3 with a BVAP of 46.9%.  *Id.* at 1307. Yet a third three-judge panel rejected those claims in *Martinez v. Bush*, finding that

---

[2]  *Election Results*, FLA. DEPT. OF STATE, DIV. OF ELECTIONS, *available at* http://results.elections.myflorida.com/ (finding results by selecting elections and offices up for reelection).

"[e]ven with only a 46.9% [BVAP], new CD 3 will afford black voters a reasonable opportunity to elect candidates of choice and probably will in fact perform for black candidates of choice." *Id*. at 1308.  As anticipated, even with less than a majority BVAP, CD3 in the 2002 congressional plan ("2002 Benchmark Plan") went on to elect Congresswoman Brown by landslide margins of 59.3% in 2002, 99.2% in 2004, and 63% in 2010, when she was challenged.[3] Congresswoman Brown had no opposition in the 2006 and 2008 elections.[4]

In the 2012 redistricting process, no doubt because CD3 in the 2002 Benchmark Plan performed soundly for African-American voters without a BVAP majority, the NAACP submitted a plan that had an analog to CD3 with a BVAP of 48%.[5]  Similarly, each of the Florida House's proposed plans contained analogs to CD3 with BVAPs ranging from 47% to 48%.  *League of Women Voters of Florida v. Detzner*, 172 So. 3d 363, 436 (Fla. 2015) ("*Apportionment VII*").

Nevertheless, after a closed-door meeting among negotiators for the majority (Republican) leadership of the Florida Legislature, the Legislature enacted plan H000C9047 (the "2012 Congressional Plan"), in which the successor district to

---

[3] *Id.*

[4] *Id*.

[5] *District 3 Demographic Profile (SPUBC0154),* FLORIDA SENATE (Nov. 01, 2011), http://www.flsenate.gov/PublishedContent/Session/Redistricting/Plans/h000c9047/h000c9047_district_details.pdf at 3.(calculated by adding BVAP and Hispanic Black VAP).

CD3 (enacted CD5) had a BVAP of 50.06%.[6]   As a state trial court would later describe it, the 2012 Congressional Plan's CD5 "is visually not compact, bizarrely shaped, and does not follow traditional political boundaries as it winds from Jacksonville to Orlando … [and] at one point … narrows to the width of Highway 17." *Apportionment VII*, 172 So. 3d at 435.  The figure below depicts the district:



In 2010, a supermajority of Florida's voters adopted Amendment 6 to the Florida Constitution ("art. III, §20") to end political gerrymandering in congressional redistricting.  As interpreted by the Florida Supreme Court, "the overall goal of the Amendment was twofold: To require the Legislature to

---

[6] *District 5 Demographic Profile (H000C9047),* FLORIDA SENATE (Jan. 25, 2012), http://www.flsenate.gov/PublishedContent/Session/Redistricting/Plans/h000c9047/ h000c9047_district_details.pdf at 5 (calculated by adding BVAP and Hispanic Black VAP).

redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations[,] and to require legislative districts to follow existing community lines so that districts are logically drawn, and bizarrely shaped districts are avoided." *In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So. 3d 597, 598 (Fla. 2012) ("*Apportionment I*"). In particular, art. III, §20 imposed the following mandates:

> In establishing congressional district boundaries:
>
> (a)   No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.
>
> (b)   Unless compliance with the standards in this subsection conflicts with the standards in subsection (a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.
>
> (c)   The order in which the standards within subsections (a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

FLA. CONST. Art. III, §20.

After the Legislature enacted the 2012 Congressional Plan, a coalition led by the League of Women Voters of Florida and Common Cause (the "Coalition") brought a state court action ("Earlier Action") challenging the 2012 version of CD5 – the identical North-South version now offered by Plaintiffs.  (Doc. 34-1 ¶¶78-79).  The Earlier Action proceeded for over two years, culminating in a 12-day trial that began in mid-May 2014.  (*See id.* ¶14 & n.2)  Throughout the Earlier Action, both the Legislature and the NAACP opposed the Coalition's challenges to the North-South CD5, claiming the East-West CD5 advanced by the Coalition would result in minority retrogression under art. III, §20, and minority vote dilution under art. III, §20 and Section 2 of the VRA.  *Apportionment VII*, 172 So. 3d at 436; (*see, e.g.,* Doc. 52-1 at 71; Doc. 52-2 at 19-29).

In a final judgment on July 10, 2014, the trial court in the Earlier Action invalidated the 2012 version of CD5 on finding that it did not adhere to the "tier-two" standards of compactness and respect for geographic and political boundaries in art. III, §20(b), *Apportionment VII*, 172 So. 3d at 435; "a more tier-two compliant district could have been drawn that would not have been retrogressive," *id*. at 436; "Defendants' argument that the vote dilution provisions of Article III Section 20 and Section 2 of the [VRA] required a majority BVAP district and that th[e] [enacted CD5] configuration was necessary to achieve that end, is not

supported by the evidence," *id*; and CD5 was drawn "with the intent of benefiting the Republican Party," *id*. at 437.

The Legislature subsequently convened a special session and, on August 12, 2014, enacted a revised version of CD5 as part of Plan H000C9057 (the "2014 Revised Congressional Plan"). *Apportionment VII*, 172 So. 3d at 386. Among the revisions, the Legislature removed Sanford from CD5 which, with other revisions, reduced CD5's BVAP to 48.1% in the 2014 Revised Congressional Plan.[7]

The trial court approved the 2014 Revised Congressional Plan on August 22, 2014. (Doc. 34-1 ¶86, Ex. 3). At that point, despite thousands of African-American voters being removed from CD5, reducing its BVAP to a minority, Plaintiffs did not challenge the 2014 Revised Congressional Plan. Rather, Congresswoman Brown waited while the Coalition appealed, and she did not file the instant case until August 11, 2015, after the Florida Supreme Court invalidated the 2014 Revised Congressional Plan and ordered CD5 to be redrawn in an East-West configuration in *Apportionment VII*. (*Compare* Doc. 34-1 ¶87 *with* Doc 1).

---

[7] *Plan: H000C9057*, FLORIDA SENATE,
http://www.flsenate.gov/Session/Redistricting/Plan/h000c9057 (containing "KMZ for Google Earth" link to official .kmz file of the 2014 Revised Congressional Plan, which allows for detailed viewing in Google Earth); *District 5 Demographic Profile (H000C9057),* FLORIDA SENATE (Aug. 7, 2014),
http://www.flsenate.gov/PublishedContent/Session/Redistricting/Plans/H000C9057/H000C9057_district_details.pdf at 5.

In remedial proceedings that followed *Apportionment VII*, both the Legislature and the Coalition proposed alternative plans with identical East-West configurations of CD5 with 45.12% BVAP. *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 272 (Fla. 2015) ("*Apportionment VIII*"); *Apportionment VII*, 172 So. 3d at 404 (reporting the district's BVAP). On December 2, 2015, the Florida Supreme Court approved the East-West CD5 configuration. It is identical to the configuration on which the Coalition relied and that both the Legislature and NAACP challenged in the trial on the 2012 Congressional Plan in May 2014. *Apportionment VIII*, 179 So. 3d at 272. As part of Plan CP-1 (the "Current Congressional Plan"), the same East-West CD5 became the law of Florida upon the trial court's entry of judgment on December 22, 2015. (Doc. 30 at 1).

Now, even though the Florida Supreme Court has approved CD5 in the Current Congressional Plan, Plaintiffs rehash a battery of challenges to CD5. In their Verified Amended Complaint (Doc. 34-1), Plaintiffs claim: in Count I, that CD5 violates the vote-dilution provision in Section 2 of the VRA (*id.* ¶¶113-118); in Count II, that CD5 was adopted, in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution, to deny or abridge the right of black citizens to vote on account of their race and color, (*id.* ¶¶119-121); in Count III, that CD5 violates the vote-dilution provision in art. III, §20, (*id.* ¶¶122-125); and, in Count

IV, that CD5 violates the anti-retrogression provision in art. III, §20, (*id*. ¶¶126-130).

On January 20, 2015, Plaintiffs voluntarily dismissed Counts III and IV, their state law claims.  (Doc. 49).  Plaintiffs' federal claims (Counts I and II) should be dismissed as well, because they fail to state a plausible claim for relief.

### III.   STANDARD OF REVIEW

Legally deficient claims should be disposed of "at the point of minimum expenditure of time and money by the parties and the court."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  Early disposition is proper when a cause of action is simply not plausible.  *Id.* at 570.  Dismissal is required where a claim has a dispositive legal flaw, such as when the facts alleged cannot support an element of the claim, *see*, *e.g.*, *Ortega Trujillo v. Banco Cent.  Del Ecuador*, 17 F. Supp. 2d 1340, 1342 (S.D. Fla. 1998) ("Regardless of the alleged facts, however, a court may dismiss a complaint on a dispositive issue of law"); when the claim is at odds with the facts disclosed in documents referenced in the complaint or susceptible to judicial notice, *see*, *e.g.*, *Griffin Indus. Inc. v. Irwin*, 496 F.3d 1189, 1205 (11th Cir. 2007); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999); or when records from prior judicial proceedings preclude further litigation of claims and issues that have already been adjudicated, *see*, *e.g.*, *Solis v. Global Acceptance Credit Co., L.P.*, 601 Fed. App'x 767, 771 (11th Cir. 2015) (unpublished)

(affirming dismissal of complaint on the basis of res judicata); *Starship Enters. of Atlanta, Inc. v. Coweta Cnty., Ga.*, 708 F.3d 1243, 1252 n.13 (11th Cir. 2013).  In assessing whether to dismiss challenges to a legislative districting plan, a court may take judicial notice, *inter alia*, of official district-related records that are publicly available on a State's redistricting website.  *See Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking notice of official voting age population statistics on Virginia's redistricting website in affirming Rule 12(b)(6) dismissal).

## IV.   LEGAL ANALYSIS

In the Earlier Action, the Legislature and NAACP claimed that minority vote dilution would result from the East-West version of CD5 included in the Current Congressional Plan.  Indeed, Plaintiffs' allegations reflect that their claims were litigated in the Earlier Action, as Plaintiffs' Verified Amended Complaint extensively cites testimony from the 2014 trial to support their claims of vote dilution and discrimination.  (*See generally* Doc. 34-1).  Plaintiffs also have sought and obtained judicial notice of trial testimony offered to support the Legislature's and NAACP's claims of vote dilution.  (*See* Docs. 36, 37).  Whether minority voting rights would be preserved was considered in the Earlier Action as a matter of fact and as a natural consequence of the legal context.

As a matter of Florida law, art. III, §20's redistricting restraints are more stringent than the U.S. Constitution's.  *See Apportionment I*, 83 So. 3d at 604.  And

the Florida Constitution's minority voting rights provisions are at least as stringent as the VRA.   Art. III, §20(a) provides two imperatives that "follow almost verbatim the requirements embodied in the Federal [VRA]."   *Id.* at 619 (quoting *Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1280 (11th Cir. 2012)).   The first is that "districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process," FLA. CONST. Art. III, §20(a), which tracks VRA's prohibition against minority vote dilution in Section 2.   *Apportionment I*, 83 So. 3d at 619 (citing 42 U.S.C. §1973(b), recodified as 52 U.S.C. § 10301(b)).   The second imperative is that "districts shall not be drawn … to diminish racial or language minorities' ability to elect representatives of their choice," FLA. CONST. Art. III, §20(a), which tracks the VRA's prohibition against minority vote diminishment in Section 5.   *Apportionment I*, 83 So. 3d at 620 (quoting 42 U.S.C. §1973c(b), recodified as 52 U.S.C. § 10304(b)).   Florida courts thus interpret art. III, §20, and apply its minority protection provisions, consistent with the VRA.   *Id.*

In light of this legal context and the claims in the Earlier Action, the doctrines of Full Faith and Credit and res judicata bar Plaintiffs from litigating their federal claims.   Plaintiffs, moreover, cannot state plausible claims of vote dilution or discrimination in light of their failure, among other things, to show a legally compliant alternative district.

A.    RES JUDICATA BARS PLAINTIFFS' CLAIMS.

Since 1790, the Full Faith and Credit Act has required that the "judicial proceedings" of each State shall be given the "same full faith and credit in every court within the United States . . . as they have by law or usage in the courts" of the rendering State.  28 U.S.C. § 1738.  By this statutory command, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so," regardless of whether a federal claim is at issue.  *Allen v. McCurry*, 449 U.S. 90, 96, 105 (1980) (holding such preclusion applies to § 1983 claims).[8]

As a general rule, the doctrine of res judicata – encompassing both claim preclusion and issue preclusion (or collateral estoppel) – bars parties from relitigating matters that were already litigated or could have been litigated in an earlier action.  *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 466 n.6 (1982); *Koziara v. City of Casselberry*, 239 F. Supp. 2d 1245, 1254 (M.D. Fla. 2002).  Under Florida law – which applies here, *see, e.g., Muhammad v. Fla. Dep't of Corr.*, 739 F.3d 683, 688 (11th Cir. 2014) – the doctrine provides:

> A judgment on the merits rendered in a . . . suit between the same parties or their privies, upon the same cause of action, by a court of competent jurisdiction, is conclusive not only as to every matter which was offered and received to sustain or defeat the claim, but as

_____

[8] *See also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373 (1996); *Sharpley v. Davis*, 786 F.2d 1109, 1111-12 (11th Cir. 1986).

> to every other matter which might with propriety have been litigated
> and determined in that action.

*Fla. Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001).  Res judicata applies when there is: (1) identity of the thing sued for and identity of the cause of action; (2) identity of the persons and parties to the action and identity of the quality or capacity of the persons for or against whom the claim is made; and (3) a judgment on the merits in a former suit.  *See*, *e.g.*, *Muhammad*, 739 F.3d at 688 (applying Florida law).[9]  Because a state court entered a final judgment approving the legal validity of the Current Congressional Plan, the following discussion is limited to the remaining res judicata elements under Florida law.

### 1.  Identity of thing sued for and identity of the "cause of action"

First, to establish that there is identity of the thing sued for, it is enough to show that the same type of relief was sought or could have been sought in the first proceeding.  *See*, *e.g.*, *ICC Chem. Corp. v. Freeman*, 640 So. 2d 92, 93 (Fla. 3d DCA 1994) (finding identity of thing sued for because "[t]he relief sought by [plaintiff] could have been granted in either [the first or second] action").[10]  In this action and the Earlier Action, the thing sued for was declaratory relief.  Both the

---

[9] While *Muhammad* and other cases separate the components of Florida res judicata into four or five elements, for simplicity, the Coalition has grouped the related components into two categories in the discussion below.

[10] *See also, e.g., AMEC Civil, LLC v. Fla. Dep't of Transp.,* 41 So. 3d 235, 242 (Fla. 1st DCA 2010) (finding that identity of "thing sued" existed where damages were sought in both actions, notwithstanding addition of declaratory judgment claim).

Legislature and NAACP urged the state court to find that Section 2 of the VRA and art. III, §20(a) required the 2012 Congressional Plan's North-South CD5 configuration to avoid vote dilution. *Apportionment VII*, 172 So. 3d at 404, 435-37; (see Doc. 52-1 at 56-64; Doc. 52-2 at 19-25; Doc. 52-3 at 30-51; Doc. 52-4 at 2-5). Here, Plaintiffs likewise seek declaratory relief determining that the VRA requires the same previously enacted North-South CD5 configuration. (Doc. 34-1 at 2-3, 5 n.1; Doc. 34-2). Accordingly, identity of the thing sued for exists because the same relief – i.e., a determination that Section 2 of the VRA requires a North-South CD5 – could have been granted in the Earlier Action.

Identity of the "cause of action" also exists here. "Florida law defines identical causes of action as causes 'sharing similarity of facts essential to both actions.'" *Muhammad*, 739 F.3d at 688; *see also Pumo v. Pumo*, 405 So. 2d 224, 226 (Fla. 3d DCA 1981) (holding that Florida law "requires only that the claims or causes of action be substantially the same. . . ."). To determine the requisite similarity,

> [A] court looks not only at the causes of action actually raised in the first suit, but also at every other matter which the parties might have litigated and had determined, within the issues as framed by the pleadings or as incident to or essentially connected with the subject matter of the first litigation.

*Zikofsky v. Marketing 10, Inc.*, 904 So. 2d 520, 523 (Fla. 4th DCA 2005).

In *Apportionment VII*, the North-South CD5 configuration was the "focal point of the challenge to the Legislature's redistricting plan," and the Florida Supreme Court reviewed and affirmed the trial court's decision that CD5 need not be drawn in that configuration with a BVAP over 50% to avoid minority vote dilution or diminishment. *Apportionment VII*, 172 So. 3d at 402-04. In the final judgment, the trial court found that two preconditions were not met to sustain a vote-dilution claim under art. III, §20 and Section 2 of the VRA. *Id.* at 436-37 (citing preconditions first announced in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)). And the Florida Supreme Court independently analyzed the voting patterns and demographics of the proposed East-West configuration of CD5, on which the Coalition relied in the merits trial. *Id*. at 404-05. It found that the East-West CD5 would not result in retrogression because African-American voters retained the ability to elect their preferred candidate of choice. *Id*. at 405-06.

Similarly, in *Apportionment VIII*, the Florida Supreme Court approved the trial court's recommendation to adopt the Coalition's proposed congressional plan ("CP-1"). CP-1, like all plans proposed in the relinquishment proceedings that followed *Apportionment VII*, had the same "East-West version of District 5 presented in the alternative 'Romo A' plan that was introduced into evidence during the original trial." *Apportionment VIII*, 179 So. 3d at 272. In that regard, the court reaffirmed its finding that, in "the 'Romo A' configuration of this district

17

[CD5], the ability of black voters to elect a candidate of their choice is not diminished." *Id.*

Plaintiffs' reliance on various claims raised during the Earlier Action heralds a pointless attempt to relitigate matters considered and rejected by the Florida courts. The gravamen of Plaintiffs' claims is that CD5 must be drawn in the North-South configuration that the Legislature and NAACP vigorously defended, but the trial court invalidated, in the Earlier Action. Plaintiffs intend to put the same district configurations at issue; and, in addition to asserting racial discrimination, raise the same legal theory – vote dilution – raised against the current East-West CD5 configuration in the Earlier Action. Moreover, Plaintiffs allege many of the same bases to support their claims – indeed, going so far as repeatedly to cite testimony from the trial in the Earlier Action to support their claims here. (Doc. 34-1 ¶¶14-19, 21-43, 45-48, 51, 53-58, 60-63, 67, 69). Plaintiffs' claims were therefore raised, or certainly could have been raised, within the issues framed by the subject matter of the Earlier Action, and thus are the same cause of action under res judicata. *E.g., Zikofsky*, 904 So. 2d at 523.

## 2.  Identity of the parties and their capacity

Res judicata's remaining elements – identity of the parties and their capacity – are satisfied here as well. "The term 'parties' has frequently been given a much broader coverage than merely embracing parties to the record of an action." *Jasser*

*v. Saadeh*, 103 So. 3d 982, 985 (Fla. 4th DCA 2012).  Identity of the parties is satisfied as "between the *same parties or their privies*."  *AMEC Civil, LLC v. PTG Constr. Servs. Co.*, 106 So. 3d 455, 456 (Fla. 1st DCA 2012) (emphasis in original).  "A privy is one who is identified with the litigant in interest."  *Id.*

Florida law recognizes that, when the government litigates interests common to the public, as opposed to "purely private interests," "res judicata will bar litigation by private individuals seeking to redress acts that were settled in [a] prior action, even if the private parties were not formal parties thereto."  *Alderwoods Gp. Inc. v. Garcia*, 119 So. 3d 497, 504 (Fla. 3d DCA 2013) (finding, after government litigated claims for similar relief, res judicata barred private parties from suing to have cemetery correct gravesite records and identify mortal remains); *see Young v. Miami Beach Imp. Co.*, 46 So. 2d 26, 30 (Fla. 1950) (finding individuals bound by judgment enjoining city from asserting interest in strip of oceanfront property, because the "judgment against a municipal corporation in a matter of general interest to all its citizens is binding on the latter, although they are not parties to the suit").

Florida law on res judicata is consistent with the law of other jurisdictions that apply res judicata to bar persons who were not parties to the initial action from relitigating challenges to redistricting plans.  In *Robertson v. Bartels*, 148 F. Supp. 2d 443, 446 (D.NJ. 2001), for instance, incumbent candidates and other individuals

attempted to purse a second action to challenge a legislative redistricting plan, after a court upheld the redistricting plan against challenges by a coalition of African-American registered voters and Republican legislators in an earlier action. The *Robertson* court found privity between the parties in the first and second actions based, primarily, on the parties' pursuit of public interest claims. On that point, the court found:

> Where the case raises a public law issue with only an indirect effect on a party's interests, the Supreme Court has recognized that due process concerns are lessened giving courts "wide latitude to establish procedures ... to limit the number of judicial proceedings...." *Richards v. Jefferson County*, 517 U.S. 793, 803, 116 S.Ct. 1761, 1768, 135 L.Ed.2d 76 (1996). Additionally, because of the potentially large number of plaintiffs with standing in public law cases, were they allowed to raise issues continually, public law claims "would assume immortality." *Los Angeles Branch NAACP v. Los Angeles Unified Sch. Dist.*, 750 F.2d 731, 741 (9th Cir.1984). Moreover, inasmuch as a plaintiff's success in a public law case may benefit a broad group of persons, claim preclusion predicated on an initial judgment may be appropriate because it deters interested individuals from "fence-sitting," namely waiting for the outcome of the prior action. *See Tyus* [*v. Schoemehl*, 93 F.3d 449, 456 (8th Cir. 1996)]. Thus, unless an action is deemed precluded by an earlier judgment, "nonparties would benefit if the plaintiffs were successful but would not be penalized if the plaintiffs lost." *Id*.

*Id*. at 450. Notably, the *Robertson* court found privity even though the challengers in the first and second actions were *private* parties seeking to invalidate the redistricting plan on *different* theories.  *Id*. at 452; *cf. Lance v. Dennis*, 444 F. Supp. 2d 1149, 1157-59 (D. Colo. 2006) (applying issue preclusion to bar

challenge to redistricting plan).  The grounds to apply res judicata are even more compelling here.

In the Earlier Action, officially on behalf of Florida and its citizens, the Legislature and the presiding officers of the Legislature raised public interest claims that are essentially the same as Plaintiffs' claims in this action.  The State, in conjunction with the NAACP, argued that the 2012 Congressional Plan's North-South CD5 configuration was necessary to avoid vote dilution and to secure the voting rights of African-American citizens, which no single person can claim as purely private.  *See id.* at 450 (finding challenges to redistricting plan were public interest claims); *Alderwoods*, 119 So. 3d at 504-05; *see also Apportionment VIII*, 179 So. 3d at 301 (Perry, J., concurring) (finding that voting rights "protection belongs to the minority community – not to the incumbent they chose to elect").

Each of the elements of res judicata is therefore met in this action. Declaratory relief was sought and Plaintiffs' claims were or could have been raised in the Earlier Action, and the State litigated substantially similar claims in a public interest capacity.  Moreover, Plaintiffs certainly could have participated in the earlier action; in fact, at least one of them (Beverlye Colson Neal) did so by testifying as a witness.  (*Compare* Doc. 34-1 at 1 *with* Doc. 37-1 at 2:5-12). Congresswoman Brown, for her part, publicly criticized the challenge to CD5 both

during and after trial.[11]   Although the trial court readily permitted the NAACP and other interested parties with similar claims to intervene upon timely request, (Doc. 52-5, 52-6), Congresswoman Brown and the other Plaintiffs made the choice not to formally advance their objections in the Earlier Action itself.  Florida law does not permit private parties to sit on the sidelines and then attempt to relitigate public interest claims adjudicated adversely to them.   Accordingly, res judicata bars Plaintiffs' claims.

**B.    PLAINTIFFS CANNOT STATE A VOTE-DILUTION CLAIM IN ANY EVENT.**

To establish vote dilution under Section 2 of the VRA, Plaintiffs must first satisfy each of the three *Gingles* factors: (1) a minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the majority population votes sufficiently as a block to enable it usually to defeat the minority's preferred candidate. *Gingles*, 478 U.S. at 50-51.   "Significantly, a court cannot find vote dilution unless the plaintiffs prove *all* of the necessary factors.  If any one of the *Gingles* prongs is not established, there is no vote dilution."   *Johnson v. Hamrick*, 296 F.3d 1065, 1073 (11th Cir. 2002) (emphasis in original).

---

[11] *See, e.g.*, Brandon Larrabee, *Rep. Corrine Brown Blasts Court Challenges to Her District's Map*, Florida Times-Union, June 2, 2014, *available at* http://jacksonville.com/news/2014-06-02/story/rep-corrine-brown-blasts-court-challenges-her-districts-map.

There are two related elements in the first *Gingles* factor.  The minority group must (1) be "geographically compact," and (2) form a "working majority" of voters in a single-member district.   *Bartlett v. Strickland*, 556 U.S. 1, 12-13 (2009).   Plaintiffs' proposed configuration of CD5 – that is, the 2012 Congressional Plan's North-South CD5 – fails both elements.

### 1.    Plaintiffs cannot meet the first *Gingles* factor's geographic compactness requirement.

The first *Gingles* requirement is that "the minority group is geographically compact."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) ("*LULAC*").   Assessing compactness requires reference to district lines and accounting for "traditional districting principles such as maintaining communities of interest and traditional boundaries."  *Id.* (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)).   "[T]raditional districting principles" include, among others, "compactness, contiguity, and respect for political subdivisions."  *Shaw v. Reno*, 509 U.S. 630, 647 (1993).  For a court to evaluate whether the first *Gingles* factor can be met, a challenger must make a specific showing of a feasible, compliant district.  *E.g.*, *Fairley v. Hattiesburg, Miss.*, 584 F.3d 660, 669 (5th Cir. 2009) (finding that, "to establish the first *Gingles* precondition, plaintiffs typically have been required to propose hypothetical redistricting schemes and present them to the district court in the form of illustrative plans," as plaintiffs "bear the burden of proof in VRA cases").  Plaintiffs in vote-dilution cases must therefore demonstrate,

*inter alia*, "some alternative, feasible benchmark system" that meets the first *Gingles* factor. *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1571 (11th Cir. 1997).

"A district that reaches out to grab small and apparently isolated minority communities is not reasonably compact." *LULAC*, 548 U.S. at 433. Centers of minority population dispersed across significant distances are not *geographically* compact. *See, e.g.*, *Johnson v. Miller*, 922 F. Supp. 1556, 1566 & n.15 (S.D. Ga. 1995), *aff'd* 521 U.S. 74, 91 (1997) (finding the first *Gingles* factor was not met because drawing separate majority-black districts in southeast and east-central Georgia would require joining dispersed population centers "using land bridges and appendages," in violation of traditional districting policies). "[S]nake-like," "irregular," or "bizarre" district shapes do not comport with traditional districting principles. *See Apportionment I*, 83 So. 3d at 634-35 (citing collected cases). Indeed, when such features appear unexplainable on grounds other than race, a district configuration is subject to strict scrutiny review and presumptively invalid. *See Miller v. Johnson*, 515 U.S. 900, 904-05 (1995); *Shaw*, 509 U.S. at 643-46. Simply put, Section 2 of the VRA "does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Abrams*, 521 U.S. at 91-92.

Plaintiffs' exemplar district – the 2012 Congressional Plan's North-South CD5 (Doc. 34-1 at 5 n.1; Doc. 34-2) – is deficient on its face.  As reflected in the image below on the left, the district is extremely non-compact, snaking through eight counties with hooks and tentacles to take in parts of Jacksonville, Gainesville Orlando, Orange Park, Sanford, and elsewhere.[12]  No single county remains whole within its path.  At one point, the district narrows to the width of Highway 17, as it jumps from Orange Park and across the neck of Doctors Lake. The district is even less compact than its predecessor (CD3) in the 2002 Benchmark Plan,[13] giving it the distinction of being dubbed one of the nation's most infamous "[c]rimes against geography."[14]

---

[12] *Plan: H000C9047*, FLA. SENATE, http://www.flsenate.gov/Session/Redistricting/Plan/h000c9047  (containing "KMZ for Google Earth" link to official .kmz file of the 2012 Congressional Plan, which allows for detailed viewing in Google Earth).

[13] *Compare id. with Plan: FL2002_CON*, FLORIDA SENATE, http://www.flsenate.gov/Session/Redistricting/Plan/fl2002_con (containing "KMZ for Google Earth" link to official .kmz file of the 2002 Benchmark Plan, which allows for detailed viewing in Google Earth).  For the Court's reference, attached to Intervenor's Notice of Filing (Doc. 52-8) are official Legislative demonstratives that include reports for the 2002 Benchmark Plan (S19C0017), 2012 Congressional Plan (H000C9047), 2014 Revised Congressional Plan (H000C9057), and the Current Congressional Plan (CP-1), and which provide objective compactness metrics for comparison.  (*See id*. at 3, reflecting 2002 Benchmark Plan metrics; *id.* at 8, reflecting 2012 Congressional Plan metrics).

[14] Christopher Ingram, *America's most gerrymandered congressional districts*, Wash. Post (May 15, 2014), http://www.washingtonpost.com/blogs/wonkblog/wp/2014/05/15/americas-most-gerrymandered-congressional-districts/.



As reflected in the image above on the right, Florida's official Legislative redistricting website also permits a review of the district's African American population centers.[15]   It shows Plaintiffs' proposed CD5 is not comprised of a single geographically compact minority group – as *Gingles* requires – but at least seven different minority populations, some rural and some urban, in Duval, Clay, Putnam, Alachua, Marion, Seminole, and Orange Counties. Because the BVAP of

---

[15] *Plan: H000C9047*, FLORIDA SENATE, http://www.flsenate.gov/Session/Redistricting/Plan/h000c9047  (containing link to "View Plan with District Explorer," in which a viewer may select the "Value Ramp" that shows concentrations of BVAP in red).

Plaintiffs' proposed CD5 is only 50.06%,[16] joining every one of these seven rural and urban populations is necessary to achieve a bare majority BVAP, and that linkage can only be accomplished by narrow unpopulated or primarily white land bridges.  Nothing in Section 2 of the VRA or any other law mandates the state of Florida to join sevem different farflung African-American populations simply to achieve a bare BVAP majority district.  Accordingly, the trial court in the Earlier Action easily found that the district did not meet the first *Gingles* factor. *Apportionment VII*, 172 So. 3d at 436.

That version of CD5 was not the first attempt to create a majority-black district in North Florida, nor the first to be rejected for failing to satisfy *Gingles*. The *Mortham* court invalidated a majority-black predecessor to CD5, finding "the African–American population in Northeast Florida is not sufficiently large and geographically compact so as to constitute a majority in a fairly drawn congressional district."  *Mortham*, 926 F. Supp. at 1471.  The court observed that the 1992 version of CD3, like Plaintiffs' proposed CD5, linked widely dispersed African-American populations primarily at the district's geographic extremes "in Duval County (Jacksonville), and … in Orange County (Orlando), some 100 miles

---

[16] *District 5 Demographic Profile (H000C9047),* FLORIDA SENATE (Jan. 25, 2012), http://www.flsenate.gov/PublishedContent/Session/Redistricting/Plans/h000c9047/ h000c9047_district_details.pdf at 5 (calculated by adding BVAP and Hispanic Black VAP).

to the south"; joins "African-American population concentrations" that "are not physically adjacent to each other, and are linked together only by narrow land bridges of white rural and small town populations"; and broke every county in its path. *Id*. at 1471-72. Because Section 2 did not justify 1992 plan's effort to create a majority-black district at the expense of compactness, *Mortham* invalidated the district on Equal Protection grounds. *See id*. at 1495.

Nevertheless, to claim that dispersed African-American enclaves in Jacksonville, Gainesville, Sanford, Orlando, and elsewhere form a single community, Plaintiffs allege that common socio-economic disparities, such as poverty (Doc. 34-1 ¶43), unemployment (*id*. ¶38), deficient housing (*id*. ¶35), deficient educational access (*id*. ¶36), and criminal justice issues (*id*. ¶37) disproportionately affect African Americans in the region. *Mortham*, however, flatly rejected that argument, finding such "socio-economic disparities are not unique to [the district], to Florida, or to the South, but rather more generally reflect the socio-economic differences between whites and African-Americans in similar districts throughout the country." *Mortham*, 926 F. Supp. at 1478. Defining communities by such non-unique attributes encourages sprawling, irregular, minority-majority districts, and would vitiate the geographic compactness requirement. *See id.* at 1492 (finding socio-economic commonality as a spurious basis to justify districts as it led to tying together pockets of mostly lower income

African-American voters with land bridges).  *Mortham* rightly rejected such efforts as prone to distort the VRA into a system of political segregation to replace a system of economic and social segregation.  *See, e.g., id*. at 1485 & n.47. Regardless, Section 2 does not require geographically remote populations – defined by race, socioeconomic condition, or otherwise – to be linked together by land bridges, hooks, and tentacles.

### 2. African Americans are not a "working majority" of voters in the proposed CD5.

Plaintiffs likewise have not presented an actual majority-black district.  To qualify, African Americans must be a "numerical, *working* majority of the voting-age population," *Bartlett*, 556 U.S. at 13 (emphasis added), which requires considering factors affecting eligibility to vote, *see, e.g., LULAC*, 548 U.S. at 429 (finding that considering citizenship "fits the language of §2 because only eligible voters affect a group's opportunity to elect candidates.").  For example, several circuits have held that courts should consider Citizen Voting Age Population ("CVAP"), rather than bare BVAP, in evaluating the "working majority" requirement.  *See, e.g.*, *Negron*, 113 F.3d at 1569; *see also Perez v. Pasadena Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998).

The previously invalidated version of CD5, on which Plaintiffs rely, is just .0579444% (2,985 voting-age African Americans) over a BVAP majority, without

excluding non-citizens or convicted felons who have lost their voting rights.[17] Accordingly, even a slight reduction in eligible African-American voters eliminates the purported majority-minority status of the district.  Notably, African Americans are only 47.2% of registered voters in Plaintiffs' CD5 as of the 2010 census, indicating that they are not a true working majority of the district.[18]  Yet Plaintiffs do not allege that their proposed CD5 is majority-black on a CVAP basis or after accounting for other factors affecting eligibility to vote.  Plaintiffs' failure in that regard is remarkable given their allegations that "[c]riminal justice issues disproportionately burden black voters in counties in North-South [CD5]" (Doc. 34-1 ¶37), and "[t]he number of African Americans in . . . correctional facilities is disproportionately black," (*id*. ¶104).  It naturally follows that Plaintiffs' CD5 also has a disproportionate number of formerly incarcerated African Americans without voting rights.  In addition to such individuals, Plaintiffs' CD5 officially has 10,195 incarcerated adults, over half of whom would be African American if *proportionate* (let alone disproportionate, as alleged) to the district's population.[19] Were it possible to capture enough African-American voters to form a working majority (such as by adding more appendages to the district to draw in pockets of

---

[17] *District 5 Demographic Profile (H000C9047),* FLORIDA SENATE (Jan. 25, 2012), http://www.flsenate.gov/PublishedContent/Session/Redistricting/Plans/h000c9047/ h000c9047_district_details.pdf at 5 (calculated by adding BVAP and Hispanic Black VAP).

[18] (Doc. 52-7 at 5).

[19] *Id.*

African-American voters), the likelihood is that it would require drawing the district in a configuration that is even less geographically compact.[20]

Under the circumstances, Plaintiffs have failed to show a valid, *Gingles*-compliant district configuration.  This Court should therefore dismiss Plaintiffs' vote-dilution claim.

## C.    PLAINTIFFS CANNOT PLAUSIBLY STATE DISCRIMINATION CLAIMS.

Also doomed is Plaintiffs' conclusory claim that the current CD5 was adopted with intent to "deny or abridge the right of black citizens residing in [CD5] to vote on account of their race and color," in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution.  (Doc. 34-1 ¶¶120-21).  Given the Florida Supreme Court's extensive analysis, validation, and implementation of East-West CD5, Plaintiffs must essentially challenge that court's good faith, because intentional discrimination claims require showing that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects."  *Miller*, 515 U.S. at 916 (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).  Plaintiffs have not adequately shown intent or causation to state such a claim.

---

[20] As CD5's history shows, and the Florida Supreme Court found, such a distorted majority-black district is not needed in northeast Florida to elect African American candidates.  Where, as in East-West CD5, African-American voters are a clear majority of Democratic voters in a solidly Democratic-performing district, those voters will effectively choose the Democratic candidate who will likely win the general election. *Apportionment VIII*, 179 So. 3d at 272.

### 1.  Plaintiffs' claims of invidious intent are inadequate.

To challenge a State's redistricting plan as intentionally discriminatory requires showing, either through circumstantial evidence of the district's shape and demographics or more direct evidence, that race was the predominant factor motivating the State's decision to place a significant number of voters within or without a particular district.  *Id.*  To make this showing, a plaintiff must prove the State "subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations."  *Id.* Where these or other race-neutral considerations are the basis for a redistricting plan, and are not subordinated to race, a State can "defeat a claim that a district has been gerrymandered on racial lines." *Id.* (citing *Shaw,* 515 U.S. at 647). These principles inform not only a plaintiff's burden of proof at trial; courts must also assess them in determining whether a case may proceed from the start.  *Id.* at 916-17 (citing, *inter alia*, Fed. R. Civ. P. 12(b)(6)).

The unfortunate irony here is Plaintiffs' insistence that CD5 should be drawn North-South as in the 2012 Congressional Plan.  That snaking, non-compact configuration epitomizes the subordination of traditional race-neutral districting principles to racial considerations, and calls for strict scrutiny and presumptive invalidation on Equal Protection grounds.  *See, e.g., Shaw*, 509 U.S. at 643-44.

The Legislature, in fact, conceded that its intent to increase CD5's BVAP over 50% prompted the 2012 Congressional Plan's configuration. (*See, e.g.*, Doc. 52-1 at 70-71). The Florida Supreme Court's rationale for the East-West CD5 stands in stark contrast, as does the district itself, demonstrating that the court did not unnecessarily subordinate traditional race-neutral districting principles to racial considerations.

To be sure, the Florida Supreme Court carefully noted that East-West CD5 would not diminish the ability of African-American voters to elect a candidate of their choice. *Apportionment VII*, 172 So. 3d at 404-05; *Apportionment VIII*, 179 So. 3d at 272. But, at the same time, the court emphasized the East-West CD5 is visually superior, more metrically compactness, splits fewer counties and incorporated cities, and improves the compactness of no fewer than four other districts, when compared to the North-South version. *Apportionment VII*, 172 So. 3d at 405-06. Thus, assuring compliance with the Florida Constitution's race-neutral redistricting principles – especially, compactness and respect for political subdivisions – guided the court's consideration, and prompted its implementation, of Florida's current East-West CD5.

As Plaintiffs do not cite a valid, race-neutral alternative and, in fact, seek a North-South CD5 configuration in which race is the predominant consideration at the expense of traditional race-neutral considerations, Plaintiffs cannot plausibly

state claims of intentional discrimination.   As a matter of law, Florida's Current Congressional Plan is entitled to substantial deference in assessing challenges. *See Miller*, 515 U.S. at 915-17 (observing the deference owed to State redistricting decisions and emphasizing that reluctance to intervene should guide federal courts to assure that a plaintiff must make an adequate showing at the outset and before trial). The inadequacy of Plaintiffs' showing regarding intent mandates dismissal at the outset.

### 2.  Plaintiffs' claims lack an adequate showing of causation.

Plaintiffs also must show a discriminatory impact to maintain their discrimination claims.   *See Johnson v. Desoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1345 n.20 (11th Cir. 2000) (finding intentional discrimination claims require causation).

> To show that inequality of opportunity is caused by a particular electoral system, a plaintiff must establish that an alternative election scheme exists that would provide better access to the political process. . . . [I]f a minority cannot establish that an alternative election scheme exists that would provide better access to the political process, then the challenged voting practice is not responsible for the claimed injury.

*Id*. at 1346.  Accordingly, without an initial showing of the three *Gingles* factors, a plaintiff asserting an intentional discrimination claim cannot demonstrate that any adverse effect actually results from the challenged plan.  *See Martinez*, 234 F. Supp. 2d at 1335-36; *Broward Citizens for Fair Districts v. Broward Cnty.*, 2012

WL 1110053 at *9 (S.D. Fla. Apr. 3, 2012) (dismissing intentional discrimination claim for failure to show *Gingles*-compliant alternative district).

Here, as previously discussed, Plaintiffs have failed to present a *Gingles*-compliant district.  The Court should therefore dismiss Plaintiffs' intentional discrimination claims, and put an end to these deficient claims.

## V. CONCLUSION

WHEREFORE, Intervenors request that this Court: (1) grant this motion; (2) dismiss Plaintiffs' Amended Complaint with prejudice; and (3) award such other and further relief as is just and proper.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Undersigned counsel for Intervenors hereby certifies that this motion and incorporated memorandum of law contain 7,875 words, excluding the case style, signature block, and certificate of service.  The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on February 3, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ David B. King
David B. King
Florida Bar No.: 0093426
Thomas A. Zehnder
Florida Bar No.: 0063274
Vincent Falcone
Florida Bar No.: 0058553
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone:  (407) 422-2472
Facsimile:  (407) 648-0161
dking@kbzwlaw.com
tzehnder@kbzwlaw.com
vfalcone@kbzwlaw.com

*Counsel for Proposed Intervenors,*
*The League of Women Voters of Florida,*
*Common Cause, Deirdre Macnab, LaVonne*
*Grayson, George Oliver III, and Angela*
*DeMonbreun*