IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CONGRESSWOMAN CORRINE BROWN,
JOHNNY BROWN, THEODORE BROWN,
MARY LAWSON BROWN, MARY L. GEORGE,
CRYSTAL R. BROWN, JUSTIN CAMPBELL,          Case No.: 4:15-cv-00398-MW-CAS
FERRILL HILL, MARGIE KELLY CODY,
JOSEPHINE HALL, SANDRA JACKSON,
MAMIE JACKSON, WILFRED W. REDDICK,
JR., SHANTEZ ROBINSON, CARRIE DAVIS,
JEAN REDDICK, ALVIN SHEPARD, CURTIS
WALKER, PHYLLIS JOHNSON, JEROME
BROWN, JOANN M. BROWN, HAZEL D. GILLIS,
ANTONIA G. BRYANT, EULIE B. JOHNL MACK,
ANTHONY MACK, DORETHA MACK, CONSTANCE
S. HALL, SHAKUR ALI, MICHAEL ASHLEY,
LAWRENCE AVERBECK, ANITA BERRIER, DANIEL L. COLE, JASMINE CROMWELL,
TRICIA DUNLAP, LA' DAISHA EVANS, JAMES
FREEMAN, RUSSELL T. GASKIN, CLARETHA S.
HICKS, TEVIN HENDERSON, MITZI HUTCHINSON,
ANGELIQUE MATTHEWS, ANNA MCLAUGHLIN,
EDWIN MERRITT, LILLIE P. POWELL, TAURICE
RICKS, DEVIN ROBERTS, CARY P. ROBINSON,
ALEXANDRA SAFFICE, SHAKA SHABAZZ, FELICIA
SMITH, RICHARD ALAN SPAULDING, WILLIE
THOMAS, TEAONNDA THOMPSON, RODERIC
TURNER, MARY S. ADAMS, JOY GREGORY, WILBERT
GREGORY, CARLOTTA L. GUYTON, LUELLA
MCQUEEN, DOROTHY M. OLIVER, JACOBY
PITTMAN, BARON RIVERS, KIMBERLY RIVERS,
ANMENIA SHAHAB, NEEMA YA NATHIERI,
MELVIN A. PHILPOT, VELMA WILLIAMS,
BEVERLYE COLSON NEAL, TYRONE FIELDS,
GLORIA R. GREEN, MAXINE S. HIXON, REBECCA
JOHNSON, NEVA SPANN-KIRKLAND, SUSIE L.
JOHNSON HARRIS, EDDIE L. JAMES, BENTLEY
M. CAREY, DWYCE L. ROSS, KENNETH WALKER,
TIFFANY WARE, VANESSA WILLIAMS, CHARITA FINCH,
LAVENIA MAY, DR. ROLOUS A. FRAZIER, JR., DOROTHY
FLUITT, SHEILA B. SMITH, CLARISE REDDICK, DAISY

1

BALES, CONSTANCE BANGO, DELORIS R. SHEPHERD,
VERNON MCQUEEN, HERBERT WILLIAMS JR.,
ROD ZEIGLER, ROYCE FLAGLER, MABLE BUTLER,
JEAN CAMPBELL, WILLIE CAMPBELL, ELLA MAE
CAMPBELL, KALEIGH CAMPBELL, MIA CAMPBELL,
WALTER DULES WILLIAMS, LULA COOKS WILLIAMS,
ROBERTA WILLIAMS, DANIEL J. WILLIAMS, IDA M.
CARSON, JUANITA SANDERS, CHERYLL DANIELS, EDDIE
A. BENN, RICH SLEET, MARIA T. BARNES, ALLEN WIGGINS,
HENRIETTA J. TICE, JASMINE MCKAY, LATOYA DAVIS,
AND LULA DAVIS,

<blockquote>Plaintiffs,</blockquote>

vs.

KEN DETZNER, in his official capacity as
Secretary of State of the State of Florida,
THE FLORIDA SENATE and THE
FLORIDA HOUSE OF REPRESENTATIVES,

<blockquote>Defendants.</blockquote>

---

## PLAINTIFFS' RESPONSE TO INTERVERNORS' MOTION TO DISMISS

Plaintiffs, by and through undersigned counsel, responds to Intervenor Defendants' Motion to Dismiss and Supporting Memorandum of Law (Doc. 54). Because Plaintiffs' Amended Complaint sufficiently states a cause of action pursuant to the requirements of Rule 8(b) of the Federal Rules of Civil Procedure, Plaintiffs respectfully submit that The Intervenors' Motion to Dismiss should be denied.

### I.     Standard for Motion to Dismiss

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court is required to accept as true "all facts set forth in the plaintiff's complaint." *Grossman v. Nations Bank, N.A.* 225, F.3d 1228, 1231 (11th Cir. 2000). Further, the court must draw all reasonable inferences in a light most favorable to the plaintiff. *See Bryant v. Avado Brands, Inc.* 187 F.3d 1271, 1273 n.1

(11th Cir. 1999). *See also Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007); Generally, to survive a motion to dismiss and meet the requirements of Fed. R. Civ. P. 8(a)(2), a complaint need not contain "detailed factual allegations," but rather "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556, U.S. at 678. The plausibility standard does not, however, impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence in support of the claim. *Id.; Twombly,* 550 U.S. at 556. Finally, the threshold is "exceedingly low" for a complaint to survive a motion to dismiss for failure to state a claim. *Ancata v. Prison Health Services, Inc.,* 760 F.2d 700, 703 (11th Cir. 1985).

**II.      Plaintiffs' Claims Are Not Barred by Res Judicata or Collateral Estoppel.**

The Intervenors argue that because of the Supreme Court's ruling in *League of Women Voters v. Detzner* ("Earlier Action") this Court is precluded from hearing Plaintiffs' claims, even though the Plaintiffs here were not involved in any way with the state court litigation. As a preliminary matter, abstention may prohibit federal courts from ruling on matters that have been litigated in a state court, but this is not the case here. See, *e.g., Lance v. Dennis*, 546 U.S. 459 (2006) (holding that the abstention *Rooker-Feldman* doctrine does not apply in redistricting cases where the federal court plaintiffs did not participate in the state court litigation). Rather, the Intervenors rest their claim preclusion arguments on the doctrines of res judicata and collateral estoppel. The Full Faith and Credit Act requires federal courts to give the "same full faith and credit . . . to state court judgments as they have by law or usage in the courts" of the rendering state. 28 U.S.C. § 1738 (2016). As the judgment in the Earlier Action was rendered by the Florida

Supreme Court, under the Full Faith and Credit act, Plaintiffs' claims in this Court would only be barred if Florida claim and issue preclusion law would bar Plaintiffs from bringing a suit in state court.

Under res judicata, a final decree or judgment bars a subsequent suit between the same parties based upon the same cause of action and is conclusive as to all matters germane thereto that were or could have been raised. *Gordon v. Gordon*, 59 So.3d 40, 44 (Fla. 1952). Stated differently, to raise the defense of res judicata under Florida law, a party must show that the two causes of action possess "(1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the cause of action; (3) identity of the persons and parties to the action; and (4) identity of quality in persons for or against whom claim is made." *The Florida Bar v. St. Louis*, 967 So.3d 108 ,119 (Fla. 2008). The absence of any of these identities is fatal to the defense of res judicata. 50 C.J.S., Judgments, § 703.

By contrast, collateral estoppel or estoppel by judgment is applicable where two causes of action are different, in which case the first suit only estops the parties to the original suit from litigating points and questions common to both causes of action that were actually adjudicated in the prior litigation. *Gordon*, 59 So.3d at 44. Collateral estoppel precludes re-litigation of a particular issue when: (1) the parties are identical with those from the prior case; (2) the issues are identical; (3) there was a full and fair opportunity to litigate the issues and they were actually litigated; and (4) those issues were necessary to the prior adjudication. *See Agripost, LLC v. Miami-Dade County, Fla.*, 525 F.3d 1049, 1055 (11th Cir. 2008) (stating the elements of issue preclusion in Florida). Thus, issue preclusion, unlike claim preclusion, applies where two different causes of action share one or more legal issues that the former court decided on the merits.

1. Res Judicata and Collateral Estoppel Are Not Properly Raised in a Motion to Dismiss.

Florida law holds that a motion to dismiss is not the proper vehicle to dispose of a case on the grounds of claim preclusion. *See Livingston v. Spires*, 481 So.2d 87, 88 (Fla. 1st DCA 1986). Rather, res judicata and collateral estoppel are affirmative defenses that cannot be raised in a motion to dismiss unless the allegations of a prior pleading in the case demonstrate their existence. *Id.* (quoting *City of Clearwater v. United States Steel Corp.,* 469 So.2d 915 (Fla. 2d DCA 1985). In considering a motion to dismiss, a court is required to confine itself to the allegations confined within the four-corners of the complaint. Arguments for the application of claim preclusion cannot be supported by allegations of fact stated in motions, nor can it be established by the assertion of extrinsic evidence at the hearing thereon. *See Glass v. Armstrong,* 330 S0.2d 57, 58 (Fla. 1st DCA 1976).

Here, the Intervenors cannot establish the elements of res judicata through the four-corners of the Plaintiffs' complaint. Indeed, in the portion of the Intervenors' motion discussing res judicata they only make three references to the Plaintiffs' amended complaint. *See,* Doc. 54 at 16 (noting that Plaintiffs seek declaratory relief; *id.* at 18 (noting that Plaintiffs' Amended complaint cites testimony from the prior state court litigation); *id.* at 21 (noting that one of the plaintiffs named in the Amended complaint testified as a witness in the prior litigation). These allegations alone are from the amount of proof necessary to prove the Intervenors' burden to establish the defense of res judicata. Indeed, none of the authority that the Intervenors cite to establish their claim rely on these facts. Rather, the Intervenors establish the factual basis for their defense using extrinsic evidence from the prior litigation and elsewhere.

While it is true that this Court, pursuant to the agreement of the parties, has taken judicial notice of portions of the record from the Earlier Action, that notice was granted only to the limited extent that the Court would judicially notice the fact that the documents in the referenced cases

were filed. *See* Doc. 32 at 21. The Court explicitly declined to take notice of the documents for their evidentiary truth. *Id.* Furthermore, even if these judicially noticed documents are considered to be incorporated into the four corners of the Plaintiffs' complaint, the Intervenors' reliance on extrinsic evidence goes even beyond the court documents from the prior litigation. A large portion of the Intervenor's argument rests on the highly speculative assumption that Congresswoman Brown and the other Plaintiffs could have intervened in the Earlier Action, but rather, "made their choice not to formally advance their objections in the Earlier Action itself," Doc. 54 at 22; a proposition for which they rely on a newspaper article allegedly containing statements made by Congresswoman Brown while the Earlier Action was ongoing. These factual arguments go far beyond what is permitted to prove res judicata in a motion to dismiss. Therefore, because the Intervenor's motion cannot establish the defense of res judicata from the four-corners of the Amended Complaint itself, the first ground for the Intervenor's motion should be denied.

2.     Res Judicata and Collateral Estoppel Are Inapplicable Because the Parties in this Case Are not the Same as in the State Court Litigation.

Even if the Intervenors' Motion to Dismiss was a proper vehicle for raising their preclusion defenses, their arguments are misplaced here because Florida law requires strict identity of parties in order to raise either a res judicata or a collateral estoppel defense. Because the Plaintiffs in the instant action were strangers to the judgment issued in the Earlier Action, under Florida law, they are not bound by the state court's judgment, and are therefore are free to bring their action here.

First, in the context of res judicata, courts have required strict identity between the parties in each action, even when the harm sought to be remedied stems from the same facts or events that gave rise to the previous action. *See Youngblood v. Taylor*, 89 So.2d 503, 505–506 (Fla. 1956). While some Florida cases have extended res judicata to persons in privity with the parties in an earlier action, they have only done so in situations where the first litigant was acting as a "virtual

6

representative" of the second party, such that the second party would ordinarily be bound by a judgment against the first. *See Massey v. David*, 831 So.2d 226, 233–34 (Fla. 1st DCA 2002).

Indeed, Florida courts have been extremely reluctant to expand the definition of privity. In *Youngblood*, for example, the Florida Supreme Court found that identity of parties did not exist in two suits seeking to recover damages against a truck driver who struck the plaintiff's son while riding a bike. *Id.* In the first suit, the father sued the driver on behalf of the child as his next of kin. *Id.* at 505. After losing the first suit, the father brought a second suit seeking damages for loss of the child's services and the child's medical expenses. *Id.* at 506. After the defendant moved for summary judgment on the second suit, the court found that the second action was not barred by res judicata, because he was not a party to the first lawsuit "in the strictest sense" but rather was suing on behalf of the minor he represented. *Id.* at 505. Florida courts have followed the lead of *Youngblood*, in denying res judicata claims where a party to the second action brings a suit based on the same facts as a prior action to which they could have ostensibly joined. *See, e.g., Martin v. Arrow Cabs, Inc.*, 107 So.3d 394 (Fla. 3d DCA 1958) (denying res judicata effect of judgment in negligence action for car accident, where the parties in the second case were different passengers from the first suit).

The Plaintiffs here were strangers to the Earlier Action[1]. Furthermore, they did not share any relationship to the state court defendants that would make those parties the Plaintiffs' "virtual representatives," such that the Plaintiffs' would be bound by a judgment entered against them. The Plaintiffs here consist of a Congressperson and voters of District 5 who are completely uninvolved

---

[1] The only involvement that the intervenor's point to linking Plaintiffs to the Earlier Action was the fact that one Plaintiff named in the Amended Complaint, Beverlye Colson Neal testified during the state court proceedings.  Doc. 54 at 21. The Intervenors do not assert that Ms. Neal was a party to the prior action, nor do they point to any other involvement by the Plaintiffs that would put them in a position to be bound by the state court's judgment.

in the redistricting process, and thus could, under no circumstances be bound by a judgment against the defendants ordering the redistricting that the state court plaintiffs sought. Furthermore, as was the case in *Armstrong*, the Plaintiffs' here seek vindication for their *own* injuries, in this case the voting rights that were violated by enacting an East-West District Five. *See, LULAC v. Perry*, 548 U.S. 399, 437 (2006) (". . . the right to an undiluted vote does not belong to the minority as a group, but to its individual members.")  It is of no moment that the state court defendants may have litigated the same issues regarding the same district, since they did so only to defend their own interests in the redistricting plan, and not the individual interests of the voters of District 5.

Second, any potential collateral estoppel defense that the Intervenors may assert also fail for lack of identity between the parties in the Earlier Action. *See, Stogniew v. McQueen*, 656 So.3d 917, 921 (Fla. 1995). In *Stogniew*, the Florida Supreme Court affirmed the longstanding principle under Florida law collateral estoppel can only be asserted when the identical issue has been litigated between the same parties or their privies. *Id.* at 919 (quoting *Trucking Employees of North Jersey Welfare Fund, Inc., v. Romano*, 450 So.2d 843, 850 (Fla. 1984). In so holding, the *Stogniew* court explicitly recognized Florida law departs from federal law and the laws of many other states, which have abandoned the doctrine of mutuality in the context of collateral estoppel. *Id.*

Furthermore, the *Stogniew* court also declined to extend the privity requirement to situations where state agencies initially bring enforcement actions to vindicate the rights of private litigant, who later sue in a private capacity during the second action *Id.* In that case, the first action arose following the plaintiff's complaint to the Florida Department of Professional Regulation (DPR) regarding counseling services that the defendant had rendered to the plaintiff. *ID.* at 918. In response to the plaintiff's complaint, the DPR brought an administrative action, whereby it found that the defendant had committed misconduct in rendering services to the plaintiff. *Id.* The

8

plaintiff then brought a subsequent lawsuit and moved for partial summary judgment against the defendant based on collateral estoppel. *Id.* at 919.

The plaintiff argued that even though she was not a party to the initial administrative action, she was in privity with the DPR in the first action because the DPR acted as her representative. *Id.* at 920. The court flatly rejected these arguments. *Id.* It noted that while the plaintiff certainly had an *interest* in being vindicated by the earlier proceeding, she could not have been bound by the court's judgment. *Id.*

Furthermore, cases following *Stogniew* have fastidiously maintained its mutuality requirement for collateral estoppel. *See, e.g., JKC v. Katz*, 731 So.3d 1268 (Fla. 1999) (applying the mutuality requirement to a defensive collateral estoppel case); *Lee v. Gadasa Corp.*, 680 So.2d 1107 (Fla. 1st DCA 1996); *Shalimar Pointe Owners Assoc, v. JMJ Bayclub, Inc.*, 745 So.2d 1129, 1130 (Fla. 1st DCA 1999) (rejecting collateral estoppel challenge where third party challenged land permit in second suit that was approved in the prior litigation); *Professional Roofing and Sales v. Flemming*, 138 So.3d 524 (2014) (rejecting collateral estoppel challenge where defendant in criminal case brought by the state sought to use dismissal under Florida's "Stand Your Ground Law" to preclude victim's assault claim in later civil case).

Thus, unlike under federal issue preclusion law, where a lack of mutuality might not be an obstacle to a collateral estoppel claim, here, the lack of mutuality is fatal to any issue preclusion claim. Furthermore, while it is true that Plaintiffs shared a common interest with the Florida Legislature and the NAACP in ensuring that the black voters in District 5 remained able to elect the candidate of their choice, the Florida Supreme Court explicitly rejected the argument that shared interests alone were sufficient to create privity between parties, even in a context where,

like in *Stogniew*, a government entity sought to vindicate the rights of a private party in later action. *Stogniew*, 656 So.3d at 920.

In order to argue that mutuality exists between the parties here, the Intervenors cite to a narrow exception to the privity requirement that Florida courts have applied at times for public interest claims. Doc. 54 at 19–20. However, the Florida Supreme Court has defined this exception narrowly, to require that the "government [in the first action] must be suing in its parens patriae capacity, litigating the rights or interests common to the public at large and thereby representing the citizenry of the state." *Engle v. Liggett Group, Inc.*, 945 So.3d 1246, 1260 (Fla. 2006). In *Engle*, the Court found that a settlement agreement reached by the state against a tobacco company to recover punitive damages and Medicaid monies paid by the state to treat tobacco related illnesses, did not bar a class of private litigants from bringing a class action against the tobacco companies for their own injuries.

The court was persuaded by the Ninth Circuit's opinion in *In Re Exxon Valdez*, 270 F.3d 1215 (9th Cir. 2001), which found that individual litigants could bring an action for their own injuries caused by the Exxon-Valdez oil spill, even after the United States and Alaska had reached a settlement agreement for violations of the Clean Water Act arising from the spill. *Id.* at 1261. Namely, the court adopted the Ninth Circuit's reasoning that preclusion did not apply because the first suit was brought to redress harm to the environment and general public while the second suit was brought to vindicate wrongs that resulted in individual injuries. *Id.*

Here, the public interest exception to the mutuality requirement does not apply for two reasons. First, the procedural posture of the Earlier Action does not lend itself to application of the exception. The court in *Engle* noted that for the exception to apply, the state in the original action must sue in its parens patriae capacity, whereas here, the state legislature was not suing in *any*

10

capacity, but rather was defending itself from claims that the statewide redistricting plan was drawn to favor the republican party. *See* Romo Plaintiff's Second Amended Complaint; NAACP's Amended Complaint.  Indeed, contrary to the present procedural posture, in both of the Florida cases cited by the Intervenors that support this exception, the government entity was a plaintiff in the initial action. *See, Alderwoods Gp. Inc. v. Garcia*, 119 So.3d 497, 504 (Fla. 3d DCA 2013) (finding res judicata applied where in initial action, the state sued a cemetery for failing to comply with its recording requirements); *Young v. Miami Beach Imp. Co.*, 46 So.3d 26, 30 (Fla. 1950) (finding res judicata applied where in initial action, municipality sued for declaratory relief that oceanfront property was reserved for public use).

Second, the exception is inapplicable here for the same reasons that The Florida Supreme Court discussed in *Engle*, the Plaintiffs seek redress of different injuries than were at issue in the state court litigation. Courts have recognized that malapportioned districts cause injury to those who live in them. *See, Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (noting that unlawfully drawn districts confers an injury on voters within that district sufficient for Article III standing purposes). Thus, while the state court defendants may have argued that the North-South configuration was necessarily required by the Voting Rights Act to defend allegations that the districts were drawn with partisan intent, it would be a far cry to say that their arguments were a parens patriae action to redress potential injuries caused to the black voters of District 5 who bring suit here.[2]

Finally, the Intervenors also argue that this Court should adopt the reasoning of several out-of-state jurisdictions that have used issue and claim preclusion in the context of redistricting suits. However, these cases both applied preclusion principles from jurisdictions that use different

---

[2] Furthermore, the NAACP's arguments on behalf of black voters in District 5 would not create privity between them and the Plaintiffs here under this exception, because the NAACP is not a state or government entity.

rules from Florida, and rely on rationales that Florida courts have explicitly rejected. *Robertson v. Bartels*, 148 F. Supp.2d 443, 450 (D. N.J. 2001), for instance, ruled that voters were barred from bringing a voting rights act challenge following a state court redistricting lawsuit. That case, however, applied federal claim preclusion principles, which use a test that relies heavily on whether the parties "share an interest" in the outcome of the litigation; a rationale that the court in *Stogniew* rejected. *Id.* ("It is the identity of interests that determines the due process question").

Furthermore, the court in *Robertson* also crafted its holding from a Third Circuit collateral estoppel case, which applied the rule of a jurisdiction that had abandoned mutuality, which only required the parties to have "some fair relationship with the prior litigation relied upon." [3]*Id.* at 449. Given that the court conceded that the parties in the two causes of action proceeded under different legal theories, *Robertson* is better characterized as a collateral estoppel ruling rather than res judicata, even though the court referred to the preclusion doctrine at issue as the latter. *Id.* at 449 (citing *Moldavan v. Great Atlantic & Pacific Tea Co.*, 790 F.2d 894, 898–99 (3rd Cir. 1986). Further, the other redistricting case to which the Intervenors refer, *Lance v. Dennis*, 444 F. Supp. 2d 1149 (D. Colo. 2006) explicitly involved collateral estoppel in a jurisdiction that did not require mutuality.

Since these cases applied laws that have not been adopted by Florida or were based on principles that have explicitly been rejected by Florida courts, they are valueless even as persuasive

---

[3] Even if *Robertson* did apply Florida law, the underlying rationale that it used to adopt its theory of virtual representation for public law issues is inapposite here. In that case, the court rested its reasoning on the fact that the second plaintiffs could have joined in on the earlier action, and that failure to preclude their claims might encourage fence-sitting and create perpetual litigation over public interest issues. *Id.* at 451. As is discussed further below, this action was the first meaningful opportunity that Plaintiffs had to challenge the East-West District 5, since that configuration was only one of many proposed configurations in the state court litigation, and was not adopted until well after the point at which Plaintiffs could have intervened in the state court litigation.

authority here. Indeed, the Intervenors are not able to identify a single Florida case where privity was extended between the state and private citizen where the first action involved the state defending itself, rather than asserting claims on behalf of the public. For these reasons, there is no privity between the Plaintiffs and the defendants in the Earlier Action here, and both the Intervenors' res judicata and collateral estoppel claims must fail.

3.    The Doctrine of Res Judicata Is Also Inapplicable, Because There is No Identity of the Cause of Action.

The doctrine of res judicata[4] does not apply in this case, because the cause of action in the state court is not the same cause of action that Plaintiffs allege here. The test for identity of causes of action asks whether the two lawsuits share facts essential to maintenance of each action. *Gordon*, 59 So.2d at 44. According to the essential facts test, the facts necessary to prove each claim must be identical. *See Tyson v. Viacom, Inc.*, 890 So.2d 120, 1209–10 (Fla. 4th DCA 2005) (finding that whistleblower, breach of contract, and fraud in the inducement claim that all arose out of the same employee's termination were not identical causes of action, because they each required proving separate facts.)

Here, the essential facts test cannot be met. As an initial matter, the two sets of plaintiffs in the Earlier Action both brought state constitutional law claims alleging that the Florida Legislature drew Florida's congressional districts with the intent to favor the republican party.[5] While both causes of action dealt in part with District 5, the essential facts required to prove

---

[4] As noted previously, collateral estoppel does not require identity of cause of action. However, unlike collateral estoppel, when a party is able to prove the elements of res judicata, it bars not only those claims that were actually litigated, but those that could have been litigated. *Gordon*, 59 So.2d at 44.

[5] The Earlier Actions' plaintiffs also brought claims alleging vote dilution, but the Florida Supreme Court's judgment did not rest on those grounds. Further, those plaintiffs brought a challenge against the North South configuration rather than the East-West configuration that Plaintiffs challenge here.

partisan intent are far from identical to the Plaintiffs' Voting Rights Act claims here, since the Plaintiffs' claims here deal with race rather than party affiliation.

The Intervenors claim that there is an identity of cause of action here, because the defendants in the Earlier Action argued that the plaintiff's proposed plans, one of which would later become the East-West District 5, violated a provision of the Florida Constitution which parallels the substantive provisions of the Voting Rights Act. To support this claim, the Intervenors rely on a series of cases that employ a broader "transactional approach" to the identity of cause of action requirement, which allows application of res judicata where the issue in the second case is a cause of action that *could have been* sought in the first case. Doc. 54 at 16 (citing *Zikofsky v. Marketing 10,* 904 So.2d 520, 523 (Fla. 4th DA 2005). However, Florida courts have applied the transactional approach narrowly, not simply to any claim which the parties could have brought in the first action, but only where the second cause of action is "within the issues" framed by the pleadings in the first suit or "essentially connected with the subject matter of the first suit." *See Tyson,* 890 So.2d at 1217, (Gross, J. Concurring specially).

Specifically, the concurring opinion in *Tyson* surveyed the Florida Supreme Court's decisions that had used this transactional approach, and found that it had generally only been used in narrow circumstances similar to the Florida Supreme Court case that first articulated the test, *Hay v. Salisbury*, 109 So. at 617 (Fla. 1926). *Tyson,* 890 So.2d at 1217. In *Hay*, the Florida Supreme Court found that a claim for quiet title shared identity of cause of action with a subsequent claim for specific performance of a contract assigning rights to the property at issue in the first suit. *Hay*, 109 So. at 621. The court found that the two claims were "essentially connected" because the quiet title suit could not have been resolved without addressing the validity of the contract for which the Plaintiff sought specific performance. *Id.*

14

Here, while the East-West configuration's compliance with the Voting Rights Act was litigated in the Court below, it was certainly not "essentially connected" with the subject matter of the litigation in the Earlier Action. Unlike in *Hay*, the state court here could have resolved the claims and issues framed by the pleadings without ruling on the validity of the East-West District 5.[6] Rather, the issue was litigated by the parties because the East-West District 5 was one of the remedies which the Romo Plaintiffs eventually proposed as a benchmark. The court certainly did not need to rule on the validity of the district to resolve the issues in the pleadings, because the legislature may have opted for a different remedy if a violation was found. Because the validity of East-West District 5 was neither the cause of action in the initial proceeding nor essential to the subject matter of the prior litigation, there is no identity of cause of action here necessary to support a claim for res judicata.

**4.      Fundamental Fairness Requires Giving Plaintiffs an Opportunity to Vindicate their Voting Rights**

Even if the Intervenors could make out the elements of a claim for res judicata or collateral estoppel purposes, the doctrine should not be applied here, because given the unusual posture of this case, the Plaintiffs never received an opportunity to vindicate their voting rights. It is a well-established principle in Florida law that res judicata will not be invoked where it will work an injustice. *See Wallavce v. Luxmoore*, 24 So.2d 302, 304 (Fla. 1946). The Intervenors insinuate that Congresswoman Brown and the other Plaintiffs had an opportunity to intervene in the Earlier Action, but made a deliberate choice not to assert their objections there. However, this argument ignores the fact that the implementation of the East-West District 5 would have been highly

---

[6] Neither complaint in the state law cause of action asked the court to adopt the current East-West District Five, but instead merely asked the court to adopt a lawful congressional districting plan. *See* Exhibits 1, 2.

unforeseeable when Plaintiffs had an opportunity to intervene in that case. Even a cursory examination of the volatile and unpredictable course of events that transpired during the state court litigation reveals that far from having a fair opportunity to object to the East-West District 5, they were blindsided by an unforeseeable and overreaching ruling by the Florida Supreme court, long after they could have participated in the case.

To clarify, the East-West configuration was only one of several proposed remedies that were discussed during trial. *See*, Doc. 35-1 at 3-4 (identifying proposed remedial districts in the Earlier Action). Furthermore, given that the Florida Legislature was defending the North-South configuration in the Earlier Action, it would have been likely that even if a violation was found, the legislature would have redrawn a compliant District 5 that still kept the black community who live in the North-South District 5 intact.[7] Indeed, the current East-West District 5 was introduced as an exemplar district to demonstrate that other configurations could comply with the Florida Constitution's mandates with an alternate configuration. As required by Florida law, the legislature would have had an opportunity to redraw the district to cure any partisan intent regardless of how the court ultimately ruled on the validity of East-West District 5. *See*. Art. III § 16 Fla. Const. (2015) It was not until the Florida Supreme Court made the highly unforeseeable ruling that *any* North-South configuration would be impermissible due to being tainted by the Florida Legislatures' intent to favor the republican party[8], that the Plaintiffs could have realized that nearly

_____

[7] Indeed, the original remedial district adopted by the trial court retained its North-South configuration. See Order Adopting Remedial District 5, Attached as Exhibit 3.

[8] This decision was even more unforeseeable taking into account the fact that the North-South configuration was originally devised, not by the Florida Legislature, but by this Court in 1992. *See DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1078 (N.D. Fla. 1992). Furthermore, when prior versions of District 5 had been found violative of the law, the legislature had previously remedied the violations by modifying the North-South framework created by this Court in *DeGrandy*, rather than gutting it entirely. *See Johnson v. Mortham*, TCA 94-40025-MMP, 1996 WL 297280 (N.D. Fla. 1996).

the entire community in the North-South District would be stripped from their congressional district. Given the fact that the Plaintiffs could not have anticipated the extent to which their votes would have been diluted when they had an opportunity to intervene, fairness requires giving them an opportunity to vindicate those rising here.

III.    **The Community of Black Voters in District 5 is Sufficiently Compact to Constitute a Majority**

In order to state a cause of action for vote dilution under Section 2 of the Voting Rights Act, a plaintiff must first demonstrate the presence of the three *Gingles* Factors: (1) a minority group that is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the majority population votes sufficiently as a block to enable it usually to defeat the minority's preferred candidate. *Thornberg v. Gingles,* 478 U.S. 30, 50-51 (1986). The Intervenors' motion does not contest the Plaintiff's claims on the second two factors, but rather contend that Plaintiffs cannot plausibly establish the first factor.

1.    The Compactness of District 5 Satisfies the First *Gingles* Precondition

The Intervenors argue that the 2012 North-South configuration of District 5 is not reasonably compact, because of the shape of the district as a whole. However, courts interpreting Section 2 claims have routinely found that the geographic shape of the district itself is not the sole, or even the predominant consideration, when evaluating the first *Gingles* factor. Rather, the first *Gingles* factor refers to the compactness and characteristics of the minority population, *LULAC;* 548 U.S. at 433-34 (2006). The vote dilution inquiry requires an "intensely local appraisal" of the geographic area in which vote dilution might occur. *Gingles,* 478 U.S. at 78. In addition to the mere shape of the district, the court must also look at social and historical conditions of the minority group itself, to determine whether it is in fact a distinct political interest

group that might assert that its vote has been diluted. *Holder v. Hall,* 52 U.S. 874, 938 (1994) (Thomas, J. Concurring).

The gravamen of the Intervenors' objection to the North-South District 5 is that it uses "land bridges" through white communities to reach a politically cohesive community of black voters who inhabit District 5. However, none of the cases that the Intervenors cite stand for the proposition that geographic isolation alone is sufficient to show that a minority community is noncompact. Indeed, the Supreme Court unequivocally stated: "to be sure, § 2 does not forbid the creation of a noncompact majority-minority district." *LULAC,* 548 U.S. at 430. While the *LULAC* court eventually found that the minority population at issue in that case was not reasonably compact, it did not rest its decision on the shape of the district alone.

Rather, the Court in that case was troubled by the fact that there was a "300-mile gap between the Latino communities [in the plan], and a *similarly large gap between the needs and interests of the two groups.*" *Id.* at 432. (emphasis added). The Court in *LULAC* primarily took issue with the fact that the district court merely added up the electoral voting strength of the two geographically disparate groups of Latino voters, without performing any inquiry into the shared interests of those communities. *Id.* The Court recognized that in other circumstances, members of a racial group in different areas could share similar interests and therefore form a compact district. *Id.* ("We emphasize it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations–not either factor alone–that renders District 25 non-compact for § 2 purposes").

The North-South District 5, by contrast, unites a politically cohesive community of black voters with shared history and political needs. As indicated in the Plaintiffs' Amended complaint, the enclaves of minority population that North-South District 5 connects is populated with the

descendants of slaves who worked the farms and plantations of north Florida and along the St. Johns River Basin. Doc. 34–1 at ¶ 14.  Further, the interests uniting the black voters in these districts stretch far beyond poverty, but include a number of shared socio-economic burdens, including inadequacies of public services, housing issues, education issues, and abuses in the criminal justice system. *Id.* at ¶¶ 34–38.

Perhaps the most telling distinction between the community at issue here and that in *LULAC* are the obstacles that have historically been imposed, and continue to be imposed in the electoral process, ranging from violent threats from groups such as the Klu Klux Klan to disenfranchisement through state-enacted electoral impediments. *Id.* at ¶¶ 23–28. Indeed, in *LULAC,* the court was concerned that uniting two groups with different social and political interests would render one or both of the groups unable to achieve their political goals, while here, by contrast, voters in the North-South District 5 have stated that before becoming a part of District 5 they felt unrepresented whereas after their inclusion they reaped substantial benefits by having a representative who understands the needs of the community. *Compare, LULAC,* 548 U.S. at 433 *with* Doc. 34-1 at ¶¶ 44–45.

Finally, the Intervenors place great reliance on this Court's holding in *Johnson v. Mortham,* 926 F. Supp. 1460 (N.D. Fla. 1996), which struck down a significantly less-compact predecessor to the North-South District 5. However, this argument overstates the precedential value of *Mortham,* since this Court later upheld a remedial version of the North-South district in place at the time, that more closely resembles the contemporary North-South District 5. *Johnson v. Mortham,* TCA 94-40025-MMP, 1996 WL 297280 (N.D. Fla. 1996). Furthermore, this Court subsequently found that a more recent version of the North-South configuration was reasonably compact. *See Martinez v. Bush,* 234 F. Supp.2d 1275, 1301 (N.D. Fla. 2002) (Adopting as a

factual finding that then Congressional District 3 was reasonably compact and complied with traditional districting principles).

The Intervenors also overstate *Mortham's* discussion regarding whether socio-economic commonality is not a proper basis for finding geographic compactness. *Mortham* merely held that, without evidence that participation in the political process by the minorities had been depressed, socio-economic disparities were not necessarily probative of a Voting Rights Act violation. *Mortham*, 926 F. Supp. at 1478.   Indeed, the very factors that the Plaintiffs have identified in their complaint are similar to those the Supreme Court has identified as those that could unite or divide communities of interest in a voting district. *See, LULAC*, 549 U.S. at 424. (noting that the Hispanic communities at issue in that case had divergent needs and interests owing to differences in socio-economic status, education, employment, health, and other characteristics).

2.  Black Voters Form a Majority of the Voters in North-South District 5

In order to meet the first *Gingles* precondition, the minority group must also make up a working majority of the voting age population in the proposed district. While most of the Section 2 analysis in a Voting Rights Act claim employs a holistic analysis that looks beyond numbers, *Bartlett* v. *Strickland*, 556 U.S. 1 (2001) established a demographic shorthand that the voting age population of the community at issue must be greater than 50% for the purposes of determining whether the first *Gingles* precondition is met. Here, the black voting age population (BVAP) of North-South District 5, is 50.1%, thus the application of this piece of the *Gingles* test should be met in a fairly straightforward manner.

The Intervenors, however, contend that "citizen voting age population" is the correct metric to analyze the first *Gingles* precondition, because a number of black voters in North-South District

5 are incarcerated and unable to vote. However, the Eleventh Circuit has only used citizen voting age population (i.e. registered voters) in place of voting age population in circumstances where data is available and indicates a "*significant* difference in the citizenship rates of the majority and minority population*." Negron v. City of Miami Beach, FL.*, 113 F.3d 1563 (11th Cir. 1990). In *Negron*, the number of citizen voters were used to determine the size of the minority community, because evidence had been produced at trial that almost 12% of the Hispanic population in the districts were not United States citizens. *Id.* By contrast, where such reliable data is not present, the Eleventh Circuit has held that it is error to focus on registered voter statistics instead of voting age population. *See Solomon v. Liberty County, FL*, 899 F.2d 1012, 1018 (11th Cir. 1988) (Kravitch, J. specially concurring) (finding that first *Gingles* precondition is satisfied where black voters made up 51% of the voting age population, but 46% of the registered voters in that district.); *See also, Solomon v. Liberty County, FL*, 865 F.3d 1566, 1574 (11th Cir. 1988) *vacated and reh'g en banc granted*, 873 F.2d 248 (11th Cir. 1989) ("Minority voter registration figures are inherently unreliable measures in vote dilution cases, because the very lack of minority political power responsible for bringing the section 2 action may also act to depress voter registration.")

Here, in contrast to *Negron*, the disparities in non-citizen population that the Intervenor's assert is less than one percent of the black population in District 5; a margin far too narrow to justify using a statistical measure that the Eleventh Circuit has called "inherently unreliable" to determine whether Plaintiffs meet the first *Gingles* precondition. Furthermore, even if this Court were to adopt a more functional approach to determining whether a working majority of black voters exist in District 5, the actual turnout statistics of Black voters in North-South District 5 strongly favor black voters. *See* Doc. 58-1 at 14–15 (noting that African Americans constituted a majority of the turnout in 2012's presidential election and a plurality in the 2010 senate election).

Indeed, the argument that African Americans do not constitute a working majority of the North-South District 5 at 50.1% BVAP seems to belie the Intervenors' earlier assertions that prior versions of District 5, with lower BVAPs, performed soundly for black voters. *See* Doc. 54 at 5. That is to say nothing of the fact that the current East-West configuration contains both a lower BVAP and higher population of incarcerated individuals. *See* Doc. 34-1 at ¶¶ 93, 103 (noting that the BVAP of East-West District 5 is 45.1% and it contains 17,140 incarcerated individuals).

Because North-South District 5 reaches a single black community of interest, and similar predecessor districts to North-South District 5 have been found to be reasonably compact by this Court, the Plaintiffs' proposed district is reasonably compact for purposes of Section 2 of the Voting Rights ,espite its unusual shape.  Furthermore, North-South District 5 has both a majority BVAP as well as a functional majority of black voters. For these reasons, the Plaintiffs have stated a strong, and certainly plausible, claim for relief under the first *Gingles* precondition.

**IV.    Plaintiffs Have Stated a Plausible Claim for Invidious Intentional Discrimination**

In order to prevail on aclaim for intentional discrimination under the Fourteenth Amendment, Plaintiffs must show both intentional discrimination and a resultant discriminatory effect. *Personnel Adm'r of Mass.v Feeney*, 442 U.S. 256, 272 (1979). The historical background of a decision is an evidentiary consideration for determining whether intentional discrimination exists.  *See Vill. Of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 267 (1997). Additionally, the specific sequence of events leading up to a challenged decision may shed some light on a decision maker's purpose. *Id.* Where there is proof that a discriminatory purpose has been a motivating factor, judicial deference to the legislature is no longer justified. *Id.* at 265–66.

The Intervenors here argue that because the Florida Supreme Court relied on race-neutral considerations in drawing the East-West District 5, the Plaintiffs cannot establish a claim for

intentional discrimination. However, "[a]lthough a legislature's compliance with traditional principles such as compactness, contiguity, and respect for political subdivisions may suffice to refute a claim of racial gerrymandering, [the state] cannot make such a refutation where, as here, those factors were subordinated to race." *Miller v. Johnson*, 515 U.S. 900, 919 (1995). Here, Plaintiffs have offered direct evidence that lawmakers relied, at least in part, on race to guide their adoption of the East-West plan for District 5 during the 2015 special session. Janet Adkins' remarks indicate that the inclusion of high prison population counties such as Baker County would disenfranchise Black Voters in the new District 5. Specifically, she stated:

> As a perfect storm, you're now reducing the percentage of minorities within that district and you've drawn it in such a fashion that perhaps a majority—or maybe not a majority, but a number of [minority voters] will live in the prisons, thereby not being able to vote, you can actually, you can be the person that will help get rid of Corrine Brown.

Doc. 58-3.

Certainly direct evidence that counties were included in a particular district in order to ensure that a significant number of the minority population in the district would be made up of incarcerated minorities shows that race was a predominate factor in selecting the districts configuration. Furthermore, given that Plaintiffs were able to produce direct evidence of discriminatory intent at the outset of their suit, it is highly plausible that more light would be shed on the racial considerations underpinning the adoption of the East-West district with the aid of pre-trial discovery.

Finally, the Intervenors argue that because Plaintiffs allegedly cannot establish the *Gingles* preconditions, they have not shown a discriminatory effect. However, even if this Court were to find that the Plaintiffs had failed in their vote dilution claims, the diminishment in the turnout of black voters between these two districts alone shows the discriminatory effect of the defendants' intentional and invidious discrimination. *See, e.g.,* Doc. 58-1 at 14–15 (noting the difference in

African American turnout between the two districts). Regardless, for the reasons discussed above, Plaintiffs *have* met the first *Gingles* precondition, and the Intervenors have offered no argument as to why they would not meet the other two. Thus, Plaintiffs have stated a claim for intentional discrimination under the Fourteenth Amendment.

## V.   Conclusion

Plaintiffs have stated plausible claims for relief under both Section 2 of the Voting Rights Act and the Fourteenth Amendment, that involve different causes of action and different parties than the state court litigation. Therefore, Plaintiffs respectfully request that the Intervenor's Motion to Dismiss be denied.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

Undersigned counsel for Plaintiffs hereby certify that this memorandum of law contains 7,555 words, excluding the case style, signature block, and Certificate of Service. The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this memorandum of law.

Respectfully submitted,

Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Sheppard, White, Kachergus & DeMaggio, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone:     (904) 356-9661
Facsimile:     (904) 356-9667
Email:         sheplaw@att.net
COUNSEL FOR PLAINTIFFS


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 17th, 2016, I electronically filed the foregoing

with the Clerk of the Court by using CM/ECF System which will send a notice of electronic

filing to the following:

**Adam S. Tanenbaum, Esquire**
**General Counsel**
**Florida Department of State**
**500 South Bronough Street, Suite 100**
**Tallahassee, Florida 32399-0250**

**David A. Fugett, Esquire**
**Assistant General Counsel**
**Florida Department of State**
**500 South Bronough Street, Suite 100**
**Tallahassee, Florida 32399-0250**

Jason N. Zakia, Esquire
Jesse L. Green, Esquire
Raoul G. Cantero, Esquire
Wachovia Financial Center
Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131

Andy V. Bardos, Esquire
Gray Robinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301

David B. King, Esquire
Thomas A. Zehnder, Esquire
Vincent Falcone III, Esquire
King Blackwell Zehnder, et al.
25 East Pine Street
Orlando, Florida 32801

I HEREBY CERTIFY that on February 17, 2016, a true and correct copy of the foregoing document and the notice of electronic filing was sent by United States Mail to the following non-CM/ECF participants:

N/A

ATTORNEY

swp[brown.corrine.resp.intervenors.dismiss.mot]