UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| CONGRESSWOMAN CORRINE BROWN, et al., <br><br>      Plaintiffs, <br><br> v. <br><br> KEN DETZNER, in his official capacity as Secretary of State of the State of Florida, THE FLORIDA SENATE, and THE FLORIDA HOUSE OF REPRESENTATIVES, <br><br>      Defendants, <br><br> and <br><br> THE LEAGUE OF WOMEN VOTERS OF FLORIDA, COMMON CAUSE, DEIRDRE MACNAB, LAVONNE GRAYSON, GEORGE OLIVER III, and ANGELA DEMONBREUN, <br><br>      Defendants-Intervenors. | CASE NO. 4:15-cv-00398-MW-CAS |

## INTERVENORS' RESPONSE TO PLAINTIFFS' FIRST AMENDED MOTION FOR PRELIMINARY INJUNCTION

The League of Women Voters of Florida ("LWVF"), Common Cause, Deirdre Macnab, LaVonne Grayson, George Oliver III, and Angela DeMonbreun (collectively, "Intervenors") respond in opposition to Plaintiffs' First Amended Motion for Preliminary Injunction (Doc. 35) and state as follows:

# I.    INTRODUCTION

The Florida Supreme Court ordered District 5 to be drawn East-West to remedy the Legislature's violation of Article III, Section 20 of the Florida Constitution.   To benefit Republicans in surrounding districts, the Legislature packed rural and urban African-American voters in Northeast and Central Florida into a single, grossly non-compact district – the same North-South District 5 that Plaintiffs offer here.   After twice conducting a minority protection analysis, the Florida Supreme Court determined that East-West District 5 improves compactness and better preserves political boundaries without diminishing the ability of African Americans to elect candidates of choice.   *See League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 402-06 (Fla. 2015) ("*Apportionment VII*"); *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 272-73 (Fla. 2015) ("*Apportionment VIII*").   By unwinding North-South District 5, the court-ordered remedial plan turned District 10 in Central Florida into an additional district in which African Americans can elect preferred candidates.   As a result, over 120,000 more voting-aged African Americans are able to elect candidates of choice under Florida's existing plan than under Plaintiffs' regressive proposal.

Plaintiffs argue that Section 2 of the Voting Rights Act ("VRA") and the Fourteenth and Fifteenth Amendments to the U.S. Constitution[1] compel the state of Florida to unravel two minority-performing districts and return to a distorted North-South district that was a "key component" of the Legislature's attempt to gerrymander Florida's congressional districts in favor of Republicans. *Apportionment VII*, 172 So. 3d at 403.  Federal law does not require the state of Florida to cast aside years of hard-fought redistricting reform to achieve a result that marginalizes, rather than enhances, minority voting opportunities.

## II.   BACKGROUND

Plaintiffs rely on a distorted and incomplete history to claim that the former North-South configuration of District 5 "was originally created by a three judge court in this district."  (Doc. 35 at 3).  In *DeGrandy v. Wetherell*, 794 F. Supp. 1076 (N.D. Fla. 1992), the panel adopted a different, wishbone-shaped district, grouping African Americans in Duval, Alachua, Marion, Seminole, Orange, and Volusia Counties into a single district.  *See Johnson v. Mortham*, 926 F. Supp. 1460, 1473, 1496 (N.D. Fla. 1996).  Although endorsed by the panel, that version of District 3 was "based in large part on the Margolis Plan," submitted by a state senator.  *Id*. at 1490 & n.60; *see also DeGrandy*, 794 F. Supp. at 1087-88.

---

[1] Plaintiffs have withdrawn their state law claims under Article III, Section 20 of the Florida Constitution.  (Doc. 49).

In 1996, a second three-judge panel invalidated District 3 in the *DeGrandy* plan because the district (1) was drawn based on a policy of maximizing majority-minority districts that the U.S. Supreme Court later found unconstitutional, *Mortham*, 926 F. Supp. at 1468-69; and (2) was not justified by the prohibition on vote dilution in Section 2 of the VRA, *id.* at 1471-81. The court rejected the Legislature's claim that a majority-minority district in Northeast and Central Florida was meant to "further the state's redistricting interest of complying with the [VRA]." *Id.* at 1490. Instead, it found that "Republicans in the State Senate were more interested in aggregating Democrats in a single district . . . than in creating an African-American majority-minority district." *Id.* In so concluding, the court observed "how politics made strange bedfellows in the 1992 redistricting process, as Republicans joined with African-American Democrats in an attempt by each group to enhance their own political power." *Id.* In response to *Mortham*, the Legislature drew a new, significantly more compact District 3 with a Black Voting Age Population ("BVAP") of 42.7%. *Apportionment VII*, 172 So. 3d at 404.

In 2002, the Legislature redrew District 3 as part of a plan that it admitted had the "overriding goal" of "maximiz[ing] the number of districts likely to perform for Republicans." *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1300-01 (S.D. Fla. 2002); *see also id.* at 1340 (noting that Legislature "stipulated" that its intent was to "advantage[] Republican incumbents and potential candidates"). A three-

judge panel found that District 3, with a BVAP of 46.9%, "will afford black voters a reasonable opportunity to elect candidates of choice and probably will in fact perform for black candidates of choice." *Id.* at 1307. Accordingly, from 1996 until 2012, District 3 was a district that consistently and decisively elected Congresswoman Brown, the African-American candidate of choice, without a majority BVAP. *See Apportionment VII*, 172 So. 3d at 404.

In 2010, a supermajority of Florida's voters approved Amendments 5 and 6 to the Florida Constitution, known as the "FairDistricts Amendments." Taken together, the FairDistricts Amendments require the Legislature to draw congressional and state legislative redistricting plans and individual districts (1) without "the intent to favor or disfavor a political party or an incumbent," (2) without "the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice," and (3) in compliance with the "tier-two" requirements of equal population, compactness, and respect for political and geographical boundaries.[2] *See* FLA. CONST. art. III §§ 20, 21. By imposing these constitutional mandates, Florida's citizens "sought to eliminate the age-old

---

[2] The "tier-two" requirements in Article III, Sections 20(b) and 21(b) of the Florida Constitution yield to the extent necessary to avoid conflict with federal law or the "tier-one" prohibitions on partisan gerrymandering, minority retrogression, and vote dilution in Article III, Sections 20(a) and 21(a). *See* FLA. CONST. art. III §§ 20(b), 21(b).

practice of partisan political gerrymandering" and "restore the core principle of republican government, namely, that the voters should choose their representatives, not the other way around." *Apportionment VII*, 172 So. 3d at 369-70.

The Legislature unsuccessfully resisted the FairDistricts Amendments in state and federal court, often with Congresswoman Brown's collaboration. *See, e.g., Advisory Op. to Att'y Gen. re Standards for Establishing Leg. Dist. Boundaries*, 2 So. 3d 161 (Fla. 2009) (rejecting financial impact statement for ballot initiative as misleading); *Advisory Op. to Att'y Gen. re Standards for Establishing Leg. Dist. Boundaries*, 2 So. 3d 175 (Fla. 2009) (rejecting Legislature's challenge to ballot initiative); *Roberts v. Brown*, 43 So. 3d 673 (Fla. 2010) (rejecting challenge to ballot initiative by Legislature and Congresswoman Brown); *Fla. Dep't of State v. Fla. State Conf. of NAACP Branches*, 43 So. 3d 662 (Fla. 2010) (rejecting Legislature's proposed counter-amendment); *Brown v. Sec'y of State of Fla.*, 668 F.3d 1271 (11th Cir. 2012) (rejecting Elections Clause challenge by House and Congresswoman Brown).  After these efforts failed, the Legislature undertook the process of drawing the 2012 Enacted Plan.

For most of that redistricting process, legislative staff and counsel agreed that District 5 did not need to be drawn as a majority-minority district to comply with the VRA or Article III, Section 20 of the Florida Constitution.  *See Apportionment VII*, 172 So. 3d at 436-37, 403-04.  Indeed, in every staff-drawn

6

map drawn until the very end of the process, District 5 had less than 50% BVAP, and staff concluded that an East-West version of District 5 with a *lower* BVAP than the current district would be constitutionally compliant. *Id.* A group of well-connected Republican consultants, however, had been secretly collaborating with the Legislature throughout the redistricting process. *Id.* at 378-86. Even as the Legislature was assuring the public that it would conduct the most open and transparent redistricting process in Florida's history, the legislators and staffers overseeing the process repeatedly met with and received input from Republican consultants in secret, made key decisions among themselves in non-public meetings, and engaged in extensive spoliation of evidence. *Id.*

Recognizing that packing as many African-American Democrats as possible into a single district benefitted Republicans in surrounding districts, the consultants collaborating with the Legislature wanted District 5 drawn with over 50% BVAP. *Id.* at 381-82, 384-85. In a series of non-public meetings shortly before adoption of the 2012 congressional plan (the "2012 Enacted Plan"), the Legislature abruptly changed course and increased the BVAP of District 5 over 50%. *Id.* at 384-85. Although the Legislature used minority protection as a pretext for the continued North-South configuration of District 5, its true goal was to benefit Republicans. *Id.* at 385, 403-04, 435-44. The district also favored Congresswoman Brown by retaining roughly 80% of the 2002 benchmark district. *Id.* at 403. In that regard,

politics once again made strange bedfellows in the 2012 redistricting process.  *See Apportionment VIII*, 179 So. 3d at 299 (Perry, J., concurring) (explaining how "minority Democrats and white Republicans often formed alliances during redistricting sessions," and "[u]nder the guise of protecting minority voters, line-drawers would group large numbers of minority voters into small numbers of districts," thereby allowing "[m]inority Democrats and white Republicans" to "increase[] the reelection prospects for individuals in both groups").

District 5 in the 2012 Enacted Plan, now promoted by Plaintiffs, has been aptly described as a "crime against geography."[3]  To achieve a majority BVAP, the district is significantly less compact than the 1996 and 2002 configurations of predecessor District 3.  (*Compare* Doc. 52-8 at 7-8[4] *with id.* at 2-3 *and Johnson*,

---

[3]  Christopher Ingram, *America's most gerrymandered congressional districts*, Wash. Post, http://www.washingtonpost.com/blogs/wonkblog/wp/2014/05/15/americas-most-gerrymandered-congressional-districts/ (last accessed Mar. 3, 2016).

[4]  Intervenors have filed statistical reports for various plans that the trial court and Florida Supreme Court relied upon in the state court proceedings.  (*See* Doc. 52-7, 52-8).  These legislatively prepared documents report the state's official standard geometric measures of compactness as well as electoral and demographic statistics for each plan.  The same electoral and demographic data may also be obtained by opening the subject maps using the House's MyDistrictBuilder website.  *See* FLA. HOUSE, http://www.floridaredistricting.org/ (map files available by clicking links to 2012, 2014A, and 2015B redistricting site archives); FLA. HOUSE, http://floridaredistricting.cloudapp.net/MyDistrictBuilder.aspx (open map file and select Preferences – Customize Data – Census, ACS, Elections and DMV).  The Court can take judicial notice of these and other legislative redistricting materials.  *See, e.g.*, *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of voting age population statistics on state website).  Intervenors have also submitted an expert declaration from Dr. Jowei Chen with supplemental data for the 2012 and 2014 elections.  (*See* Doc. 63-2).

1996 WL 297280, at *1 (N.D. Fla. May 31, 1996)).  The 2012 version of District 5 began in Jacksonville and meandered down to Orlando in a serpentine configuration with hooks, tentacles, and appendages picking up rural and urban African-American populations in Duval, Clay, Putnam, Alachua, Marion, Seminole, and Orange Counties.  (Doc. 52-8 at 7).  As it snaked through Northeast and Central Florida, the district narrowed at one point to the width of a highway and divided every county it touched.  (*Id.*).  The following figure shows the African-American communities aggregated in North-South District 5:[5]

---

[5] The images are derived from interactive maps on the Senate's redistricting website and reveal concentrations of BVAP in red and Hispanic Voting Age Population ("HVAP") in blue.  *See* Plan: H000C9047, FLA. SENATE, http://www.flsenate.gov/Session/Redistricting/Plan/h000c9047 (follow link to "View Plan with District Explorer" and select "Value Ramp").



        In state court, LWVF, Common Cause, and individual voters challenged the

2012 Enacted Plan and several districts, including District 5, under Article III,

Section 20 of the Florida Constitution.  After over two years of litigation and a

twelve-day trial, the trial court found that the Legislature drew the 2012 Enacted

Plan, District 5, and adjoining District 10 with partisan intent and in violation of

the "tier-two" requirements of compactness and respect for political boundaries.

*Apportionment VII*, 172 So. 3d at 426-49.  The trial court rejected the Legislature's

claim that it was required to draw a majority-minority District 5 to avoid vote

dilution.  *Id.* at 436-37.  In particular, the trial court found that the first and third *Gingles* preconditions were absent because (1) District 5 achieved a majority BVAP only by "connect[ing] two far flung urban populations in a winding district which picks up rural black population centers along the way"; and (2) the Legislature failed to show that "the majority population votes sufficiently as a bloc to enable it usually to defeat the candidates preferred by minorities," given that "the benchmark district [in the 2002 plan], which was never majority-minority, elected an African-American to Congress during its entire existence."  *Id.*

The Legislature responded by enacting a revised plan (the "2014 Enacted Plan") with a version of District 5 that maintained substantially the same North-South configuration, but eliminated an appendage into Seminole County and slightly improved compactness.  *Id.* at 386-87, 402.  As a result of these minor changes, District 5 in the 2014 Enacted Plan had a BVAP of 48.1%.  *Id.* at 404. The challengers, by contrast, advocated an alternative East-West version of District 5 that was more compact, better preserved city and county boundaries, and improved the compactness of numerous Central Florida districts, *id.* at 406, while transforming District 10 in the Orlando area into a second district in which African Americans can elect candidates of choice, (*see* Doc. 63-1 at 14-20).

After the trial court approved the 2014 Enacted Plan, the challengers appealed.  In *Apportionment VII*, the Florida Supreme Court affirmed the trial

court insofar as finding improper intent and invalidating Districts 5 and 10, but reversed the trial court for approving the 2014 Enacted Plan and declining to invalidate certain other districts. *See Apportionment VII*, 172 So. 3d at 416-17. As to District 5, the Court carefully analyzed electoral performance and found that an East-West District 5 would continue to allow African Americans to elect candidates of their choice, while improving compactness and better preserving political boundaries. *Id.* at 402-06. Because the Legislature failed to carry its burden of justifying the North-South configuration, the Florida Supreme Court ordered that "District 5 must be drawn in an East-West manner." *Id.* at 403.

The *Apportionment VII* decision led the Legislature to convene a special session to consider a remedial plan. Clashes over certain districts resulted in the House and Senate failing to enact a joint plan, and led the House to seek a judicially adopted remedial plan. *Apportionment VIII*, 179 So. 3d at 266. In the ensuing proceedings, the House, the Senate, and the challengers (including LWVF and Common Cause) all submitted plans containing the same East-West District 5 favorably considered in *Apportionment VII*. *Id.* at 271-72. Ultimately, the Florida Supreme Court adopted CP-1 (the "Current Plan"),[6] proposed by LWVF and Common Cause, as the congressional plan for the state of Florida. *Id.* at 297-98 &

---

[6] The Senate has redesignated CP-1 as Plan SC14-1905 on its official redistricting website. *See* FLA. SENATE, http://www.flsenate.gov/Session/Redistricting.

12

App'x A.  (Doc. 52-8 at 15).  In adopting the current East-West District 5, the Florida Supreme Court reiterated that "the proposed district . . . does not diminish the ability of black voters to elect a candidate of choice."  *Id.* at 273.

Plaintiffs now seek to collaterally attack these rulings in the state court proceedings and reinstitute the invalidated 2012 version of District 5.  In substance, Plaintiffs ask this Court to compel the state of Florida to disband two minority-performing districts and instead join rural and urban African Americans from seven counties into a single, grossly non-compact district.  Neither the VRA nor the U.S. Constitution requires this irrational and unjust result.

## III.   ARGUMENT

### A. <u>Plaintiffs Have Not Shown a Likelihood of Success on the Merits.</u>

#### 1.  **Res Judicata Bars Plaintiffs' Claims.**

For the reasons discussed more fully in Intervenors' Motion to Dismiss, the doctrine of res judicata precludes Plaintiffs' claims.  (*See* Doc. 54 at 14-22).  Under applicable state law preclusion principles, when the government litigates interests common to the public, as opposed to "purely private interests," "res judicata will bar litigation by private individuals seeking to redress acts that were settled in [a] prior action, even if the private individuals were not formal parties thereto." *Alderwoods Group, Inc. v. Garcia*, 119 So. 3d 497, 504 (Fla. 3d DCA 2013); *see also Young v. Miami Beach Improvement Co.*, 46 So. 2d 26, 30 (Fla. 1950).

Because the Legislature, in conjunction with the NAACP, unsuccessfully litigated precisely the same vote dilution argument Plaintiffs advance here to revert to District 5 in the 2012 Enacted Plan, res judicata precludes Plaintiffs from asserting their Section 2 claim and related federal constitutional claims in this action.

### 2. Plaintiffs Have Not Established Vote Dilution Under Section 2 of the VRA.

To prove vote dilution, Plaintiffs must establish that: (1) a minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district" and (2) the minority group is "politically cohesive"; and (3) the majority "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). Plaintiffs must prove "*all* of the necessary factors"; "[i]f any one of the *Gingles* prongs is not established, there is no vote dilution." *Johnson v. Hamrick*, 296 F.3d 1065, 1073 (11th Cir. 2002) (emphasis in original). If the *Gingles* factors are established, the Court must also assess the totality of the circumstances to determine whether minorities' voting power is truly diluted. *See Johnson v. De Grandy*, 512 U.S. 997, 1013 (1994). Plaintiffs have not shown vote dilution under the VRA because they (1) have not met the first and third *Gingles* requirements, (2) offer a plan with *fewer* minority-performing districts than the Current Plan, and (3) have not demonstrated vote dilution under the totality of the circumstances.

### a. Plaintiffs' Proposed North-South District 5 Does Not Satisfy the First *Gingles* Requirement.

There are two related elements in the first *Gingles* requirement.  The minority group must (1) be "geographically compact," and (2) form a "working majority" of voters in a single-member district.  *Bartlett*, 556 U.S. at 12-13.  Plaintiffs have failed to meet their burden of establishing either element.

### i.  Geographic Compactness

As Plaintiffs readily concede, their proposed district includes "a minority population that is not compact in geographic terms." (Doc. 35 at 17).   Rather than accept their resulting inability to meet the first *Gingles* requirement, Plaintiffs argue that geography is unimportant.  They point in particular to language in *LULAC* indicating that "§ 2 does not forbid the creation of a noncompact majority-minority district."  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006) ("*LULAC*").  But the Supreme Court never held the converse – namely, that Section 2 *compels* states to draw non-compact districts.  The very same page of *LULAC* makes clear that "there is no § 2 right to a district that is not reasonably compact."  *Id.*  In requiring geographic compactness, *Gingles* necessarily accounts for "traditional districting principles," *id.* at 433, including, among others, "compactness, contiguity, and respect for political subdivisions," *Shaw v. Reno*, 509 U.S. 630, 647 (1993).  Thus, a district that "reaches out to grab small and

apparently isolated minority communities," *LULAC*, 548 U.S. at 433, or joins dispersed minority populations "using land bridges and appendages," *Johnson v. Miller*, 922 F. Supp. 1556, 1566 & n.15 (S.D. Ga. 1995), does not satisfy the first *Gingles* requirement.

As the figure below demonstrates, Plaintiffs' District 5 is not comprised of a single geographically compact African-American population.  It instead pieces together at least seven distinct pockets of African-American voters using narrow land bridges comprised of primarily white or unpopulated territories.



C9047 District 5

Proposed District 5 employs a series of hooks, tentacles, and appendages to draw African-American population not only from urban areas in Duval, Alachua, Orange, and Seminole Counties, but also from rural territory in Marion, Clay, and Putnam Counties and areas outside major cities in other counties.  The land bridges linking together these disparate communities – one of which is the mere width of a highway – produce a district that winds for over 200 miles between Jacksonville and Orlando.  The proposed North-South district has extremely low Reock and Convex Hull compactness scores of 0.09 and 0.29, respectively.  (Doc. 52-8 at 8).[7] No single county remains whole in Plaintiffs' proposed District 5.  And because the BVAP of the proposed district is a bare 50.06%, removing any of its urban or rural minority population centers would yield a BVAP under 50%.

In rejecting the prior attempt at a majority-minority district in this region, the *Mortham* panel found that "the African-American population in Northeast Florida is not sufficiently large and geographically compact so as to constitute a majority in a fairly drawn congressional district."  926 F. Supp. at 1471.  The wishbone-shaped district reviewed in *Mortham* linked together "widely dispersed population concentrations" of African-American voters in Duval, Orange, Alachua, Marion,

---

[7] The Reock or circle-dispersion method "measures the ratio between the area of the district and the area of the smallest circle that can fit around the district."  *Apportionment VII*, 172 So. 3d at 407 n.17.  The Area/Convex Hull method "measures the ratio between the area of the district and the area of the minimum convex bounding polygon that can enclose the district."  *Id.* n.18.  Both measures use a score of 0 to 1, with a score of 1 representing the highest level of compactness.

Seminole, and Volusia Counties through "land bridges of white rural and small town populations." *Id.* at 1471-72.  The panel emphasized that the district flouted the traditional districting principles of maintaining political boundaries and compactness.  *Id.* at 1472-73.  The same defects afflict Plaintiffs' District 5.  *See Apportionment VII*, 172 So. 3d at 436 (trial court ruling that minority population in identical North-South District 5 "is not sufficiently large and geographically compact to constitute a majority of the voting age population" under *Gingles* because the district "connects two far flung urban populations in a winding district which picks up rural black population centers along the way").

Recognizing the geographic problem with their proposed district, Plaintiffs emphasize a purported commonality of interests between the minority populations within the district.  Were that true, however, it would not be enough to establish vote dilution.  *Gingles* expressly requires *geographic* compactness.  While the Supreme Court has "accept[ed] that in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district," those communities must still be "in reasonably close proximity" to satisfy *Gingles*.  *LULAC*, 548 U.S. at 435. Otherwise, there would be a Section 2 right to districts meandering the length of entire states to collect far-flung population centers, considering that nearly every

urban population deals with similar socioeconomic issues involving, for example, affordable housing, unemployment, educational access, and poverty.

In any event, Plaintiffs offer evidence relating almost exclusively to urban communities in Duval, Alachua, Seminole, and Orange Counties. (*See* Doc. 34-1 ¶¶ 48-64 (allegations regarding Sanford and Eatonville); Doc. 36-5 at 2-19 (testimony of former Sanford resident); Doc. 37-1 at 2-27 (testimony of Orlando and former Jacksonville resident); *id.* at 27-40 (testimony of Jacksonville resident); *id.* at 41-48 (testimony of Gainesville resident); Doc. 37-3 at 74-103 (testimony of Sanford resident)).[8]  As for the rural voters needed to achieve a majority BVAP – such as those in Clay, Putnam, and Marion Counties – Plaintiffs say little to nothing.  Indeed, Plaintiffs concede divergent interests by criticizing East-West District 5 for including both rural and urban areas.  (*See, e.g.*, Doc. 35 at 6, 16; Doc. 34-1 ¶ 98; *see also* Doc. 36-5 at 98-101 (testimony from expert relied upon by Plaintiffs that urban and rural African Americans in Florida have different interests)).  And, while Plaintiffs emphasize that their proposed district "has two port cities" and "many tourism communities" (Doc. 35 at 16), it also draws African-American population from cities that are landlocked (*e.g.*, Orlando and Gainesville) and lack tourism-based economies (*e.g.*, Sanford, Palatka, and

---

[8] Plaintiffs have also submitted the testimony of a resident of Ocala, which is not included in North-South District 5.  (Doc. 37-1 at 48-64).

Gainesville).    Plaintiffs' district likewise unites cities that have significant educational centers (*e.g.*, Gainesville and Orlando) and major healthcare facilities (*e.g.*, Jacksonville and Orlando) with small towns lacking similar resources.  By failing to demonstrate that African-American voters throughout their proposed district truly share common interests, Plaintiffs promote the forbidden assumption that voters of the same race "think alike, share the same political interests, and will prefer the same candidates at the polls." *LULAC*, 548 U.S. at 433.

For urban populations, Plaintiffs rely heavily on socioeconomic issues, claiming that African Americans within their district "experience shared difficulties with poverty, lack of employment and housing, as well as ongoing racial discrimination."  (Doc. 35 at 5; *see also* Doc. 34-1 ¶¶ 34-38, 43 (listing socioeconomic issues relating to poverty, unemployment, deficient housing, educational access, and criminal justice)). Courts have rightly rejected common socioeconomic concerns as a substitute for the geographic compactness *Gingles* demands.  The *Mortham* panel, for example, found the first *Gingles* prong lacking, even though the plaintiffs "submitted a great deal of evidence that District Three possesses socioeconomic commonality and cohesion." *Mortham*, 926 F. Supp. at 1492.  The panel rejected such commonality as a "spurious" justification for a district piecing together remote minority populations, *id.*, because "socioeconomic disparities are not unique to District Three, to Florida, or to the South, but rather

20

more generally reflect the socio-economic differences between whites and African-Americans in similar districts throughout the country," *id.* at 1477.   Because Plaintiffs have failed to prove that the minority population in their proposed district is geographically compact, they are not entitled to an injunction.

### ii.  Working Majority Requirement

Plaintiffs' District 5 has a BVAP of 50.06% simply because the Legislature set a 50% BVAP threshold as a nonnegotiable floor for the district.  *Apportionment VII*, 172 So. 3d at 384-85.  Courts have repeatedly expressed skepticism over the use of bare VAP quotas in drawing minority districts.  *See, e.g.*, *Harris v. McCrory*, __ F. Supp. 3d. __, 2016 WL 482052, at *10 (M.D.N.C. Feb. 5, 2016) (emphasizing "[t]he Supreme Court's skepticism of racial quotas" in striking down district drawn primarily to exceed 50% BVAP threshold).   For that reason, minority voters must be a "numerical, *working* majority of the voting-age population," *Bartlett*, 556 U.S. at 13 (emphasis added), which requires consideration of factors affecting eligibility to vote, *see, e.g., LULAC*, 548 U.S. at 429 (finding that accounting for citizenship "fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates").   Courts look, for example, to minority Citizen Voting Age Population ("CVAP"), rather than VAP alone, when there is a difference between the two numbers.  *See, e.g.*, *Negron v. City of Miami Beach*, 113 F.3d 1563, 1570 (11th Cir. 1997); *Perez v. Pasadena*

*Indep. Sch. Dist.*, 165 F.3d 368, 372 (5th Cir. 1999); *Barnett v. City of Chicago*, 141 F.3d 699, 704 (7th Cir. 1998).

Plaintiffs' District 5 has a BCVAP of less than 50% (Doc. 36-4 at 20; Doc. 63-3), and according to Plaintiffs, "nearly one in four blacks [is] disqualified from voting due to a felony conviction," (Doc. 35 at 14). The district is thus majority-minority in only the hollowest sense. Plaintiffs miss the point by arguing that their district performs for African-American candidates of choice despite its failure to achieve a majority of eligible voters. (Doc. 60 at 21-22). It is a fundamentally arbitrary endeavor – and does not to comport with the VRA's goal of equalizing *electoral* opportunities – to patch together remote minorities solely to create the façade of a majority-minority district without regard to actual eligibility to vote. For Plaintiffs' District 5 to collect enough African-American voters to form a true working majority, Plaintiffs would have to deviate even more from traditional redistricting principles in further violation of the first *Gingles* factor.

### b. Plaintiffs Have Not Established the Third *Gingles* Requirement.

Plaintiffs must prove that the white majority in current District 5 "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. The test is not whether the minority-preferred candidate could conceivably lose, but whether he or she will *usually* be defeated.

*See id.* at 51 (holding that "the usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election"). Consequently, the third *Gingles* requirement focuses on whether there is an "equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson*, 512 U.S. at 1014 n.11.

If minority voters have the ability to elect their preferred candidates without a majority BVAP, there is no vote dilution. *See, e.g.*, *Baca v. Berry*, 806 F.3d 1262, 1274 (10th Cir. 2015) ("Consider a case where racially polarized voting exists, but a minority is nevertheless electing candidates of its choice. In that case, the requirement that the white majority votes as a bloc to defeat the minority's preferred candidate would be unsatisfied."); *Page v. Bartels*, 144 F. Supp. 2d 346, 364-65 (D.N.J. 2001) (holding that third *Gingles* factor was absent where the "reduction of the African-American voting age population in District 27 from 53% under the [benchmark] plan to 27% will not impair or prevent minorities from electing their preferred candidates"); *Harris*, 2016 WL 482052, at *19 (rejecting vote dilution claim where "the composition and election results under earlier versions of [the district] vividly demonstrate that, though not previously a majority-BVAP district, the white majority did not vote as a bloc to defeat African-Americans' candidate of choice"); *Personhuballah v. Alcorn*, __ F. Supp. 3d. __ 2016 WL 93849, at *9 (E.D. Va. Jan. 7, 2016) (noting that "a Section 2 challenge

23

to [a district with 40.9% BVAP] would fail, as the ability to garner 60% of the vote with a significantly below-majority BVAP" shows absence of third *Gingles* requirement).   Plaintiffs bear the burden of proof on this issue, and "racial bloc voting . . . never can be assumed, but specifically must be proved." *Shaw*, 509 U.S. at 653.

Plaintiffs assert that voting in both the North-South and East-West districts is racially polarized (Doc. 35 at 9-10), but they have not proved that racial polarization is so strong that it usually leads to the defeat of the African-American candidate.   In that regard, Plaintiffs' expert, Dr. Engstrom, does *not* opine that minority-preferred candidates would actually lose in the current East-West District 5.   The furthest Dr. Engstrom is willing to go is to say that "the ability of the African Americans to elect the representatives of their choice in District 5 would be *diminished* by using the East-West version of the district rather than [Plaintiffs'] North-South version."   (Doc. 58-1 at 11 (emphasis added)).   That is, however, not the test under *Gingles* – a point that Dr. Engstrom readily admits. (Doc. 37-1 at 139 (conceding that Section 2 is concerned with the creation of a "reasonable opportunity," which is "a different analysis for opportunity to elect when compared to diminishment")).[9]   Dr. Engstrom's unwillingness to opine that

---

[9] If "diminishment" between the enacted district and the proposed alternative were the test,

African-American candidates would usually be defeated is understandable, considering that every election he analyzed shows the African-American candidate winning in East-West District 5. (Doc. 58-1 at 14-15 (tables showing Obama prevailing by margins of more than 20% in 2008 and 2012 presidential elections and Meek winning by margin of 4.9% in 2010 senatorial election)).

Because Plaintiffs have failed to carry their burden of establishing that bloc voting leads to the usual defeat of the minority candidate, this Court need go no further. *Cf. Radogno v. Ill. State Bd. of Elections*, 836 F. Supp. 2d 759, 772-73 (N.D. Ill. 2011) (rejecting vote dilution claim on summary judgment where minority-preferred candidates won three out of four elections considered by expert). Nevertheless, the Current Plan not only affords African Americans the ability to elect preferred candidates in East-West District 5, but also allows District 10 in Central Florida to become an African-American performing district.

History shows that African Americans are able to elect their preferred candidates in District 5 without a majority BVAP. Between 1996 and 2012, District 5's predecessors consistently elected Congresswoman Brown, by landslide margins, with BVAPs as low as 42.7%. *See Apportionment VII*, 172 So. 3d at 404.

---

plaintiffs could prevail simply by offering an alternative district with a larger African-American population, even if the existing district already affords a reasonable opportunity to elect. As Dr. Lichtman explains, Dr. Engstrom's "diminishment analysis only demonstrates that the previous [North-South] CD5 was packed with more African-American voters than necessary to provide these voters the ability to elect candidates of their choice." (Doc. 63-1 at 14).

As shown below, in the current East-West District 5 with a BVAP of 45.1%, African Americans are a supermajority of Democratic registered voters and decisively control the Democratic primary, and African-American candidates of choice are able to win general elections by landslide margins.[10]

| East-West District 5 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| % of Voters Who are African American in Democratic Primaries | | | % of Registered Democrats who are African American | | | % Vote for Democratic Candidate in General Election | | |
| 2010 | 2012 | 2014 | 2010 | 2012 | 2014 | 2008 Pres. | 2010 Gov. | 2012 Pres. |
| 57.2% | 62.2% | 62.8% | 63.1% | 66.1% | 65.8% | 63.8% | 64.1% | 64.2% |

After analyzing the metrics of East-West District 5, the Florida Supreme Court twice concluded that African Americans maintain their ability to elect in the district. *See Apportionment VII*, 172 So. 3d at 405; *Apportionment VIII*, 179 So. 3d at 272; *see also Martinez*, 234 F. Supp. 2d at 1307-09 (reviewing similar metrics and finding that District 3 in the 2002 plan "afford[ed] black voters a reasonable opportunity to elect candidates of choice" with a BVAP of 46.9%). The expert opinion of Dr. Lichtman supports this conclusion. Dr. Lichtman evaluated primary and general election data for dozens of elections dating back to 2002 and also conducted an ecological regression analysis.[11]   (Doc. 63-1 at 6-13).  He found that

---

[10] The statistics in the chart are derived from Doc. 58-8 at 18-20 and Doc. 63-2 at 12-13.

[11] Ecological regression is "the standard technique used to infer voting behavior among distinct population groups" and allows for "reasonably accurate estimates of majority and minority

African-American voters dominate the Democratic primary in East-West District 5 and, with a near majority BVAP, consistently elect preferred candidates in the general election.  (*Id.* at 6-14).  Dr. Lichtman analyzed 14 statewide elections in East-West District 5, and the African-American candidate of choice prevailed in each such election – often by landslide margins.  (*Id.* at 9-10).  Dr. Lichtman also evaluated 39 elections of various kinds in Florida that involved electorates with non-majority BVAPs as low as 30.3%.  (*Id.* at 11-12).  In all 39 of the elections, the African-American candidate of choice prevailed.  (*Id.* at 11-13).  Based on his multi-level electoral analysis, Dr. Lichtman determined that East-West District 5 "is a district in which African Americans are overwhelmingly likely to elect candidates of their choice to Congress."  (*Id.* at 6).

Plaintiffs attempt to confront this reality by introducing a red herring in the form of prison population.  Prison population, however, has no effect on the foregoing electoral analysis, which is based on actual election results and turnout and registration data.  By its nature, an electoral analysis accounts only for persons who actually were eligible to – and in fact did – register to vote, which, by definition, *excludes* those with felony convictions.  Ignoring the proper analysis,

voting behavior from demographic data and, depending on whether voting in a specific election or party affiliation is being estimated, election returns and party registration data, respectively." *Reed v. Town of Babylon*, 914 F. Supp. 843, 851 (E.D.N.Y. 1996); *see also Gingles*, 478 U.S. at 53 n.20 (noting that district court found ecological regression to be a "standard" method in the literature for the analysis of racially polarized voting").

Plaintiffs try to divert the Court's attention by asserting that there are 17,140 persons in correctional facilities in East-West District 5, and they attach a chart showing that 6,890 (50.6%) of 13,620 prisoners in certain facilities are African American.  (Doc. 35-4).[12]  Applying the same percentage to the 17,140 figure yields 8,671 African-American prisoners.  Removing that population from the VAP of District 5 reduces BVAP by less than 0.2 percentage points.[13]  This *de minimis* reduction has no material impact on minority voting strength.

### c. The Current Court-Ordered Plan Contains More Minority-Performing Districts Than Plaintiffs' Plan.

At its core, a vote dilution claim "requires the possibility of creating *more* than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice."  *Johnson*, 512 U.S. at 1008 (emphasis added).  While majority-minority districts are sometimes necessary to cure true vote dilution, federal courts should not lightly preempt state decisions to create multiple districts affording African Americans an ability to elect their preferred candidates simply because they have less than a majority BVAP.  *See*

---

[12] Plaintiffs provide the total number of prisoners in FCI Tallahassee (943), but not the racial breakdown.  Accordingly, the calculation excludes that facility.

[13] The total VAP of East-West District 5 is 529,910, and the total BVAP (including both Hispanic African Americans and non-Hispanic African Americans) is 239,094.  *See* FLA. SENATE,                http://www.flsenate.gov/PublishedContent/Session/Redistricting/Plans/SC14-1905/SC14-1905_pop_sum.pdf.  With the elimination of the prison population identified by Plaintiffs, District 5 would have a total VAP of 512,770 and a BVAP of 230,423 or 44.94%.

*Bartlett*, 556 U.S. at 23 (recognizing that "legislative determination[s] . . . to create two crossover districts," rather than a single majority-minority district, "may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal").

Historically, North-South District 5 constrained African Americans to a single ability-to-elect district that equally benefitted Congresswoman Brown and Republicans in surrounding districts.  By unwinding that gerrymandered district, Florida has now created two minority-performing districts – Districts 5 and 10.  As Dr. Lichtman's analysis demonstrates, African Americans in District 10 have an ability to elect preferred candidates that did not exist in the 2012 Enacted Plan now advocated by Plaintiffs.  (Doc. 63-1 at 14-16).  Plaintiffs' North-South District 5, by contrast, leeches African Americans from the Orlando area and leaves District 10 as a Republican-performing district with BVAP of only 11.14%.  (Doc. 52-8 at 8).  Over 120,000 more voting-aged African Americans are able to elect preferred candidates under the Current Plan than under Plaintiffs' proposed plan.[14]

---

[14]  Plaintiffs' North-South District 5 has 257,873 voting-aged (Hispanic and non-Hispanic) African Americans.  *See* FLA. SENATE,  http://www.flsenate.gov/PublishedContent/Session/ Redistricting/Plans/H000C9047/H000C9047_pop_sum.pdf.  Districts 5 and 10 in the Current Plan have 380,420 voting-aged African Americans (239,094 and 141,326, respectively).  *See* FLA.  SENATE,  http://www.flsenate.gov/PublishedContent/Session/Redistricting/Plans/SC14-1905/SC14-1905_pop_sum.pdf.

The minority-marginalizing impact of Plaintiffs' proposed district is neither speculative nor inconsequential.  In 2012, a popular African-American candidate, Val Demings, narrowly lost to Republican Daniel Webster in District 10 under the gerrymandered plan that Plaintiffs now advocate.[15]  In 2014, that same version of District 10 did not even draw an African-American candidate, and Congressman Webster easily won reelection.[16]  Since the Florida Supreme Court has invalidated North-South District 5, at least two African Americans – Val Demings and state senator Geraldine Thompson – have publicly declared their candidacy for Congress in District 10.[17]  Congressman Webster, deprived of a district tailor-made to benefit Republicans, has announced that he will run for reelection in a different district.[18]  The recent history of District 10 is perhaps the best evidence of the

---

[15]  *See* FLA. SEC'Y OF STATE, DIV. OF ELECTIONS, https://results.elections.myflorida.com/ (select 2012 General Election, Federal Offices, District 10).  This Court may take judicial notice of election results published by the Secretary of State.  *See Martinez*, 234 F. Supp. 2d at 1307 n.36.

[16]  *See* FLA. SEC'Y OF STATE, DIV. OF ELECTIONS, https://results.elections.myflorida.com/ (select 2014 Primary Election, Democratic Primary – Federal Offices, District 10 and 2014 General Election, Federal Offices, District 10).

[17]  *See* Val Demings to Run for Congress, http://www.orlandosentinel.com/news/politics/political-pulse/os-val-demings-to-run-for-congress-20150817-post.html (last accessed Mar. 3, 2016); Geraldine Thompson Plans Congressional Bid, http://www.orlandosentinel.com/news/politics/political-pulse/os-geraldine-thompson-plans-congressional-bid-20150818-post.html (last accessed Mar. 3, 2016).

[18]  *See* Webster to Run in Rep. Nugent's District, http://www.orlandosentinel.com/news/politics/political-pulse/os-daniel-webster-leaving-redrawn-orlando-congressional-district-to-run-in-rep-nugent-s-district-20160222-story.html (last accessed Mar. 3, 2016).

increased opportunities afforded to minority voters by the Current Plan and the danger posed by Plaintiffs' requested return to a North-South District 5.

Florida has expanded African Americans' electoral opportunities by replacing the gerrymandered North-South District 5 with two districts in which African Americans can elect candidates of choice. Congresswoman Brown and her supporters clearly prefer a single majority-minority district in which she is assured reelection from her traditional constituency. The VRA is, however, meant to increase electoral opportunities, not constrain them to benefit incumbents. *See Apportionment VIII*, 179 So. 3d at 301 (recognizing that minority protection requirements "belong[] to the minority community – not to the incumbents they choose to elect," and that the Current Plan promotes "the purpose and goal of the [VRA]" by "increas[ing] the number of districts where minorities, both racial and ethnic, will have the opportunity to elect the representatives of their choice")  (Perry, J., concurring). Because Plaintiffs propose a plan with fewer minority-performing districts, they are not entitled to injunctive relief.

### d. Plaintiffs Have Not Shown Vote Dilution Under the Totality of the Circumstances.

Although there is no dispute that Florida has a history of racial discrimination, Plaintiffs do not tie their enumerated instances of past racial discrimination – such as white primary laws, poll taxes, at-large elections, and

literacy tests – to African Americans' present ability to elect preferred candidates in North and Central Florida. *See Mortham*, 926 F. Supp. at 1476-77 (holding that the "past use of such mechanisms as multiple ballot box laws, tissue ballots or 'little jokers,' the secret ballot, the 'white primary,' the poll tax, run-off elections, at-large elections, multiple-member elections, and gerrymandering" did not support vote dilution claim, "[a]bsent proof of any existing discriminatory voting practice").   Nor does Plaintiffs' discussion of socioeconomic disparities demonstrate vote dilution unless "coupled with proof that participating in the political process is in fact depressed among minority citizens." *Id.* at 1477.

Plaintiffs identify several issues regarding the inadequate administration of voting machinery in impoverished areas, changes to early voting, and Florida's felon ineligibility law.  These are certainly legitimate concerns, but Plaintiffs have not shown that they result in vote dilution in North and Central Florida.  For at least the last two decades, African Americans have successfully elected candidates without a majority BVAP, including in District 5 itself. *See Apportionment VII*, So. 3d at 404.  Although Dr. Engstrom points to differing turnout between whites and African Americans, the African-American candidate still prevailed in every race he analyzed under East-West District 5.  (Doc. 58-1 at 14-15).   African Americans turn out in sufficient numbers to dominate the Democratic primary, comprise roughly the same percentage of registered voters in the general election

as the overall BVAP of the district,[19] and can easily elect their candidates of choice – often by landslide margins.  (*See* Part III.A.2.b, *supra*).

Under the totality of the circumstances, Plaintiffs have not shown vote dilution.  *Cf. Mortham*, 926 F. Supp. at 1476-80 (finding no vote dilution, despite past discrimination and ongoing socioeconomic disparities, because African Americans registered to vote at roughly same rate as other voters and could elect candidates of choice).   Accordingly, Plaintiffs would not be entitled to an injunction even if they could establish each of the three *Gingles* factors.

### 3. Plaintiffs Have Not Established a Violation of the Fourteenth Amendment to the U.S. Constitution.

Plaintiffs' Fourteenth Amendment claim shares the same premise as their VRA claim: East-West District 5 "dilutes the voting strength and political influence of black voters."  (Doc. 35 at 22).  Unlike for the VRA claim, however, Plaintiffs must prove both dilutive effect and discriminatory intent to show an Equal Protection violation.  *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 72 F.3d 1556 n.3 (11th Cir. 1996); *Veasey v. Abott*, 796 F.3d 487, 504 (5th Cir. 2015).[20]

---

[19] In East-West District 5, African Americans comprised 44.2% and 46.1% of registered voters in the 2010 and 2012 general elections (Doc. 52-8 at 18-19), and 45.1% of registered voters in the 2014 general election, (Doc. 63-2 at 13).

[20] Plaintiffs do not mention the Fifteenth Amendment other than a single statement that District 5 was drawn with "intentional discrimination . . . in violation of the Fourteenth and Fifteenth Amendments to the Constitution of the United States."  (Doc. 35 at 23).  Regardless, the same

The effect prong requires Plaintiffs to show "both inequality of opportunity and a causation element," which requires proof that a valid, "alternative election scheme exists that would provide better access to the political process." *Johnson v. Desoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1346 & n.20 (11th Cir. 2000). This, in turn, requires that Plaintiffs satisfy the same *Gingles* and totality of the circumstances tests as are necessary to prove vote dilution under the VRA. *See Martinez*, 234 F. Supp. 2d at 1334-36 (holding that *Gingles* and totality of circumstances tests must be met to show discriminatory effect); *Broward Citizens for Fair Districts v. Broward Cnty.*, 2012 WL 1110053, at *9 (S.D. Fla. Apr. 3, 2012) (holding that plaintiffs "failed to establish the discriminatory impact necessary to substantiate an Equal Protection claim" where they "failed to establish the *Gingles* factors" in support of related claim under Section 2 of VRA). Because Plaintiffs have not satisfied the three *Gingles* factors nor shown vote dilution under the totality of the circumstances for the reasons stated above, they cannot prove the effect element of their Fourteenth Amendment claim.

As for discriminatory intent, Plaintiffs must prove that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects." *Miller v. Johnson*, 515 U.S. 900, 916

analysis applies under either the Fourteenth Amendment or the Fifteenth Amendment. *See, e.g.*, *Lucas v. Townsend*, 967 F.2d 549, 551 (11th Cir. 1992); *LaRouche v. Fowler*, 152 F.3d 974, 987 n.15 (D.C. Cir. 1998); *Solomon v. Liberty Cnty.*, 957 F. Supp. 1522, 1571 (N.D. Fla. 1997).

(1995).  Here, the "decisionmaker" was the Florida Supreme Court, which ordered and then adopted East-West District 5.   Plaintiffs cite the apparent views of one state representative, Janet Adkins, in a transcript of comments made at a private political event for the Republican Party of Florida.  The statement at best reflects a single legislator's misguided opinion that District 5 could be redrawn with "perhaps a majority – or maybe not a majority, but a number of [minorities who] live in the prisons" to "help get rid of Corrine Brown."  (Doc. 35-4 at 4).  As it turned out, the district that Adkins may have envisioned was not proposed or adopted.  Adjusting for prison population lowers the current East-West District 5's BVAP by less than 0.2 percentage points – hardly a "majority" of voters – and African Americans retain the decisive ability to elect their preferred candidates in East-West District 5 despite felon ineligibility.  (*See* Part III.A.2.b, *supra*).

In any event, Plaintiffs offer no evidence that Adkins – or, for that matter, anyone in the Legislature – made the decision to draw District 5 in its East-West configuration.  As Plaintiffs concede, the Florida Supreme Court directed District 5 to be drawn East-West (Doc. 34-1 ¶ 87), and the Legislature opted in its proposed remedial plans to follow the identical East-West configuration that the Court favorably considered.  *See Apportionment VIII*, 179 So. 3d at 272.  Plaintiffs offer no evidence that the Florida Supreme Court acted with discriminatory intent in requiring an East-West District 5 or adopting the version of District 5 in the

Current Plan.   In fact, the Court expressed at least the following non-discriminatory reasons for its decision: (1) the Legislature drew the North-South version of District 5 with partisan intent in violation of the Florida Constitution, *Apportionment VII*, 172 So. 3d at 403; (2) East-West District 5 affords African Americans the undiminished ability to elect candidates of choice, *id*. at 404-05; and (3) East-West District 5 is more compact and splits fewer cities and counties than the "unusual," "bizarre," and "meandering" North-South District 5, while making the Central Florida districts as a whole more compact, *id*. at 406.   Because Plaintiffs have not shown that District 5 was drawn with discriminatory intent or caused a dilutive effect, they are not entitled to injunctive relief.

**B.** **The Public Interest and the Balance of the Harms Do Not Support a Preliminary Injunction.**

To obtain a preliminary injunction, Plaintiffs must show that (1) "the threatened injury to [them] outweighs whatever damage the proposed injunction may cause the opposing party," and (2) "if issued, the injunction would not be adverse to the public interest."   *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).   The citizens of Florida have fought long and hard for redistricting reform and have finally achieved their goal of fairly drawn districts.   If a preliminary injunction is wrongfully issued and the 2016 election proceeds under a plan similar to the one proposed by Plaintiffs, Florida's voters will endure yet another election

cycle in gerrymandered districts drawn for partisan benefit in violation of Article III, Section 20 of the Florida Constitution.  Minority voters in particular will lose the ability to elect an additional candidate of choice in Central Florida. The public interest and the risk of irreparable injury to Intervenors and the voters represented by LWVF and Common Cause therefore greatly outweigh any conceivable harm that Plaintiffs may suffer.

## IV.   CONCLUSION

Plaintiffs ask this Court to compel the state of Florida to turn back the clock on redistricting reform, eliminate two ability-to-elect districts for African Americans, and replace them with a single, grossly non-compact district that aggregates rural and urban minority communities from at least seven different counties.  Congresswoman Brown understandably prefers a district in which she is virtually guaranteed reelection by her traditional constituents, but neither the VRA nor the U.S. Constitution supports the relief sought in this case.  Accordingly, this Court should deny Plaintiffs' request for a preliminary injunction.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

Undersigned counsel for Intervenors hereby certifies that this motion and incorporated memorandum of law contain 7,282 words, excluding the case style, signature block, and certificate of service.  The foregoing word count has been

calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 4, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ David B. King
David B. King
Florida Bar No.: 0093426
Thomas A. Zehnder
Florida Bar No.: 0063274
Vincent Falcone
Florida Bar No.: 0058553
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
dking@kbzwlaw.com
tzehnder@kbzwlaw.com
vfalcone@kbzwlaw.com

*Counsel for Intervenors, The League of Women Voters of Florida, Common Cause, Deirdre Macnab, LaVonne Grayson, George Oliver III, and Angela DeMonbreun*