**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

CONGRESSWOMAN CORRINE BROWN,
*et al.*,

      Plaintiffs,

v.                                        Case No. 4:15cv398-MW/CAS

KEN DETZNER, in his official capacity as
Secretary of State of the State of Florida, *et al.*,

      Defendants.

_____/

## ORDER

Before ROSENBAUM, Circuit Judge, HINKLE and WALKER, District Judges.

BY THE COURT:

      Congresswoman Corrine Brown, along with dozens of black voters[1] in north and central Florida, challenge the redrawing of Florida's 5th Congressional District into an east-west configuration, as opposed to its former north-south orientation, as ordered by the Florida Supreme Court in *League of Women Voters of Florida v. Detzner*, 179 So. 3d 258, 271-73 (Fla. 2015) ("*Apportionment VIII*").  Plaintiffs' Amended Complaint asserts two counts, both brought under 42 U.S.C. § 1983:  Count I alleges that the redrawn District 5 violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, by diluting the ability of black voters to elect congressional representatives of their choice, and Count II avers that District 5 was redrawn with the intent to

---

[1] In this order we use the term "black" as opposed to "African American" to reflect that we are including black individuals who may not describe themselves as African Americans.  The term is also intended to coincide with the voter-population evidence submitted by the parties, which employs the term "black" to include those who identify as both Hispanic and black as well as those who identify as non-Hispanic blacks.

discriminate against black citizens, in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution.  ECF No. 34-1, ¶¶ 113-121.[2]  Plaintiffs seek declaratory relief and preliminary and permanent injunctions prohibiting Defendants from "enforcing or giving any effect to" the redrawn District 5.  After considering the parties' arguments and reviewing the evidence, we now set forth our findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a)(1).[3]  We find that Plaintiffs have not proven their case and that Defendants are entitled to judgment in their favor.

## I. BACKGROUND INFORMATION AND FINDINGS OF FACT

Before diving into our findings of fact, we set the stage by briefly recounting the nature of a vote-dilution claim under the Voting Rights Act.  Section 2 of the Voting Rights Act, as amended, provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C. § 10301(a).  A violation of this statute occurs "if, based on the totality of circumstances, . . . members [of a protected class] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *Id.* § 10301(b).  So the Voting Rights Act prohibits the manipulation of district lines that hinder the ability of a politically cohesive minority population to elect its preferred candidates, such as by

---

[2] Plaintiffs voluntarily dismissed their state-law claims.  *See* ECF No. 49.  Only the federal-law claims remain before this Court.

[3] The parties agreed during the March 25, 2016, preliminary-injunction hearing that the merits of the case would be decided on the submitted written record without further need for a trial or live testimony.  We therefore provided the parties with additional time to supplement the record.  Plaintiffs provided verified copies of the state-court trial transcripts they had already filed, ECF No. 73, along with two affidavits, ECF No. 74, but no other evidence or argument.  No other parties filed supplemental materials.  The record is now complete and the case ripe for disposition.

fragmenting the population among several districts.  *See Voinovich v. Quilter*, 507 U.S. 146, 153-54, 113 S. Ct. 1149, 1155 (1993).  A claim of this nature is known as vote dilution.  *See id.*

In *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752 (1986), the Supreme Court construed 1982 amendments to the Voting Rights Act that, among other things, reintroduced a "results test" to Section 2 violations.  478 U.S. at 34, 35, 106 S. Ct. at 2758.  Under *Gingles*, a plaintiff must demonstrate three "necessary preconditions" in support of establishing a Section 2 violation based on vote dilution in multimember districts:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. . . . Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . .—usually to defeat the minority's preferred candidate.

*Id.* at 50-51, 106 S. Ct. at 2766-67.  These three preconditions are sometimes referred to by the shorthand references of "compactness," "political cohesiveness," and "majority bloc voting," respectively.

The Supreme Court has extended these preconditions to vote-dilution claims regarding single-member districts such as congressional districts.  *See Growe v. Emison*, 507 U.S. 25, 40-41, 113 S. Ct. 1075, 1084 (1993).  Once a plaintiff satisfies all three *Gingles* prongs, the plaintiff must still "demonstrate that, under the totality of the circumstances, the [electoral scheme] result[s] in unequal access to the electoral process" so that a minority population has "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *Gingles*, 478 U.S. at 43, 46, 106 S. Ct. at 2762, 2764; *Abrams v. Johnson*, 521 U.S. 74, 91, 117 S. Ct. 1925, 1936 (1997); 52 U.S.C. § 10301(b); *see Johnson v. De Grandy*, 512 U.S. 917, 1011, 114 S. Ct. 2647, 2657 (1994) (noting that the preconditions are necessary but not

sufficient to establish a Section 2 claim and that the totality-of-the-circumstances inquiry is also required).

## A. History of Florida's Fifth Congressional District

### 1. The Judicially Created Majority-Minority District—1992

Following the 1990 census, Florida became entitled to four additional seats in the United States House of Representatives. *See DeGrandy v. Wetherall*, 794 F. Supp. 1076, 1078 (N.D. Fla. 1992). When Florida's legislature failed to pass an updated districting plan, a three-judge federal court adopted a plan, as proposed by an appointed special master. *See id.* at 1080-81. That plan included two districts with a majority black voting-age population ("VAP") and one black "influence" district. *Id.* at 1088. The *DeGrandy* District 3, from which the Plaintiffs' preferred North-South District 5 traces its origin, was one of the black-majority districts, with a black VAP of 50.6%. *See id.*

In evaluating the various proposed districting plans, the *DeGrandy* panel observed that the Voting Rights Act, including Section 2's prohibition on vote dilution, guided it. But because the case did not involve a "traditional [S]ection 2 challenge to an existing plan," the court noted that the preconditions set out in *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752 (1986), did not strictly govern the analysis. *See* 794 F. Supp. at 1082-83. The court further recognized that "racial fairness" factored significantly in court-ordered districting plans, *id.* at 1084-85, and it determined that it needed to maximize black-majority districts, where those districts could be reasonably drawn, instead of maximizing black-influence districts. *See id.* at 1085.

Although the court acknowledged that some parties had objected to District 3 as "grotesquely shaped," it did not analyze the compactness issue before adopting the challenged District 3. *Id.* at 1089-90. Nevertheless, District 3's unique shape led one of the judges to file a

4

special concurrence observing that while the adopted plan was "fair," District 3 in particular did not comport with any reasonable standard of compactness. *See id.* at 1090-92 (Vinson, J., specially concurring).

### *2. Invalidation of the Judicially Created District and Adoption of a New District—1996*

Following the 1992 elections, a coalition of white and Hispanic voters challenged the "odd-shaped" District 3 imposed by *DeGrandy*, characterizing it as an unconstitutional racial gerrymander. *See Johnson v. Mortham*, 926 F. Supp. 1460, 1466 (N.D. Fla. 1996) ("*Mortham II*"); *Johnson v. Mortham*, 915 F. Supp. 1529, 1533-34 (N.D. Fla. 1995) ("*Mortham I*"). The *Mortham* plaintiffs did not raise a challenge under the Voting Rights Act. *See Mortham I*, 915 F. Supp. at 1534.

Because the three-judge *Mortham* panel concluded that *DeGrandy* relied predominantly on race in drawing District 3, it evaluated whether District 3 satisfied strict scrutiny as a narrowly tailored means of furthering a compelling interest. *Mortham II*, 926 F. Supp. at 1466. The *Mortham* defendants asserted that the need for compliance with Section 2 of the Voting Rights Act constituted a compelling interest that justified the drawing of *DeGrandy* District 3. *Id.* at 1467. But the *Mortham* panel disagreed, finding that no actual Section 2 violation had been proven at the time that the court issued *DeGrandy*, so remedial action was not required to avoid violating federal law. *Id.* at 1468-69. Specifically, the *Mortham* panel determined that *DeGrandy* failed to recognize that any Section 2 concerns were moot, that *DeGrandy* operated under the mistaken assumption that the Act required maximizing the number of majority-minority districts, and that, even setting aside these first two obstacles, the *DeGrandy* "record demonstrate[d] the absence of a 'strong basis in evidence' that a Section 2 violation occurred." *Id.*; *see id.* at 1480-81. Because

no Section 2 violation had been proven, the need for compliance with Section 2 could not serve as a compelling interest justifying *DeGrandy* District 3.

In discussing the evidentiary record, the *Mortham* panel observed that *DeGrandy* District 3 connected far-flung urban black populations in Jacksonville, Orlando, Daytona Beach, Gainesville, and elsewhere via "narrow land bridges of white rural and small town populations." *Id.* at 1471-72.  It further opined that "by any number of quantitative measures of compactness commonly used in political science, [District 3] ranks among the least compact districts in the country."  *Id.* at 1472-73.  Based on these findings, the panel concluded that "it is evident that the African-American population in Northeast Florida is not sufficiently large and geographically compact so as to constitute a majority in a fairly drawn congressional district," so District 3 could not "meet the first *Gingles* precondition for establishing vote dilution in violation of Section 2." *See id.* at 1473.

Because the *DeGrandy* District 3 failed to survive strict scrutiny,[4] the *Mortham* panel remanded the matter to the Florida legislature to adopt new congressional districts.  *Id.* at 1494-95.  Although the court stated that the legislature could not simply re-adopt the *DeGrandy* districts, *id.* at 1494 n.73, the court offered no specific guidance on drawing the districts beyond mandating general compliance with federal law.  *See id.* at 1494-95.  The Florida legislature adopted a new plan, redrawing District 3 in a form more closely resembling the Plaintiffs' preferred north-south version.  *See Johnson v. Mortham*, No. TCA 94-40025-MMP, 1996 WL 297280, at *1 (N.D. Fla. May 31, 1996).  Finding that the revised District 3 remedied the constitutional infirmities of *DeGrandy* District 3, the *Mortham* panel closed the case.  *Id.*  Because *Mortham* did not involve a

---

[4] The *Mortham* court also considered and rejected arguments that District 3 addressed the compelling interest of remedying the present effects of past discrimination, 926 F. Supp. at 1481-83, and that District 3 was narrowly tailored to further any compelling interest, *id.* at 1483-93.

Section 2 challenge, the *Mortham* panel never had cause to evaluate the compactness of the redrawn District 3.

### 3. Post-2000 Redistricting Passes Muster Under Federal Law—2002

Following the 2000 census, Florida was apportioned two additional representatives in Congress. *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1286 (S.D. Fla. 2002). In 2002, the Florida legislature adopted a redistricting plan for Florida's resulting twenty-five congressional districts. *Id.* at 1286-88. Newly adopted District 3, although modified at the margins, retained the core characteristics of the District 3 approved in 1996. *See id.* at 1308. Demographically, the new District 3 had a total black population of 51.4% and a total black VAP of 46.9%. *Id.* at 1307. This compared favorably with the 1996, post-*Mortham* version of District 3, which had a total black VAP varying over time from 42.7% to 46.7%. *Id.* at 1308.

Unlike previous plans, the 2002 redistricting—including District 3—was challenged under Section 2 of the Voting Rights Act. *See id.* at 1278-79, 1319-24. The *Martinez* plaintiffs apparently took the position that the 2002 District 3 and other purported minority-performing districts should have been drawn in another manner to guarantee a higher likelihood that the districts would, in fact, perform for candidates preferred by the protected group. *See id.* at 1309, 1323. Because the parties focused on the actual voting performance of the challenged districts, they did not dispute the *Gingles* preconditions in *Martinez*. *See id.* at 1321. Although the court did describe District 3 as "reasonably compact," it qualified that statement by noting that no party had challenged compactness. *Id.* at 1320-21 & n.20. Ultimately, because the court concluded that the new District 3 as drawn by the Florida legislature was likely to perform for the minority-preferred candidate—and had, in fact, performed for the minority-preferred candidate for the previous decade, despite less favorable demographics—*Martinez* held that vote dilution had not

7

occurred.  *Id.* at 1323-24.  The court reached this conclusion while explicitly declining to apply rigid, mechanical population-percentage requirements on minority-performing districts.  *See id.* at 1321-22.

### 4. Florida Prohibits Partisan Gerrymandering

In 2010, the citizens of Florida amended Florida's constitution to expressly forbid the state legislature from drawing or redrawing congressional districts "with the intent to favor or disfavor a political party or an incumbent."[5]  Fla. Const. art. III, §20; *see League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 369 (Fla. 2015) ("*Apportionment VII*").  Prior to the adoption of these amendments, known colloquially as the Fair Districts Amendments, the political party in control of Florida's legislature blatantly—often proudly—but legally emphasized partisan advantage in redistricting plans.  *See Martinez*, 234 F. Supp. 2d at 1300-01; *id.* at 1351-52 (Hinkle, J., concurring); *Apportionment VII*, 172 So. 3d at 371; *In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So. 3d 597, 615-16 (Fla. 2012) ("*Apportionment I*").  After ratification of these amendments, partisan gerrymandering became illegal in Florida.  *See Apportionment VII*, 172 So. 3d at 370; *Apportionment I*, 83 So. 3d at 615-18.

Under Florida's Fair Districts Amendments, ideally, districts comply with both "tier one" and "tier two" constitutional requirements.  *See Apportionment I*, 83 So. 3d at 599.  Tier-one requirements demand that districts be drawn in a way that (a) does not promote a particular political party or incumbent, (b) protects and preserves racial and language minorities' electoral rights, and (c) promotes territorial contiguity.  *See* Fla. Const. art. III § 20(a).  Tier-two requirements include considerations of population equivalency, compactness, and respect for political and geographical

---

[5] Voters passed Florida Legislative Districts Boundaries, Amendment 5 (2010), and Congressional District Boundaries, Amendment 6 (2010).

boundaries.  Fla. Const. art. III § 20(b).  Tier-two standards are subordinate to both tier-one requirements and federal law.  *See id.*; *Apportionment I*, 83 So. 3d at 599.

### 5. *Florida Supreme Court Invalidates a North-South District, Adopts an East-West District*

Following the 2010 census, Florida passed a redistricting plan in February 2012 apportioning the state's now twenty-seven congressional seats.  *Apportionment VII*, 172 So. 3d at 373.  This plan included a district in northeast Florida with a black VAP majority of 50.1%, roughly similar in shape and north-south orientation to former District 3, but now labeled District 5.  *See id.* at 435-37 (trial court opinion); ECF No. 52-8 at 8.  The Florida courts described District 5 as "visually not compact [and] bizarrely shaped," observing that it "does not follow traditional political boundaries as it winds from Jacksonville to Orlando," narrowing at one point to the width of a highway and possessing a "finger-like appendage jutting" into Seminole County.  *Id.* at 435, 437; *see also id.* at 402.  When the legislature's 2012 redistricting plan was challenged under the Fair Districts Amendments, the Florida courts determined that the plan—including District 5— was "drawn in violation of the Florida Constitution's prohibition on partisan intent."  *Id.* at 370.  Specifically, the Florida courts concluded that District 5 was designed to create a majority black VAP district with the intent of assisting the political party controlling the legislature by packing members of the minority political party into District 5 under the guise of benefiting black voters, instead of placing them in other districts where they more naturally geographically fell and were likely to have resulted in districts that would perform for the minority political party.  *Id.* at 385, 403-06.  To achieve that result, District 5 "d[id] not adhere to the tier-two standards in Article III Section 20."  *Id.* at 435 (trial court opinion).

After the trial court ordered that District 5 be redrawn, the Florida legislature held a special session in August 2014 and adopted modest remedial changes to District 5.[6]  *Id.* at 386-87.  Those changes included widening the district in places and dropping the finger-like appendage but generally retaining the same shape and north-south orientation.  *Id.* at 402; *see* ECF No. 52-8 at 11.  As a result of the legislature's remedial plan, the black VAP of District 5 dropped from 50.06% to 48.11%.  *See* ECF No. 52-8 at 12.  Although the trial court conceded that remedial District 5 was "not a model of compactness," it approved the remedial plan as "much improved."  *Romo v. Detzner*, No. 2012-CA-412, 2012 WL 4261829 (Fla. Cir. Ct. Leon Cty. Aug. 22, 2014) (available at ECF No. 34-4 at 4).

On appeal, the Florida Supreme Court rejected the remedial District 5 as not compliant with Florida's tier-two standards.  *Apportionment VII*, 172 So. 3d at 402-03.  As a result, under the Fair Districts Amendments, the remedial District 5 could stand only if it were necessary to comply with federal laws, such as the Voting Rights Act, or the Florida constitution's own tier-one requirements.  *Id.* at 403.

But the Florida Supreme Court held that remedial District 5 violated tier-one standards as well.  More specifically, the court concluded that remedial District 5 failed to pass constitutional muster in Florida because it was drawn with the unconstitutional partisan intent of benefiting the political party in control and Congresswoman Brown—the lead Plaintiff in this lawsuit—who had "previously joined with leading [members of the political party in control] in actively opposing the Fair Districts Amendment[s] and redistricting reform."  *Id.* at 403.  In addition, the Florida

---

[6] To be clear, Plaintiffs in this case are asserting that the 2012 version of District 5, not the subsequently adopted 2014 remedial version, is an appropriate remedy in this case because it is the only version of District 5 with a black VAP higher than 50%.  *See generally* ECF No. 35 at 4, 8-9 (relying on the North-South District 5 with a majority black VAP).

Supreme Court rejected as unsupported by the evidence the contention that a north-south configuration, versus an east-west orientation—the only non-partisan version of District 5 on the record—was necessary to avoid diminishing the ability of blacks to elect a candidate of their choice. *Id.* at 403-04. In fact, the court observed that the black VAP of an east-west district was actually higher than that of the 1996 version of District 3, a district that nonetheless consistently elected the black-preferred candidate, Congresswoman Brown. *See id.* at 404-06. Because the Florida Supreme Court found that an east-west district would still permit black voters to elect the candidates of their choice and would comply with Florida's constitutional standards, the court ordered the legislature to redraw District 5 in an east-west orientation. *Id.* at 405-06, 413.

Although the legislature held another special session, it failed to agree on a new congressional redistricting plan. *Apportionment VIII*, 179 So. 3d at 261. So the Florida Supreme Court directed the trial court to recommend a redistricting map. *Id.*; *see id.* at 309-10 (trial court order). Because the challengers and the Florida legislature all agreed on an identical configuration of an east-west District 5,[7] the trial court recommended that the Supreme Court adopt that configuration. *Id.* at 310-11, 313-14. The Florida Supreme Court observed the absence of any party objections or proposed alternatives regarding East-West District 5 in the case before it[8] and opined that the east-west configuration "does not diminish the ability of black voters to elect a candidate of choice." *Id.* at 271-73, 298. It therefore approved the configuration for Florida's congressional elections in 2016 and thereafter until the next decennial redistricting. *Id.*

---

[7] This configuration is found in, and at various times referred to as, House Plan 9071, Senate Plan 9062, Senate Plan 9066, CP-1, and Romo Plan A. *See Apportionment VIII*, 179 So. 3d at 310-11 (trial court order).

[8] The Florida Supreme Court acknowledged that Congresswoman Brown objected to the east-west configuration and had filed this federal lawsuit to present those objections. *Apportionment VIII*, 179 So. 3d at 272 n.5.

**B. Demographics and Statistics**

East-West District 5 has a VAP that is 45.8% white, 45.1% black (including black Hispanic individuals), 5.5% non-black Hispanic, and 3.6% other.  Redistricting Plan SC14-1905, District Summary Population Report (Dec. 2, 2015), http://www.flsenate.gov/PublishedContent/ Session/Redistricting/Plans/SC14-1905/SC14-1905_pop_sum.pdf  ("East-West Population Report"); *see also* ECF No. 52-8 at 16.  It stretches from Jacksonville in the east along the Florida-Georgia border to Gadsden County in the west, picking up portions of Tallahassee—while avoiding others—along the way.  *See* ECF No. 52-8 at 15.  East-West District 5 is not particularly compact, scoring just 0.12 on the Reock scale, 0.71 on the Convex-Hull scale, and 0.10 on the Polsby-Popper scale (with 1.0 being the most compact).  *Id.* at 16.

The east-west district also contains a number of correctional facilities whose residents are likely not eligible to vote.  Plaintiffs have provided evidence indicating that roughly 50.59% of the incarcerated population in the district is black.  *See* ECF No. 35-4 at 2.  Applying this percentage to Plaintiffs' total of 17,140 incarcerated individuals in the district reduces the black VAP of East-West District 5 to 44.9%.

Plaintiffs' preferred district, the 2012 version of North-South District 5, has a VAP that is 50.1% black (including black Hispanic individuals), 36.2% white, 10.0% non-black Hispanic, and 3.7% other.  Redistricting Plan H000C9047, District Summary Population Report (Jan. 25, 2012), http://www.flsenate.gov/PublishedContent/Session/Redistricting/Plans/H000C9047/ H000C9047_pop_sum.pdf; *see also* ECF No. 52-8 at 8.  From Jacksonville it winds south along the St. Johns River for a ways before abruptly jutting westward to pick up portions of Gainesville, and then meanders in a southeasterly direction to Orlando, with a notable appendage extending due east to encompass the city of Sanford.  *See* ECF No. 52-8 at 7.  North-South District 5 is not

13

geographically compact by any measure, scoring 0.09 on the Reock scale, 0.29 on the Convex-Hull scale, and 0.04 on the Polsby-Popper scale.  *See id.* at 8.

As a result of the Florida Supreme Court's adoption of East-West District 5, other districts were necessarily modified.  Among these was Congressional District 10 in Orange County. District 10 has a VAP that is 44.4% white, 27.1% black (including black Hispanic individuals), 21.4% non-black Hispanic, and 7.1% other.  *See* East-West Population Report; ECF No. 52-8 at 16.  None of the five other modified congressional districts in the east-west plan that contain portions of North-South District 5 (Districts 3, 4, 6, 7, and 11) have a black VAP higher than 15.5%.  *See* East-West Population Report; ECF No. 52-8 at 16.

## C. Electoral Performance

Plaintiffs' expert, Dr. Richard Engstrom, conducted an analysis of the electoral performance in both the north-south and east-west configurations of District 5.  *See* ECF No. 58-1; *see also* ECF No. 35-1.  Dr. Engstrom analyzed precinct data from three state-wide elections, the 2008 and 2012 presidential elections, and the 2010 general election for the United States Senate, using the Ecological Inference method[9] to determine the degree of racially polarized voting in each configuration of District 5.  ECF No. 58-1 at 7-9.  His analysis demonstrates that voting in either configuration of District 5 is racially polarized and that the black voting population is politically cohesive—points not contested here.  *See id.*

In addition, Dr. Engstrom analyzed the hypothetical outcomes of congressional races in these two configurations using actual election data from the 2008, 2010, and 2012 state-wide

---

[9] Courts have recognized Gary King's Ecological Inference method as a reliable means of estimating racially polarized voting and have opined that it represents an "improvement" on other statistical methods.  *See, e.g.*, *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 995-96, 1003 (D.S.D. 2004).

elections.  *Id.* at 9-12.  Significantly, because Dr. Engstrom's analysis relies on *actual* voting data, his performance conclusions necessarily exclude non-voting felons.

In the 2008 election, the black-preferred candidate, Barack Obama, would have won North-South District 5 with 71% of the vote and would have won East-West District 5 with 64% of the vote.  *Id.* at 11.  In the 2012 election, the black-preferred candidate, again Barack Obama, would have won North-South District 5 with 71.4% of the vote and would have won East-West District 5 with 64.3% of the vote.  *Id.*  In the 2010 senatorial election—a three-candidate race—the black-preferred candidate, Kendrick Meek, would have won the North-South District 5 with a plurality of 48.2% of the vote and would have won East-West District 5 with a plurality of 40.4% of the vote.  *Id.* at 12, 16.  In sum, Dr. Engstrom's analysis demonstrates that the black community's candidate of choice would have prevailed handily in either the east-west or north-south configurations.

Intervenor-Defendants' expert, Dr. Allan Lichtman, also analyzed electoral performance in East-West District 5.  *See* ECF No. 63-1.  First, Dr. Lichtman determined that black voters compose a sizeable majority of Democratic Party primary voters in East-West District 5, so they are likely to elect their preferred candidate in the Democratic primary election.  *Id.* at 6-9.  Dr. Lichtman then analyzed actual voting data in fourteen state-wide elections from 2006 to 2014, just as Dr. Engstrom had done, to determine who would have prevailed in fourteen hypothetical congressional elections in East-West District 5.  *Id.* at 9-10.  Based on this analysis, Dr. Lichtman concluded that the Democratic primary winner and therefore Democratic candidate in the general election—the likely black-preferred candidate—would have prevailed in every election by receiving anywhere from 52.9% to 69.5% of the vote.  *Id.* at 10.

Beyond the specific performance of East-West District 5, Dr. Lichtman recounted the results of thirty-nine Florida congressional, state senate, and state house elections where the voting district had a non-majority black VAP (ranging from 30 to 47%) and observed that a black Democratic candidate won each and every one of those elections. *Id.* at 10-13.

Besides the analyses of the alternative configurations of District 5, both Dr. Engstrom and Dr. Lichtman provided an electoral analysis of Congressional District 10.  While Dr. Engstrom's analysis focused on the issue of racial polarization, he noted that black-preferred candidate Meek would have lost a three-way race in District 10 based on the 2010 United States Senate election results.  ECF No. 35-1 at 21.  But Dr. Lichtman, using data from the same fourteen elections he analyzed with respect to East-West District 5, concluded that the Democratic candidate would have prevailed in a majority of hypothetical District 10 contests—eight of fourteen.  ECF No. 63-1 at 17-18.  Dr. Lichtman's data included Meek's 2010 loss as one of the six losses.  *Id.*

Although the parties have not submitted expert electoral analysis for any of the other congressional districts that had been part of North-South District 5, Plaintiffs have provided testimony about the dearth of black candidates elected to county and local offices in areas touched by North-South District 5.  For example, Velma Williams, a black City Commissioner for the City of Sanford, testified that she is only the second black official ever elected to the city commission.  ECF No. 73-8 at 86:7-:13.  Williams and Turner Clayton, Jr., testified that no black has ever been elected as mayor of a city in Seminole County, nor has any black ever been elected to the Seminole County Board of Commissioners or School Board.  *Id.* at 87:10–88:9; ECF No. 73-5 at 10:18–12:13.  Evelyn Foxx testified that no black has ever been elected to "constitutional office" or as sheriff in Alachua County.  ECF No. 73-7 at 45:13-:23.  And Whitfield Jenkins testified that no black has been elected to the Marion County Board of Commissioners since Reconstruction, and

no black has been elected to the Reddick City Council during Jenkins's lifetime. *Id.* at 56:21–57:4, 58:22–59:2.

## II. CONCLUSIONS OF LAW

### A. Plaintiffs Fail to Establish Vote Dilution Under the Section 2 of the Voting Rights Act

As we have discussed, Plaintiffs must satisfy the three *Gingles* factors before they can prevail on their vote-dilution claims. The second *Gingles* prong has not been contested in this case. That leaves the first and third prongs. So Plaintiffs must show that the black population of northeast Florida is sufficiently large and geographically compact to constitute a majority in a congressional district, and they must demonstrate that the white majority votes sufficiently as a bloc to usually defeat the black community's preferred candidate. *See Gingles*, 478 U.S. at 50-51, 106 S. Ct. at 2766-67.

We evaluate the first *Gingles* precondition to identify whether "the minority [population] has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40, 113 S. Ct. at 1084. A Section 2 plaintiff shows the existence of a geographically compact minority community by proposing a remedy district. *Nipper v. Smith*, 39 F.3d 1494, 1530-31 (11th Cir. 1994) (en banc). The compactness inquiry must "take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries,'" and, in the Section 2 context, the inquiry focuses on the characteristics of the minority community rather than lines of the proposed district. *See League of United Latin American Citizens v. Perry*, 548 U.S. 399, 433, 126 S. Ct. 2594, 2618 (2006) ("*LULAC*") (quoting *Abrams*, 521 U.S. at 92, 117 S. Ct. at 1936). Nevertheless, a compact community of interest cannot be based solely on the commonality of race. *Id.* at 433-34, 117 S. Ct. at 2618.

Under the third *Gingles* prong, we consider whether "the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population."  *Growe*, 507 U.S. at 40, 113 S. Ct. at 1084.  But racially polarized voting alone is insufficient to satisfy the third precondition; instead, polarized voting must usually lead to the defeat of the minority-preferred candidate.  *Johnson v. Hamrick*, 196 F.3d 1216, 1221 (11th Cir. 1999) ("*Hamrick II*") ("To establish the third *Gingles* factor, a plaintiff must show not only that whites vote as a bloc, but also that white bloc voting *regularly causes* the candidate preferred by black voters to lose . . . ." (emphasis in original)).  The existence of successful white-bloc voting cannot be assumed, but must be proved.  *See Gingles*, 478 U.S. at 46, 106 S. Ct. at 2764.  The Eleventh Circuit has held that vote-dilution plaintiffs fail to establish the third *Gingles* prong when black-preferred candidates prevail at least as frequently as they lose.  *See Johnson v. Hamrick*, 296 F.3d 1065, 1081 (11th Cir. 2002) ("*Hamrick III*").

In this case, Plaintiffs have devoted the bulk of their efforts to demonstrating that the North-South District 5 encompasses a geographically compact community of interest and satisfies the first *Gingles* precondition.  They have attempted to do so by producing volumes of testimony concerning the appalling history and continuing legacy of racial discrimination in northeastern Florida; the community's shared political and economic interests in topics such as poverty, public services, housing, education, and criminal justice; and the ameliorating effect that former District 3 and District 5 has had for the community.

Without minimizing the shameful history of racism or the heritage of blacks in northeastern Florida, we do not decide whether Plaintiffs have demonstrated a geographically compact community in North-South District 5.  Even if they have, we must conclude that Plaintiffs' Section

2 claim fails for another reason:  Plaintiffs have not proven that white-bloc voting regularly defeats black-preferred candidates.

In their Amended Complaint, Plaintiffs appear to assert that the east-west configuration diluted the black vote in District 5 itself.  Plaintiffs rely heavily on the fact that East-West District 5 has a black VAP of 45.1%—a number they argue is deceivingly high based on the district's prison population—as evidence that they will not be able to elect their candidates of choice in the district.  Instead, they contend that the (bare) majority-minority VAP of 50.1% found in North-South District 5 is necessary to avoid denying blacks the ability elect candidates of their choosing.

As borne out by Plaintiffs' own expert (as well as the Intervenors' expert), though, the black-preferred candidate should easily continue to prevail in East-West District 5, despite the lower black VAP.  Although the victory percentages may drop slightly from those in the north-south configuration, the evidence demonstrates that black-preferred candidates should generally continue to win East-West District 5 with about sixty percent of the vote.  And a win is a win, regardless of the margin of victory.  Moreover, on this record, any drop in the margin of victory in District 5 reflects only that, for purposes of obtaining partisan advantage, members controlling the legislature's redistricting process previously sought to and, for a time, succeeded in packing black voters into the north-south configuration to minimize their presence in other districts.

Nor, as Plaintiffs suggest, should the large number of nonvoting prisoners undermine the ability of blacks to elect their candidate of choice in East-West District 5.  As we have noted, the experts' analyses relied on actual voting data from past elections, so they necessarily accounted for the non-voting prison population when they showed the black-preferred candidate winning every election.  Indeed, as the Florida Supreme Court recognized, Congresswoman Brown has been continuously elected despite black VAP percentages dropping as low as 42.7%—more than

two points less that the black VAP in East-West District 5.  *See Apportionment VII*, 172 So. 3d at 404.

When confronted with the reality of this evidence during the preliminary-injunction hearing, Plaintiffs shifted the emphasis of their vote-dilution arguments to those communities of blacks who would no longer be included in District 5 as a result of its east-west configuration. Plaintiffs contend that the votes of these blacks will be diluted because they now reside in districts that will not perform for black-preferred candidates.  But the problem with Plaintiffs' argument is that they simply have not produced evidence that racial-bloc voting in these other districts will defeat their candidates of choice.  In fact, the record contains electoral-performance evidence for only one of these other districts—District 10—and that evidence suggests that the black-preferred candidate will prevail more often than not (in eight of fourteen elections).  This is insufficient to establish vote dilution in District 10.  *See Hamrick III*, 296 F.3d at 1081.  To the contrary, the combination of East-West District 5 and new District 10 will provide approximately 120,000 *more* black voters with an opportunity to be able to elect their candidate of choice than a districting plan that includes North-South District 5.[10]

Beyond Dr. Engstrom's conclusion that congressional elections in North-South District 5 are racially polarized, Plaintiffs have provided absolutely no electoral-performance evidence for new Congressional Districts 3, 4, 6, 7, and 11.  Instead, Plaintiffs rely solely on testimony of residents from Seminole, Marion, and Alachua Counties that black candidates have rarely been elected, and are often defeated, in local county and city elections.  But this anecdotal evidence

---

[10] With a north-south configuration of District 5, the resulting District 10 (and former District 8) had a history of generally electing the Republican candidate—in other words, likely not the black-preferred candidate, extrapolating Dr. Lichtman's reasoning from District 5 to District 10—most recently electing Daniel Webster.  For example, between 1992 and 2014, fourteen United States congressional elections occurred, and the Republican candidate won 13 of them.

does not address whether white-bloc voting is responsible for the lack of black candidates' electoral success in these elections, and it does not rule out other possible reasons for the lack of success.  As the Supreme Court has made clear, Section 2 plaintiffs must prove racial bloc voting; we may not assume it.  *Gingles*, 478 U.S. at 46, 106 S. Ct. at 2764.  In this case, Plaintiffs simply have not provided sufficient evidence.

Relatedly, Plaintiffs also lean heavily on *LULAC* and *Shaw v. Hunt*, 517 U.S. 899, 116 S. Ct. 1894 (1996), for the proposition that a state may not cure a Section 2 violation in one part of the state by drawing a majority-minority district in another part of the state.  But while Plaintiffs correctly characterize this holding, it does not apply in this case.  As *Shaw* makes clear, when a Section 2 violation *is proved for a particular area*, the injuries suffered by these persons are not remedied by creating a performing district elsewhere in the state.  *See* 517 U.S. at 917, 116 S. Ct. 1906; *see also LULAC*, 548 U.S. at 429-31, 126 S. Ct. at 2616-17.   For *Shaw* to be relevant here, Plaintiffs must first prove a Section 2 violation somewhere; by failing to establish the third *Gingles* precondition, they have not done so.

Plaintiffs have not shown that under the redistricting plan implemented by the Florida Supreme Court, white-bloc voting will usually defeat the black-preferred congressional candidate in northeastern Florida.  In fact, what electoral evidence has been provided demonstrates the opposite—that in East-West District 5, the black-preferred candidate will prevail and in Congressional District 10, the black-preferred candidate will likely prevail more often than not.  Because Plaintiffs have not satisfied the third *Gingles* precondition, their Section 2 vote-dilution claim necessarily fails.  We need not, and therefore do not, opine on whether Plaintiffs have satisfied the first *Gingles* precondition.  Defendants are entitled to judgment on Count I of Plaintiffs' Amended Complaint.

**B. Intentional Discrimination Under the Fourteenth and Fifteenth Amendments**

To demonstrate a violation of the Fourteenth and Fifteenth Amendments, Plaintiffs must show that East-West District 5 (1) was adopted with a discriminatory intent or purpose and (2) has led to discriminatory results. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1188-89 (11th Cir. 1999); *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 72 F.3d 1556, 1559-60 & n.3 (11th Cir. 1996). In the context of the Fourteenth Amendment, racial vote dilution is a cognizable discriminatory "result" and is essentially governed by the same standards as a Section 2 vote-dilution claim. *See Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1344-45 (11th Cir. 2000). But the Eleventh Circuit has rejected the idea that vote dilution—as compared with denials of the right to vote or to register to vote—violates the Fifteenth Amendment. *See Osburn v. Cox*, 369 F.3d 1283, 1288 (11th Cir. 2004).

We need not resolve whether Plaintiffs' constitutional claim proceeds under the Fourteenth or Fifteenth Amendment, though, because both require a showing of discriminatory intent that is lacking here. The only evidence that Plaintiffs point to of discriminatory intent is the transcript of a meeting held by Florida Republicans in August or September 2015,[11] where a Florida state representative discussed redistricting following the Florida Supreme Court's decision in *Apportionment VII*. *See* ECF No. 35-3. In that transcript, the state representative and her colleagues discussed the perceived political benefits of an east-west district that encompassed a large black prison population. Specifically, the state representative noted,

> As a perfect storm, you're now reducing the percentage of minorities within that district and you've drawn it in such a fashion that perhaps a majority—or maybe not a majority, but a number of

---

[11] Plaintiffs assert in their Amended Complaint and other filings that this meeting occurred in August 2015 and involved the North Florida Republican Caucus. *See* ECF No. 34-1, ¶ 89; ECF No. 35 at 22. The transcript itself is labeled "Republican Party of Florida Quarterly Meeting" and is dated September 21, 2015. ECF No. 35-3 at 2. Any discrepancy, though, is immaterial to our disposition of this case.

them will live in the prisons, thereby not being able to vote, you can actually—Danny, you, you can be the person that will help get rid of Corinne Brown.

*Id.* at 5:17-:25.  According to Plaintiffs, these comments "indicate that the East-West configuration of District 5 was adopted with an intent to, and it indeed does, deny or abridge the right of black citizens residing in District 5 to vote on account of their race and color."  *See* ECF No. 35 at 22.

Setting aside any admissibility concerns,[12] as offensive as this comment is, the problem with Plaintiffs' reliance on it is that Plaintiffs do not explain how the comments of a single legislator demonstrate a *decision maker's* discriminatory intent—especially when the Florida courts, and not the Florida legislature, ordered the east-west configuration of District 5.  *See Miller v. Johnson*, 515 U.S. 900, 916, 115 S. Ct. 2475, 2488 (1995) ("'[D]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects . . . ." (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979) (omissions and alteration in original)).  The Florida Supreme Court ordered that District 5 be redrawn in an east-west orientation on July 9, 2015—at least a month before Representative Adkins made her comments.  *See Apportionment VII*, 172 So. 3d at 406.

Moreover, the final configuration of District 5 was drawn by legislative staff, isolated from input by Florida legislators, and was identical to the plan known as "Romo Plan A," originally submitted in 2013 by the state-court challengers to the 2012 redistricting plan.  *See Apportionment VIII*, 179 So. 3d at 265-66, 272; *see id.* at 310 (trial court order); *see also* ECF No. 35-1 (Affidavit of Dr. Engstrom) at 5, 25-27, 30-32 (mentioning Romo Plan A), 24 (attested to Apr. 8, 2013).  At

---

[12] No party has raised an objection to consideration of this transcript.

the time that the state-court challengers submitted Romo Plan A, Florida Republicans (such as Adkins) advocated against the plan and were still arguing in favor of a north-south configuration of District 5. Nowhere have Plaintiffs explained how Representative Adkins influenced or took part in the decisions made by the Florida judiciary, the legislative staff, or the state-court plaintiffs. Nor have Plaintiffs argued that the Florida courts were motivated by discriminatory animus. In sum, Plaintiffs have failed to produce evidence that any individual who made a decision with respect to the configuration of East-West District 5 took that particular course of action because of its adverse effects on blacks. As a result, Defendants are entitled to judgment on Plaintiffs' constitutional claims.

### III. HOUSEKEEPING MATTERS

This case necessarily requires us to act on an expedited basis. Florida's deadline for candidates to file papers to run for office in the upcoming election is June 24, 2016. In order to allow time for any appeal of our order, we feel a responsibility to rule on the pending case now. In the normal course of events, after resolving the merits of a complaint, we would enter judgment under Rule 58 and be done with the case. But the Secretary of State has filed an interlocutory appeal of this Court's decision regarding the Secretary's Eleventh Amendment immunity.[13] So we are without jurisdiction to enter judgment in the Secretary's favor.[14] *See Griggs v. Provident*

---

[13] Although no party has advanced this argument here, we note in passing that the Secretary's Eleventh Amendment defense is likely irrelevant to Plaintiffs' Voting Rights Act claim. While the Supreme Court has not squarely addressed the question, we find persuasive the reasoning of the Sixth Circuit in *Mixon v. Ohio*, 193 F.3d 389, 398-99 (6th Cir. 1999), holding that Congress validly abrogated the states' Eleventh Amendment immunity when passing the Voting Rights Act pursuant to its enforcement powers under Section 2 of the Fifteenth Amendment. Nevertheless, because the parties do not frame the issue here, and because Eleventh Amendment immunity is still relevant to Plaintiffs' constitutional discrimination claims, we do not reach the abrogation issue in this case.

[14] Of course, if the Secretary so desires, he may choose to withdraw his appeal, seek remand from the circuit court, or waive his asserted Eleventh Amendment immunity for the limited

*Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *Showtime/The Movie Channel, Inc. v. Covered Bridge Condo. Ass'n*, Inc., 895 F.2d 711, 713 (11th Cir. 1990). Accordingly, this Order serves as an "indicative judgment" with respect to the Secretary, noting that we would enter judgment in the Secretary's favor if the Eleventh Circuit Court of Appeals remanded the case to us. *See* Fed. R. Civ. P. 62.1(a)(3).

Despite the Secretary's appeal, we are nonetheless empowered to enter judgment with respect to the remaining Defendants and deny several pending motions. *See* Fed. R. Civ. P. 62.1(a)(2). Because we have concluded Plaintiffs' claims lack merit, Plaintiffs necessarily cannot demonstrate the "substantial likelihood of success on the merits" that would entitle them to a preliminary injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Accordingly, Plaintiffs' First Amended Motion for Preliminary Injunction, ECF No. 35, is **DENIED**. Furthermore, because we have resolved the merits of this case, the Legislative Parties' Motion to Dismiss, ECF No. 51, and the Intervenors' Motion to Dismiss Plaintiffs'

---

purpose allowing us to enter judgment in this case. *See* Fed. R. App. P. 42(b); Fed. R. Civ. P. 62.1; *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618, 122 S. Ct. 1640, 1643 (2002).

Verified Amended Complaint, ECF No. 54, are each **DENIED AS MOOT**.

      **DONE and ORDERED** this 18th day of April 2016.

ROBIN S. ROSENBAUM
UNITED STATES CIRCUIT JUDGE

s/Robert L. Hinkle
_____
ROBERT L. HINKLE
UNITED STATES DISTRICT JUDGE

s/Mark E. Walker
_____
MARK E. WALKER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of record